IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

PETER TAYLOR,

                              Plaintiff,                    Civil Action No.
          v.                                               9:09-CV-0385 (FJS/DEP)

LT. R. HALLADAY and C.O. R. MILLER,

                              Defendants.

APPEARANCES:

FOR PLAINTIFF:

PETER TAYLOR, *Pro Se*
11967-052
USP Cannon
PO Box 300
Waymart, PA18472

FOR DEFENDANTS:

HON. RICHARD S. HARTUNIAN          CHARLES E. ROBERTS, ESQ.
United States Attorney             Assistant U.S. Attorney
Northern District of New York
P.O. Box 7198
100 S. Clinton Street
Syracuse, New York 13261-7198

DAVID E. PEEBLES
U.S. Magistrate Judge

## REPORT AND RECOMMENDATION

          Plaintiff Peter Taylor, a federal prison inmate, has commenced this

action against two corrections officials employed at the facility in which he was incarcerated at the relevant times, alleging that they violated his civil rights.[1]  Plaintiff alleges that while administratively confined in a prison special housing unit ("SHU") he was exposed to conditions tantamount to cruel and unusual punishment and denied certain personal property and participation in various programs and activities, in violation of the Eighth Amendment as well as his rights to due process and equal protection.  As relief, plaintiff's complaint seeks recovery of compensatory and punitive damages.

In response to plaintiff's complaint defendants have moved for summary judgment dismissing plaintiff's claims on a variety of grounds.  In their motion, which plaintiff has not opposed, defendant argues, *inter alia*, that plaintiff's claims are procedurally barred since he did not exhaust available administrative remedies before bringing suit, and additionally that plaintiff's claims lack merit.

Having carefully considered defendants' arguments, without the benefit of any opposing submission by the plaintiff, I find that plaintiff's

---

[1]    Plaintiff's claims are brought pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S. Ct. 1999 (1971), permitting parties aggrieved by civil rights violations committed by federal employees to bring suit in a federal district court.

claims are procedurally barred based upon his failure to fulfill the requirement of exhausting available administrative remedies, and further that in any event the majority, though not all, of plaintiff's claims are lacking in palpable merit; I therefore recommend dismissal of his complaint without leave to replead.

I.    BACKGROUND[2]

Plaintiff is a federal prison inmate entrusted to the care and custody of the United States Bureau of Prisons ("BOP").  Complaint (Dkt. No. 1) ¶ 2; Magnusson Decl. (Dkt. No. 14-4) ¶ 3.  Between February 7, 2007 and July 24, 2009, plaintiff was designated to the Ray Brook Federal Correctional Institution ("FCI Ray Brook") located in Ray Brook, New York, where the events relevant to his claims occurred.  Complaint (Dkt. No. 1) ¶ 2; Magnusson Decl. (Dkt. No. 14-5) ¶ 4.

From September 25, 2008 until the time of his transfer out of FCI Ray Brook on July 24, 2009, plaintiff was confined in an SHU setting for what he characterizes as administrative detention.  Complaint (Dkt. No. 1) ¶ 9.  While in SHU plaintiff's cell window was covered, thus preventing him

---

[2]        In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

from looking out of the window; plaintiff's complaint, however, does not attribute this circumstance to either of the named defendants. *Id.* ¶ 10.  In addition, plaintiff alleges that defendant Halladay denied plaintiff access to a picture from among his stored property. *Id.*  Plaintiff further contends that while in SHU confinement he was denied recreation on occasion, including on February 25 and 26, 2009, and was not provided with adequate winter clothing for outdoor exercise.[3] *Id.* ¶¶ 11-15, 20.  Plaintiff further asserts that while in SHU confinement at FCI Ray Brook he was not permitted to attend school or religious programs, or to work. *Id.* ¶ 20.

II.   PROCEDURAL HISTORY

Plaintiff commenced this action on April 3, 2009.  Dkt. No. 1. Named as defendants in plaintiff's complaint are Lt. R. Halladay and C.O. R. Miller, both of whom appear to be BOP employees assigned to work at FCI Ray Brook. *Id.*  Plaintiff's complaint's contains a claim of cruel and unusual punishment, in violation of the Eighth Amendment, as well as

---

[3]      Plaintiff's complaint is equivocal regarding the dates on which he was denied recreation.  While plaintiff initially alleges that those denials occurred on February 25 and 26, 2009, at another point in his complaint he references March 25 and 26, 2009, apparently in connection with that denial. *Compare* Complaint (Dkt. No. 1) ¶¶ 13 and 14 *with* Complaint (Dkt. No. 1) ¶ 20.  From the relevant chronology, including the date of his filing of grievance regarding that denial, it appears likely that the denials occurred during February.  It is not necessary, however, to resolve this potential discrepancy in deciding the pending motion.

claims purportedly brought under the Fifth Amendment.  *Id.*

On October 28, 2009, following service of process, defendants moved pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment dismissing plaintiff's complaint.[4]  Dkt. No. 14.  In their motion, defendants argue that 1) plaintiff's claims are barred by virtue of his failure to exhaust available administrative remedies before commencing suit; 2) plaintiff's claim for recovery of compensatory damages is precluded based upon his failure to allege the existence of a physical injury resulting from defendants' actions; and 3) in any event, plaintiff's claims are substantively lacking in merit.  *Id.*  Despite passage of the assigned deadline of November 19, 2009 for responding to defendants' motion, plaintiff has submitted no papers in opposition to the

---

[4]       Defendants have not answered Taylor's complaint in this action.  Unlike its Rule 12(b) dismissal motion counterpart, a summary judgment motion does not automatically stay the requirement of answering a plaintiff's complaint.  *Compare* Fed. R. Civ. P. 12(b)(6) *with* Fed. R. Civ. P. 56.  Despite the lack of a specific rule recognizing such a stay, some courts have deemed the interposition of a pre-answer summary judgment motion as an act of defending in the case, negating a finding of a default, while others have not.  *Compare Rashidi v. Albright,* 818 F. Supp.  1354, 1355-56 (D. Nev. 1993) *with Poe v. Cristina Copper Mines, Inc.,* 15 F.R.D. 85, 87 (D. Del. 1953).  In this instance, exercising my discretion, I will *sua sponte* order a stay of defendants' time to answer plaintiff's complaint until twenty days after a final determination is issued with respect to defendants' motion, in the event that the action survives. *See Snyder v. Goord*, 9:05-CV-01284, 2007 WL 957530, at * 5 (N.D.N.Y. Mar. 29, 2007) (McAvoy, S. J. and Peebles, M. J.).

pending motion, which is now ripe for determination and has been referred

to me for the issuance of a report and recommendation, pursuant to 28

U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c).  *See also* Fed. R. Civ. P.

72(b).

III.    DISCUSSION

    A.    Plaintiff's Failure to Oppose Defendants' Motion

Before turning to the merits of plaintiff's claims, a threshold issue to

be addressed is the legal significance, if any, of his failure to oppose

defendants' summary judgment motion, and specifically whether that

failure automatically entitles defendants to summary judgment dismissing

plaintiff's complaint.

This court's rules provide that

> [w]here a properly filed motion is unopposed and the
> Court determines that the moving party has met its
> burden to demonstrate entitlement to the relief requested
> therein, the non-moving party's failure to file or serve any
> papers as this Rule requires shall be deemed as consent
> to the granting or denial of the motion, as the case may
> be, unless good cause is shown.

N.D.N.Y.L.R. 7.1(b)(3).  Undeniably, *pro se* plaintiffs are entitled to some

measure of forbearance when defending against summary judgment

motions.  *See Jemzura v. Public Serv. Comm'n,* 961 F. Supp. 406, 415

6

(N.D.N.Y. 1997) (McAvoy, C.J.).  The deference owed to *pro se* litigants,

however, does not extend to relieving them of the consequences of Local

Rule 7.1(b)(3).  *Robinson v. Delgado*, No. 96-CV-169, 1998 WL 278264,

at *2 (N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd, M.J.); *Cotto v.*

*Senkowski*, No. 95-CV-1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23,

1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian*, 980 F. Supp.106, 106-

07 (N.D.N.Y. 1997) (Pooler, J. & Hurd, M.J.).[5]  Accordingly, absent a

showing of good cause defendants' unopposed summary judgment

motion should be granted, if determined to be facially meritorious. *See*

*Allen v. Comprehensive Analytical Group, Inc*., 140 F. Supp.2d 229, 231-

32 (N.D.N.Y. 2000) (Scullin, C.J.); *Leach v. Dufrain*, 103 F. Supp. 2d 542,

545-46 (N.D.N.Y. 2000) (Kahn, J.).

It should also be noted that the plaintiff's failure to properly oppose

defendants' summary judgment motion is not without further

consequences.  By failing to submit papers in opposition to their motion,

plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3)

Statement unchallenged, thus permitting the court to deem facts set forth

in that statement of material facts not in dispute to have been admitted

---

[5]     Copies of all unreported decisions cited in this document have been
appended for the convenience of the *pro se* plaintiff.

based upon his failure to properly respond to that statement.[6]  *See Elgamil v. Syracuse Univ.*, No. 99-CV-611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corrs.*, 214 F.3d 275, 292 (2d Cir. 2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).

Based upon plaintiff's failure to oppose defendants' motion, I recommend that the court review the motion for facial sufficiency, accepting defendants' assertions of facts as set forth in their Local Rule 7.1(a)(3) Statement as uncontroverted, and that the motion be granted if determined to be facially meritorious.[7]

B.    Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure.  Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any

---

[6]    Local Rule 7.1(a)(3) provides, in relevant part, that "[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."  *See* N.D.N.Y.L.R. 7.1(a)(3)(emphasis in original).

[7]    In compliance with this court's rules, in their motion papers defendants advised the plaintiff of the potential consequences associated with a failure to respond to the motion.  Dkt. No. 14-6; *see* N.D.N.Y.L.R. 7.1(a)(3), 56.2.

material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion.  *Anderson*, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83.  In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.  Fed.

9

R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511.  Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party.  *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party.  *See Building Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S. Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

C.    Exhaustion of Remedies

As a threshold matter, defendants argue that plaintiff's claims are procedurally barred based upon his failure to exhaust available administrative remedies before commencing suit.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S. Ct. 2378, 2382 (2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007).  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532, 122 S. Ct. 983, 992 (2002) (citation omitted).

In the event a defendant named in such an action establishes that

11

the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal.  *See Pettus v. McCoy*, No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford*, 548 U.S. at 94-95, 126 S. Ct. at 2387-88 (holding that the PLRA requires "proper exhaustion" of available remedies).  "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules."  *Woodford*, 548 U.S. at 95, 126 S. Ct. at 2388; *see also Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007) (citing *Woodford*).[8]

In order to provide an avenue for internal presentment and adjudication of complaints regarding prison conditions, the BOP has implemented an Administrative Remedy Program ("ARP") featuring a four-step process available to inmates for that purpose.  Magnusson Decl. (Dkt. No. 14-5) ¶ 7; *see* 28 C.F.R. § 542, Subpt. B.  The first step of the ARP entails making an effort to obtain an informal resolution of the matter

---

[8]      While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA.  *Macias*, 495 F.3d at 43 (quoting *Johnson v. Testman*, 380 F.3d 691, 697-98 (2d Cir. 2004) (emphasis omitted).

by raising the issue informally to staff.  28 C.F.R. § 542.13(a).  In the event that step does not lead to a successful resolution, the inmate next may submit a formal written Administrative Remedy Request ("ARR") to the warden of the particular facility involved, utilizing a designated form, within twenty days of the relevant event. 28 C.F.R. § 542.14(a).  If the ARR is denied, an appeal may be taken to the appropriate BOP regional director within twenty calendar days of the date of denial.  20 C.F.R. § 542.15(a).  As a fourth step, an unfavorable decision from the regional director may be appealed to the general counsel's office within thirty days of the date on which the regional director rejects the inmate's appeal.  *Id.* Complete exhaustion has not occurred, for purposes of the PLRA, until all of the foregoing steps have been taken.  *See Johnson v. Rowley*, 569 F.3d 40, 45 (2d Cir. 2009).

During the relevant time period, plaintiff availed himself of the ARP on fourteen occasions.  Magnusson Decl. (Dkt. No. 14-5) ¶¶ 8-23.  Eight of those, including Nos. AR 514797-F1, AR 518513-F1, AR 511670-F1, AR 534421-F1, AR 511668-F1, AR 511668-R1 and AR 511668-R2, and AR 541904-R1, are plainly unrelated to the matters referenced in plaintiff's complaint.  Of the remaining six, including Nos. AR 514997-F1, AR

514997-R1, AR 521883-F1, AR 522225-F1, AR 527134-F1, and AR
529858-F1, which could plausibly relate in some way to the claims now
being raised, none were addressed on their merits by the warden at FCI,
nor did they progress through the remaining two steps of the ARP.[9]

Because it is clear from the record now before the court that the
plaintiff did not file and pursue to completion one or more grievances
regarding the matters of which he now claims in this action, his claims are
barred and subject to dismissal on this procedural basis.

D.    Recovery of Compensatory Damages

In their motion defendants also challenge plaintiff's request for an
award of compensatory damages based upon his failure to allege that he
suffered physical injury as a result of the defendants' alleged
constitutional conduct.

Among the measures added in 1996 by the PLRA was one which
provides, in relevant part, that

> [n]o Federal civil action may be brought by a
> prisoner confined in a jail, prison, or other

---

[9]    The only ARR which appears to squarely implicate matters raised in
plaintiff's complaint is AR 5298-58-F1, filed on or about March 12, 2009, in which
plaintiff complained of being denied recreation by a corrections officer within the SHU.
That grievance was rejected on a procedural basis and was not pursued further by the
plaintiff.  Magnusson Decl. (Dkt. No. 14-5) ¶ 21.

> correctional facility, for mental or emotional injury
> suffered while in custody without a prior showing of
> physical injury.

42 U.S.C. § 1997e(e).  Section 1997e(e) includes within its purview

alleged constitutional violations, whether brought pursuant to 42 U.S.C. §

1983, or instead attached in a *Bivens* action such as this. *Thompson v.*

*Carter,* 284 F.3d 411, 417-18 (2d Cir. 2002); *Petty v. Goord,* No. 00

Civ.803, 2002 WL 31458240, at *8-*9 (S.D.N.Y. Nov. 4, 2002).  Under

section 1997e(e), claims brought by inmates for emotional damages

unrelated to any physical injury in civil rights actions are subject to

dismissal.  *Shariff v. Coombe*, No. 96 Civ. 3001, 2002 WL 1392164, at *4

(S.D.N.Y. June 26, 2002).  The absence of physical injury does not totally

bar civil rights claims by inmates, however, since section 1997e(e) does

not preclude claims for nominal damages, punitive damages, or

declaratory or injunctive relief.  *Id.*, at *5 (citation omitted).

Plaintiff's complaint is devoid of any indication that he experienced

physical injury as a result of defendants' conduct. Moreover, in response

to defendants' motion, which asserts the lack of physical injury, plaintiff

has chosen not to respond and controvert that assertion.  Under these

circumstances I recommend dismissal of plaintiff's claim for recovery of

15

compensatory damages on this independent basis.

     E.    Merits of Plaintiff's Claims

     In their motion defendants also maintain that plaintiff's allegations fall short of establishing cruel and unusual punishment or a violation of the Due Process Clause of the Fifth Amendment, and therefore seek dismissal of plaintiff's claims as a matter of law.

     Plaintiff's alleges claims under the Eighth Amendment, which precludes imposition of cruel and unusual punishment.[10]  The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society."  *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S. Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S. Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle*).  While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment

---

     [10]     That amendment provides, in relevant part, that "[e]xcessive bail shall be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S.C. Const. Amend. VIII.

scrutiny.  *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S. Ct. 1970, 1976

(1994) (citing *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S.Ct. 2392,

2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment

must satisfy both an objective and subjective requirement – the conditions

must be "sufficiently serious" from an objective point of view, and the

plaintiff must demonstrate that prison officials acted subjectively with

"deliberate indifference".  *See Leach,* 103 F. Supp.2d at 546 (citing *Wilson*

*v. Seiter*, 501 U.S. 294, 111 S. Ct. 2321 (1991)); *Waldo v. Goord,* No. 97-

CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and

Homer, M.J.); *see also, generally, Wilson*, 501 U.S. 294, 111 S. Ct. 2321.

Deliberate indifference exists if an official "knows of and disregards an

excessive risk to inmate health or safety; the official must both be aware

of facts from which the inference could be drawn that a substantial risk of

serious harm exists, and he must also draw the inference."  *Farmer*, 511

U.S. at 837, 114 S. Ct. at 1978; *Leach*, 103 F. Supp.2d at 546 (citing

*Farmer*); *Waldo*, 1998 WL 713809, at *2 (same).

1.      Recreation

It is well-established the Eighth Amendment protects an inmate's

17

right to exercise.  *Williams v. Goord*, 142 F. Supp.2d 416, 425 (S.D.N.Y.

2001) (citing *Williams v. Greifinger*, 97 F.3d 699, 704 (2d Cir. 1996)).

That right, however, is not limitless, nor does it guaranty an inmate's

ability to participate in all forms of recreation, including congregate

recreational programming.  *Davidson v. Coughlin*, 968 F. Supp. 121, 129

(S.D.N.Y. 1997).  It should be noted, moreover, that occasional, isolated

interruptions or denials of the right to exercise are considered

constitutionally *de minimis*. *See Branham* v. *Meachum*, 77 F.3d 626, 630-

31 (2d Cir. 1996) (finding that keeping inmate on lockdown and "full

restraint" status without outdoor exercise for a period of approximately

twenty-two days does not violate the Eighth Amendment); *Gibson v. City

of New York*, No. 96 CIV. 3409 (DLC), 1998 WL 146688, *3 (S.D.N.Y.

Mar. 25, 1998) (denial of recreation for eight days in a sixty-day period

and the opportunity to exercise on two consecutive days found not

constitutionally actionable); *Young v. Scully,* Nos. 91 Civ 4332, 91 Civ.

4801, 91 Civ. 6769, 1993 WL 88144, at *5 (S.D.N.Y. March 22, 1993)

(holding that Eighth Amendment was not violated when inmate was

deprived of exercise for periods lasting several days); and *Jordan v.

Arnold*, 408 F. Supp. 869, 876-877 (M.D. Pa. 1976) (holding that Eighth

Amendment not violated when inmates confined to special housing unit were allowed two hours of exercise per week).

In this instance no reasonable factfinder could conclude that a two-day denial of recreation, such as that alleged by the plaintiff, gives rise to a claim of cruel and unusual punishment.[11]

### 2.    Adequate Winter Clothing

In his complaint plaintiff also cites defendant Halladay's failure to provide adequate winter clothing for recreation, a matter about which he complained on or about October 1, 2008.  Complaint (Dkt. No. 1) ¶ 11. Exposure to extreme cold as a result of the denial of adequate winter clothing can provide a basis for finding that an Eighth Amendment violation has occurred.  *Wright v. McMann*, 387 F.2d 519 (2d Cir. 1967); *Corselli v. Coughlin*, 842 F.2d 23, 27(2d Cir. 1988) (citing *Wright*). Factors to be considered when determining whether cruel and unusual punishment has resulted from the denial of adequate cold weather clothing include the length of exposure and temperatures experienced.

---

[11]    It appears from plaintiff's complaint that the denial of exercise on February 25, 2009 stemmed from a finding that plaintiff's cell was littered with commissary purchases.  Complaint (Dkt. No. 1) ¶ 13.  It therefore appears that it was within plaintiff's control to qualify for participation in recreation by simply cleaning his cell.

*See, e.g. Gaston v. Coughlin*, 249 F.3d 156, 164-65 (2d Cir. 2001).

Unfortunately, the record is less than fully developed with regard to this issue.  Plaintiff's complaint does not provide an indication of the extent to which the deprivation is alleged to have occurred, and defendants' motion papers are silent with regard to the factual underpinnings of this claim.  At this early procedural juncture, the court is therefore unable to find, as a matter of law, that no reasonable factfinder could conclude that no deprivation of constitutional proportions resulted from the failure to provide the requested clothing.

### 3.    Cell Windows and Personal Photographs

Another component of plaintiff's Eighth Amendment claim is his contention that his Eighth Amendment right against cruel and unusual punishment was violated when his cell window was covered up, precluding his ability to look out of the window.  This is an allegation that falls far short of the type of deprivation that would implicate a "denial of the minimal civilized measure of life's necessities."  *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (internal quotation and citation omitted).  Indeed, a truly *de minimis* deprivation will rarely support a finding of an Eighth Amendment violation.  *See, e.g., Sims v. Artuz*, 230 F.3d 14, 22

(2d Cir. 2000); *Govan v. Campbell*, 289 F. Supp.2d 289, 298 (N.D.N.Y.

2003) (Sharpe, M.J.). Objectively, plaintiff's allegation is not sufficiently

serious, revealing serious risk of harm, to constitute a constitutional

deprivation and support that required element of an Eighth Amendment

violation. *See, e.g., Brown v. McElroy*, 160 F. Supp.2d 699, 706 (S.D.N.Y.

2001) (allegation that plaintiff was kept in a room which was extremely

cold, without clean linens for the bed, toiletries, and clean clothing, found

insufficient to state a constitutional claim); *Mabery v. Keane*, No. 95 Civ.

1093, 1998 WL 148386, at *8 (S.D.N.Y. Mar. 30, 1998) (allegations of

unsanitary conditions of confinement, including nearby running of raw

sewage requiring inmates to breathe the fumes associated with that

burning, found insufficient to state an Eighth Amendment violation);

*Giglieri v. New York City of Dep't of Corrections*, No. 95 CIV 6853, 1997

WL 419250, at *2, 4 (S.D.N.Y. July 25, 1997) (allegation of pre-trial

detainee that he was exposed to second-hand tobacco smoke was

insufficient to state a claim under the Fourteenth Amendment or the

Eighth Amendment); see also *Williams v. Adams*, 143 Fed. App'x 76 (9th

Cir. 2005) (affirming summary judgment dismissing plaintiff's claim that

frosted cell window deprived him of natural light and constituted an Eighth

Amendment violation) (cited in accordance with Fed. R. App. Pr. 32.1).

Accordingly, plaintiff's claim alleging that the window in his cell was

covered fails to state a constitutionally cognizable claim.

Plaintiff's allegation that he was deprived of family photographs

similarly fails to support a constitutional claim. Although far from clear, in

addition to the alleged Eighth Amendment violations plaintiff's complaint

appears to allege claims under the Fifth Amendment; liberally construed, it

seems that he may be asserting that defendants' refusal to allow him to

possess family photographs violated his Fifth Amendment rights. The

Due Process Clause of the Fifth Amendment states that "no person shall

be deprived of life, liberty, or property without due process of law[.]" U.S.

Const. amend. V; *see also Fusco v. Drew*, Civil Action No. 9:05-cv-41,

2007 WL 2227506, at * 2 (Jul. 31, 2007) (Sharpe, D.J. and Homer, M.J.).

"In evaluating due process claims, the threshold issue is always whether

the plaintiff has a property or liberty interest protected by the Constitution."

*Perry v. McDonald*, 280 F.3d 159, 173 (2d Cir. 2001). In the prison

context, it is will established that the alleged destruction or loss of a

plaintiff's personal property will not support a claim redressable under §

1983 if adequate post-deprivation remedies are available. *Hudson v.*

*Palmer*, 468 U.S. 517, 533, 104 S.Ct. 3194 (1984).

Here, however, plaintiff does not allege a destruction or loss of any personal property.  Instead, plaintiff merely claims that he was not permitted access to his personal photographs while in administrative segregation.  As a result, plaintiff's complaint does not allege a claim under the Fifth Amendment for deprivation of property without due process of law.

Similarly, to the extent that plaintiff attempts to state an Eighth Amendment deprivation, he has failed to do so since it cannot seriously be argued that the failure to allow plaintiff to possess personal photographs is tantamount to a denial of life's bare necessities.  *See Hudson*, 468 U.S. at 526-527, 104 S.Ct. at 3200 (holding that the Eighth Amendment imposes the requirement that prisoners receive adequate food, clothing, shelter and medical care); see also *May v. DeJesus*, No.3:06CV1888, 2010 WL 1286800, at *4 (D.Conn. Mar. 30, 2010) (To satisfy the objective prong of an Eighth Amendment conditions of confinement claim, a plaintiff must demonstrate a deprivation of "'the minimal civilized measure of life's necessities,' such as adequate food, clothing, shelter, sanitation, medical care, and personal safety.").

For the foregoing reasons, those portions of plaintiff's complaint premised upon the facts that his cell window was covered and that he was not permitted to have family photographs while in SHU are subject to dismissal as a matter of law.

### 4.    Work, Religious Programs, and Education Courses

In his complaint, plaintiff maintains that as a result of his SHU confinement he has been unable "to attend school, religious programs or work".[12]  Complaint (Dkt. No. 1) ¶ 20.  A prison inmate enjoys no recognized property interest in prison work assignments or programs; accordingly, the alleged denial of such matters cannot support a cognizable due process claim under the Fifth Amendment.  *Johnson v. Rowley*, 569 F.3d at 44.  Moreover, any Eighth Amendment claim based upon such deprivations, fails since the denial of participation in a prison program does not constitute a deprivation that is "objectively, sufficiently

---

[12]    It appears that plaintiff may be mistaken in his statement that because of his administrative confinement he has been denied, education, religious and work privileges.  BOP regulations provide that "[t]he Warden shall give an inmate housed administrative detention the same general privileges given to inmates in the general population.  This includes, but is not limited to, providing an inmate with an opportunity for participation in an education program, library services, social services, counseling, religious guidance, and recreation."  28 C.F.R. § 541.22(d).  In their motion, however, defendants do not submit anything of evidentiary value to demonstrate that this regulation was followed with regard to the plaintiff.

24

serious" so as to deny Taylor "the minimal civilized measure of life's necessities." *See Moore v. New York State Dept. of Corr. Serv.*, 26 Fed. App'x 32, 33 (2d Cir. 2001) (citing *Gaston v. Coughlin*, 249 F.3d at 164) (cited in accordance with Fed. R. App. Pr. 32.1); *see also Toney v. Goord*, No. 04-CV-1174, 2006 WL 2496859, at *8 n.3 (N.D.N.Y. Aug. 28, 2006) (McAvoy, S.J. and Treece, M.J.) (finding no constitutional right to participate in drug treatment program) (citations omitted).  For these reasons, to the extent plaintiff's Fifth or Eighth Amendment claims are based upon such allegations, they too are subject to dismissal.

The one allegation that does give room for pause is that regarding religious programming.  While plaintiff has not asserted a claim under the First Amendment, that provision guaranties the right of inmates, including those in SHU confinement, a reasonable accommodation in order to practice their chosen religions.  *Cruz v. Beto*, 405 U.S. 319, 321 n.2, 92 S.Ct. 1079, 1081 n.2 (1972) .  In this instance, were it not for the procedural deficiency based upon plaintiff's failure to exhaust administrative remedies, I would recommend that plaintiff be permitted to amend his complaint to assert a First Amendment cause of action, if

desired, based upon this allegation.[13]   Nonetheless, I would also

recommend dismissal of plaintiff's Fifth and Eighth Amendment claims

based upon the alleged deprivation of his right to attend educational and

work programs.[14]

_____

[13]     Plaintiff's allegations regarding the denial of access to religious
programming could also potentially support a claim under the Religious Land Use and
Institutionalized Persons Act of 2000 ("RLUIPA"), which provides, in pertinent part, that

> [n]o government shall impose a substantial burden on the
> religious exercise of a person residing in or confined to an
> institution . . . . even if the burden results from a rule of
> general applicability, unless the government demonstrates
> that imposition of a burden on that person – 1) is in
> furtherance of a compelling governmental interest; and 2) is
> the least restrictive means of furthering that compelling
> governmental interest.

42 U.S.C. § 2000cc-1(a).  The familiar principles which inform the analysis of plaintiff's
free exercise claim are similar to those applicable to the potential RLUIPA cause of
action, although the two claims are analyzed under somewhat different frameworks,
*see Salhuddin v. Goord,* 467 F.3d at 264.

[14]     Plaintiff's complaint also alleges that he was treated differently than
inmates who were not in administrative segregation.  To the extent that plaintiff
attempts to allege a violation of his right to equal protection, his claim must fail.  "The
Equal Protection Clause of the Fourteenth Amendment commands that no State shall
'deny to any person within its jurisdiction the equal protection of the laws,' which is
essentially a direction that all persons similarly situated should be treated as alike."
*City of Cleburne, Tx. v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S. Ct. 3249, 3254
(1985) (citation omitted).  The Equal Protection Clause, however, does not forbid all
classifications.  *Curtis v. Pataki*, No. 96-CV-425, 1997 WL 614285, at *3 (N.D.N.Y Oct.
1, 1997) (Pooler, J. and DiBianco, M.J.) (citing *Nicholas v. Tucker*, 114 F.3d 17, 20 (2d
Cir.1997)).   Unless either a fundamental right is implicated or a distinction is created
that burdens a suspect class, defendants need only demonstrate that their challenged
actions were rationally related to a legitimate government interest.  *Id.* (citations
omitted).  Inmates are not a suspect classification; therefore, prison administrators,
when making classifications, "'need only demonstrate a rational basis for their
distinctions.'"  *Hameed v. Coughlin*, 37 F. Supp.2d 133, 137 (N.D.N.Y. 1999) (Kahn, J.
& Sharpe, M.J.) (citing *Jones v. North Carolina Prisoners' Union, Inc.*, 433 U.S. 119,

IV.   SUMMARY AND RECOMMENDATION

Plaintiff's claims in this action are barred by virtue of his failure to file and process to completion grievances regarding the matters giving rise to the claims set forth in his complaint.  Plaintiff's request for recovery of compensatory damages is also precluded based upon his failure to allege the existence of physical injury suffered as a result of defendants' conduct.

Turning to the merits of plaintiff's complaint, I find that while certain of plaintiff's claims, including those predicated upon the denial of recreation and participation in certain programs, the covering of his cell window, the denial of a photograph, and the deprivation of equal protection fail to state cognizable constitutional claims, plaintiff's claim

_____

134, 97 S.Ct. 2532 (1977)); *Nicholas*, 114 F.3d at 20.

Plaintiff's putative equal protection claim against the defendants is stated in wholly conclusory and speculative terms.  *See, e.g., Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987) ("complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning").  As a matter of law, plaintiff fails to establish the existence of a suspect classification.  Instead, plaintiff merely alleges that defendants distinguished between two groups of similarly situated inmates – inmates who were in administrative segregation and those who were not, a distinction that is patently insufficient to state a claim under the Equal Protection Clause.  *See Smith v. Fischer*, No. 9:07-CV-1264, 2009 WL 632890, at * 10 and n.29 (N.D.N.Y. Feb. 2, 2009) (Lowe, M.J.), Report and Recommendation Adopted by 2009 WL 5449125 (N.D.N.Y. Mar. 9, 2009) (Hurd, D.J.).  In any event, moreover, it has been recognized that a rational basis exists for treating inmates confined in administrative segregation differently than other inmates.  *Hameed*, 37 F.Supp.2d at 137.

regarding the denial of access to religious programs cannot be resolved as a matter of law at this early juncture based upon the record now before the court.[15]

Based upon the foregoing, it is hereby

RECOMMENDED, that defendants' motion for summary judgment (Dkt. No. 14) be GRANTED, and that plaintiff's complaint be DISMISSED in its entirety based upon his failure to exhaust available administrative remedies before commencing suit.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

---

[15]      In light of my determination with respect to the issue of exhaustion and the merits of plaintiff's claims, I have declined to address defendants' assertion that plaintiff's claims are precluded by the doctrine of qualified immunity.

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:      July 1, 2010
            Syracuse, NY



Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

H  Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Shawn Michael SNYDER, Plaintiff,
v.
Glenn S. GOORD, et al., Defendants.
**Civil Action No. 9: 05-CV-01284.**

March 29, 2007.

Shawn Michael Snyder, Pro Se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, Christopher W. Hall, Esq., Assistant Attorney
General, of counsel, Albany, NY, for Defendants.

### DECISION & ORDER

THOMAS J. McAVOY, Senior United States District
Judge.

**\*1** This *pro se* action brought pursuant to 42 U.S.C. §
1983 was referred to this Court to the Hon. David E.
Peebles, United States Magistrate Judge, for a
Report-Recommendation pursuant to 28 U.S.C. § 636(b)
and Local Rule N.D.N.Y. 72.3(c). The Report,
Recommendation and Order dated February 27, 2007
recommended

that defendants' motion for summary judgment
dismissing plaintiff's complaint (Dkt. No. 20) be
GRANTED, in part, and that plaintiff's legal mail claim
be DISMISSED in its entirety, and further that all
remaining claims be DISMISSED as against defendants
Goord, Roy, Plescia and Miller, but that it otherwise be
DENIED, and that the matter proceed with regard to
plaintiff's constitutional claims against defendants

Whittier and Funnye based upon events occurring at the
Washington Correctional Facility.

Rep., Rec. & Ord., p. 33.

Plaintiff and Defendants have filed objections to the
Report-Recommendation. When objections to a magistrate
judge's Report-Recommendation are lodged, the Court
reviews the record *de novo. See* 28 U.S.C. § 636(b)(1).
After such a review, the Court may "accept, reject, or
modify, in whole or in part, the findings or
recommendations made by the magistrate [judge]. The
[Court] may also receive further evidence or recommit the
matter to the magistrate [judge] with instructions." *Id.*

Having reviewed the record *de novo* and having
considered the issues raised in the objections, this Court
has determined to accept and adopt the recommendation
of Magistrate Judge Peebles for the reasons stated in the
February 28, 2007 Report-Recommendation with one
modification as set forth below.

In this regard, it is hereby

**ORDERED** that Defendants' motion for summary
judgment [dkt. No. 20] is **GRANTED in part and
DENIED in part.** Plaintiff's legal mail claim is
**DISMISSED in its entirety.** Further all remaining claims
against Defendants Goord, Roy, Plescia and Miller are
**DISMISSED.** The motion is denied with regard to
Plaintiff's constitutional claims against Defendants
Whittier and Funnye based upon events occurring at the
Washington Correctional Facility, but Defendants are
**granted leave to renew** the motion following a period of
discovery. Accordingly, Defendants may assert in their
renewed motion, should they decide to file one, that
Plaintiff failed to exhaust his administrative remedies by
failing to promptly file a grievance once at Groveland
Correctional Facility.

**IT IS SO ORDERED.**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

*REPORT, RECOMMENDATION AND ORDER*

DAVID E. PEEBLES, U.S. Magistrate Judge.

Plaintiff Shawn Michael Snyder, an openly gay New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983 to complain principally of a series of occurrences which he attributes to his sexual orientation, including harassment by prison workers and fellow inmates and, in one instance, an assault by a corrections officer. Plaintiff's complaint, which is comprehensive, asserts constitutional claims under the First, Fourth, Eighth and Fourteenth Amendments arising out of those incidents as well as his apparently unsuccessful efforts to contact the National Gay and Lesbian Task Force to elicit that agency's assistance.

*2 In lieu of answering his complaint, defendants have instead moved for summary judgment dismissing plaintiff's claims based upon his failure to exhaust available administrative remedies before commencing suit and, in the case of some of the defendants and one entire claim, plaintiff's failure to allege and establish their personal involvement in the constitutional deprivations at issue. For the reasons set forth below I recommend that plaintiff's claims against defendants Goord, Roy, Miller and Plescia, as well as his cause of action for alleged interference with his legal mail, be dismissed on the basis of a lack of sufficient personal involvement in the constitutional violations alleged. Finding the existence of a genuine issue of material fact surrounding plaintiff's efforts to exhaust administrative remedies, however, I recommend that the portion of defendants' motion seeking dismissal of plaintiff's remaining claims on this procedural basis be denied.

I. *BACKGROUND* [FN1]

FN1. The vast majority of the information serving as a backdrop for the court's decision is drawn from plaintiff's complaint which, as notarized, qualifies as a functional equivalent of an affidavit for purposes of the pending motion. 28 U.S.C. § 1746 (1994); Fed.R.Civ.P. 56(e);

*Franco v. Kelly,* 854 F.2d 584, 587 (2d Cir.1998) (citations omitted); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir .1995); *Yearwood v. LoPiccolo,* No. 95 CIV. 2544, 1998 WL 474073, at *5-*6 & n. 2 (S.D.N.Y. Aug. 10, 1998); *Ketchmore v. Gamache,* No. 96 CIV. 3004, 1997 WL 250453, at *4 n. 1 (S.D.N.Y. May 12, 1997). As required, for the purpose of analyzing defendants' arguments I have drawn all inferences, and resolved any ambiguities, in favor of the plaintiff, as the non-moving party. *See Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997).

Plaintiff, who at the times relevant to his claims was a prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS"), has over time been confined in various DOCS facilities. Complaint (Dkt. No. 2) at 2. The bulk of plaintiff's claims were precipitated by events which transpired while he was housed in the Washington Correctional Facility ("Washington") although, as will later be seen, certain of the occurrences which followed his transfer out of Washington and ultimately into the Groveland Correctional Facility ("Groveland") are relevant to some of his claims, as well as to the issue of whether he properly exhausted available administrative remedies before commencing this action. *Id.; see also* O'Brien Aff. (Dkt. No. 20) ¶ 4. The plaintiff is gay, a fact which according to him was common knowledge within Washington during the time of his confinement within that facility. Complaint (Dkt. No. 2) ¶ 2.

The circumstances giving rise to plaintiff's centerpiece claim date back to May of 2005, when he was transferred from another location within Washington into the prison's B-2 housing dormitory. Complaint (Dkt. No. 2) ¶ 1. Immediately following that transfer Snyder began to experience verbal threats and abuse, attributed by the plaintiff to his sexual orientation, at the hands of defendant Whittier, a corrections officer. *Id.* ¶ 1. According to Snyder the abuse spread, fueled by encouragement from defendant Whittier, resulting in harassment from fellow inmates, who engaged in a variety of abusive and hostile acts which included the throwing of trash, objects, debris and body fluids at him. *Id.* ¶¶ 2-27.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

Defendant Whittier's ongoing harassment of the plaintiff
led to a confrontation between the two on June 1, 2005,
during the course of which Snyder was physically
assaulted by the officer, who thrust his elbow and forearm
into plaintiff's throat, forcing him to the floor. *Id.* ¶¶
24-36. Once plaintiff was on the floor, defendant Whittier
placed his knees on Snyder's middle back area and neck,
and pulled his left arm up behind his back. *Id.* Toward the
end of the encounter defendant Whittier pulled the
plaintiff up by his arm and hair and dragged him out of the
area, pushing him into a wall and punching his kidney area
several times in the process. *Id.* ¶¶ 33-39.

**\*3** On June 3, 2005 plaintiff was treated for injuries
sustained during the encounter with Corrections Officer
Whittier, and was transferred into the E-1 dormitory
within Washington. Complaint (Dkt. No. 2) ¶¶ 47, 51.
While housed in that unit Snyder was approached and
advised by several inmates that they had been encouraged
by other inmates, as well as by defendant Whittier, to
assault him. *Id.* ¶¶ 51-54.

Plaintiff was again transferred within Washington on or
about June 20, 2005, on this occasion having been
re-assigned to the D-1 housing dormitory. Complaint (Dkt.
No. 2) ¶ 57. While residing within that unit, plaintiff had
his locker broken into and some of his personal property
stolen, an event for which he blames fellow inmates. *Id.* ¶¶
70.

Out of concern over reprisals which could result from his
taking such action, plaintiff did not file a formal grievance
regarding the assault by Corrections Officer Whittier while
at Washington. Complaint (Dkt. No. 2) ¶¶ 51-54. As
justification for that fear, plaintiff cites defendant
Whittier's reported efforts to have him harmed by other
inmates following his transfer out of the dormitory to
which Whittier was assigned. *Id.* Plaintiff did, however,
take other steps while at Washington to lodge complaints
regarding defendant Whittier's actions. After earlier
complaints registered verbally to other prison employees,
including Corrections Officers Funnye and Graves, went
unaddressed, *see* Complaint (Dkt. No. 2) ¶¶ 21, 42,
plaintiff sent a letter dated July 7, 2005 to Corrections
Lieutenant Greene, complaining of the assault by
defendant Whittier and expressing fear of retribution at the
hands of that corrections officer; a copy of that letter was

forwarded by Snyder to Corrections Lieutenant
Hopkins.[FN2] Complaint (Dkt. No. 2) ¶ 60 & Exh. 1. Five
days later, apparently precipitated by his letter to
Lieutenant Greene, plaintiff was asked by Corrections
Sergeant Belden to provide a formal, written statement
regarding the assault, and was taken by Sergeant Belden
to the prison infirmary for a medical evaluation.
Complaint (Dkt. No. 2) ¶ 61.

> [FN2.] Plaintiff's complaint does not provide
> specifics regarding the official positions of
> Lieutenants Greene and Hopkins including,
> notably, whether either could properly be
> characterized as Corrections Officer Whittier's
> supervisor, nor does he indicate whether those
> individuals were officially designated by prison
> officials at Washington to receive inmate
> complaints regarding the actions of corrections
> workers.

On July 14, 2005, plaintiff was transferred temporarily
into the Great Meadow Correctional Facility, where he
was interviewed on the following day by defendant Miller,
an Assistant Deputy Inspector General for the DOCS,
regarding the alleged assault by defendant Whittier.
Complaint (Dkt. No. 2) ¶¶ 62-64. During that session,
defendant Miller advised Snyder that he had been
transferred out of Washington for his safety, and that in
light of his sexual orientation and the significant
probability that similar acts would recur in the future, his
contemplated transfer into the Greene Correctional
Facility had been rescinded, and instead he would be
moved "West and closer to home [.]" *Id.* ¶ 66. Later that
day, plaintiff was transferred into the Groveland
Correctional Facility. *Id.* ¶ 67.

Plaintiff reiterated his interest in pursuing his claims
against Corrections Officer Whittier by letter dated July
22, 2005 sent to Investigator Miller. Complaint (Dkt. No.
2) Exh. 3. Despite sending subsequent written
communications to defendant Miller and others, however,
as of the time of commencement of this action plaintiff
still had not been apprised of the status of the Inspector
General's investigation into his allegations regarding
Corrections Officer Whittier. *Id.* ¶¶ 67-69; *see also*
Complaint (Dkt. No. 2) Exhs. 9, 17.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

**\*4** On August 24, 2005, while at Groveland, plaintiff filed a formal grievance regarding the physical assault involving Corrections Officer Whittier. Complaint (Dkt. No. 2) ¶ 76 and p. 60, ¶ B. That grievance was rejected, however, based upon the fact that it was filed beyond the fourteen day deadline for initiating such grievances, and did not recite any mitigating circumstances which would provide a ground for overlooking its lateness. [FN3] *Id.; see also* O'Brien Aff. (Dkt. No. 20) ¶ 8 & Exh. 2; Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 22) ¶ 27. Plaintiff did not appeal that determination, or any other grievance alleging harassment, excessive force, or other similar claims arising out of events at Washington, to the Central Officer Review Committee ("CORC"). Eagan Aff. (Dkt. No. 20) ¶¶ 5-6.

> **FN3.** DOCS Directive 4040, which governs the filing of inmate grievances, permits an Inmate Grievance Program Supervisor ("IGPS") to permit the late filing of grievances when presented with "mitigating circumstances." *See* O'Brien Aff. (Dkt. No. 20) ¶ 12.

On August 19, 2005 plaintiff endeavored to send a letter to the National Gay and Lesbian Task Force seeking the assistance of that organization; claiming that it qualified as legal mail, Snyder attempted to forward that communication without paying for postage. Complaint (Dkt. No. 2) ¶ 71. Prison officials rejected plaintiff's efforts, however, concluding that the communication did not fall within the prevailing definition of legal mail, and returned it to the plaintiff on August 22, 2005. *Id.* Plaintiff thereafter resent the letter on August 23, 2005, with proper postage affixed. *Id.* ¶ 72. The letter was later returned to the plaintiff on September 2, 2005, marked as "undeliverable". *Id.* ¶ 73. When the letter was returned plaintiff found that it had been opened, apparently by personnel within the Groveland mailroom. *Id.*

On August 29, 2005 plaintiff filed a grievance at Groveland seeking, as relief, a determination that the National Gay and Lesbian Task Force constituted a legal entity and that, as such, he should be permitted to send and receive correspondence from that organization as "legal mail". *Id.* ¶ 74 & Exh. 16. Plaintiff's grievance was denied at the local level, including by the facility superintendent, and that unfavorable determination was upheld on appeal

to the CORC. *Id.* ¶ 75 & Exh. 16.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on or about September 27, 2005. [FN4] Dkt. No. 2. Named as defendants in Snyder's complaint are DOCS Commissioner Glenn S. Goord; Richard Roy, the DOCS Inspector General; Assistant Deputy Inspector General Mark Miller; James Plescia, the Superintendent at Washington; and Corrections Officers Whittier and Funnye. *Id.* Plaintiff's complaint asserts a variety of claims growing out of the events at Washington and Groveland, alleging deprivation of his rights under the First, Fourth, Eighth and Fourteenth Amendments to the United States Constitution, as well as a host of pendent state statutory and common law claims. [FN5] As relief, plaintiff seeks both the entry of an injunction and awards of compensatory and punitive damages.

> **FN4.** This action was initially filed in the United States District Court for the Western District of New York, but was transferred here by order issued by District Judge David G. Larimer on September 29, 2005. *See* Dkt. No. 4.

> **FN5.** Plaintiff's complaint, which is comprised of seventy-two typewritten pages and several attached exhibits, is not lacking in detail. Despite its refreshing clarity, however, plaintiff's complaint is in many respects repetitive and fails to comply with the governing provisions of the Federal Rules of Civil Procedure which require, *inter alia,* that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed.R.Civ.P. 8(a). This requirement is more than merely technical, and instead is designed to permit a responding party and the court to accurately gauge the allegations of a complaint and permit the issues in a case to be properly framed. *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 103 (1957); *Phillips v. Girdich,* 408 F.3d 124, 127-29 (2d Cir.2005); *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988); *In re Ferro Corp. ERISA Litig.,* 422 F.Supp.2d 850, 857 (N.D.Ohio 2006); *Rashidi v. Albright,* 818 F.Supp. 1354,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if "it might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson).* A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than merely "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary

judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict.").

C. *Failure to Exhaust Administrative Remedies*

**\*7** In their motion defendants assert that plaintiff's harassment and assault claims growing out of events which occurred at Washington are procedurally barred, based upon his failure to file and pursue to completion a timely grievance relating to those claims. Plaintiff responds by asserting that his failure to file a grievance regarding the matter while at Washington was the product of his fear of retaliation, and further argues that the requirement of exhaustion should be excused based upon the fact that his claims were, in fact, investigated by the DOCS Inspector General.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), altered the inmate litigation landscape considerably, imposing several restrictions on the ability of prisoners to maintain federal civil rights actions. One such restriction introduced by the PLRA requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that the "PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992 (2002). The PLRA's exhaustion requirement thus applies to plaintiff's excessive force claims absent a finding of sufficient basis to find that plaintiff's failure to exhaust was justified or should be excused. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006).

New York prison inmates are subject to an Inmate Grievance Program established by the DOCS, and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* No. 96 CV 5396, 2004 WL 324898, at \*4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2003) and *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999)). The New

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

York Inmate Grievance Program consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within fourteen days of the incident.[FN7] 7 N.Y.C.R.R. § 701.7(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. 7 N.Y.C.R.R. § 701.7(a). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. Id. § 701.7(b). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the Central Office Review Committee ("CORC"), which makes the final administrative decision. Id. § 701.7(c). Absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in federal court. Reyes v. Punzal, 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing, inter alia, Sulton v. Greiner, No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

FN7. The Inmate Grievance Program supervisor may waive the timeliness of the grievance submission due to "mitigating circumstances." 7 N.Y.C.R.R. § 701.7(a)(1).

*8 The record before the court confirms Snyder's awareness of New York's IGP. Plaintiff in fact grieved the failure of prison officials at Groveland to treat his correspondence with the National Gay and Lesbian Task Force as legal mail and unsuccessfully pursued that grievance through to a determination by the CORC. Accordingly-and defendants do not argue otherwise-plaintiff has fulfilled his obligation to exhaust administrative remedies with regard to his legal mail claim before commencing this action.

Distinctly different circumstances obtain with regard to plaintiff's claims of the use of excessive force and harassment by prison officials and fellow inmates. While plaintiff did file a grievance regarding those matters, the grievance was rejected as untimely, and that determination was neither appealed to the CORC, nor did plaintiff commence a second grievance challenging the untimeliness rejection, a course which was apparently available to him under the IGP.[FN8]

FN8. Although there is no need to address this argument since plaintiff failed to pursue the matter through to the CORC, he had done so with regard to the excessive force and harassment grievance filed at Groveland, he nonetheless would have failed to satisfy the PLRA's exhaustion requirement since, as the Supreme Court has now made clear, the filing and pursuit to completion of an untimely grievance does not satisfy the Act's exhaustion requirement. Woodford v. Ngo, --- U.S. ----, 126 S.Ct. 2378, 2382 (2006).

This is not to say that plaintiff cannot be said to have exhausted available administrative remedies. It should be noted that the three tiered IGP set forth in the controlling regulations does not describe the sole method for a New York State prison inmate to complain of prison conditions including, notably, the use of excessive force. Heath v. Saddlemire, No. 9:96-CV-1998, 2002 WL 31242204, at *4 (N.D.N.Y. Oct. 7, 2002). Indeed, the IGP regulations themselves provide that the three tiered mechanism " 'is intended to supplement, not replace, existing formal or informal channels of problem resolution.' " Id. (quoting 7 N.Y.C.R.R. § 701.1(a)). One of those alternative methods is a process for informal, expedited review of allegations of harassment by prison officials. 7 N.Y.C.R.R. § 701.11; Perez, 195 F.Supp.2d at 543. In this instance, an issue of fact exists surrounding whether plaintiff complied with section 701.11 by submitting a letter regarding Corrections Officer Whittier's actions to Lieutenant Greene. See Perez, 195 F.Supp.2d at 543.

Even assuming that plaintiff's efforts to address Corrections Officer Whittier's actions by writing to Lieutenant Green did not suffice to exhaust available remedies, the court must determine whether there is a basis to overlook this deficiency and permit the plaintiff to nonetheless proceed with his excessive force and harassment claims. The situations under which courts have excused an inmate's failure to comply with the IGP's three tier system generally one or more of the categories, including when 1) administrative remedies are not in fact available to the prisoner; 2) the defendants have either waived the defense or engaged in conduct which should estop them from raising it; and 3) other special circumstances, including a reasonable misunderstanding of the grievance procedure, which justify the inmate's failure

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

to comply with the applicable administrative procedural requirements.[FN9] *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004); *see also Ruggiero,* 467 F.3d at 175 (citing *Hemphill* ). If the court deems any of these three categories applicable, then plaintiff's claims may be considered exhausted and should not be dismissed.[FN10] *Hemphill,* 380 F.3d at 690-91.

> FN9. As this case aptly illustrates, many of the typical fact patterns presented in cases involving an inmate's failure to exhaust do not fit neatly into any single category, but instead may overlap into two, or potentially even all three, of the groupings identified in *Hemphill.* See *Giano v. Goord,* 380 F.3d 670, 677 n. 6. This fact may well account for a blurring of these categories in a large share of Second Circuit PLRA cases. *Id.*

> FN10. Relying upon case law which has since been supplanted in light of the Supreme Court's contrary decision in *Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983 (2002), plaintiff argues that he was not required to exhaust administrative remedies in light of the nature of his claim. The case upon which Snyder principally relies, however, *Lawrence v. Goord,* 238 F.3d 182 (2d Cir.2001), has since been vacated, 535 U.S. 901, 122 S.Ct. 1200 (2002), and the Court has now made it clear in *Porter* that PLRA's exhaustion requirement applies to "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532, 122 S.Ct. at 992; *Ruggiero,* 380 F .3d at 173 (citing *Porter* ). The contention implicit in plaintiff's argument, to the effect that his reliance upon pre-*Porter* case law as a basis for not filing a formal grievance was appropriate, citing *Rodriguez v. Westchester County Jail Correctional Dept.,* 372 F.3d 485 (2d Cir.2004), is misplaced, since *Porter* was decided some three years prior to the events at issue.

1. *Availability Of Administrative Remedies*

*9 Under certain circumstances the behavior of prison officials may have the legal affect of rendering administrative remedies functionally unavailable. *Abney v. McGinnis,* 380 F.3d 663, 667 (2d Cir.2004). In such cases, the finding that the three tiered IGP was open to the plaintiff inmate does not necessary end the inquiry. *Hemphill,* 380 F.3d at 686-88. Like the plaintiff in *Hemphill,* Snyder argues that he was deterred from filing a grievance while at Washington in light of threats made against him, principally by Corrections Officer Whittier. As was also the situation in *Hemphill,* however, plaintiff did avail himself of other avenues of recourse including to write a letter of complaint to a corrections lieutenant, thereby potentially signaling that his claims of fearing retribution are less than genuine.

When, as in this case, an inmate asserts that his or her resort to the grievance process was deterred based upon conduct such as threats by prison officials, the question of whether a sufficient basis to negate a finding of "availability" has been established entails an objective inquiry, focusing upon whether " 'a similarly situated individual of ordinary firmness' [would] have deemed them available." *Id.* at 688 (citing *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)). Plaintiff's complaint and papers in opposition to defendants' motion, in which he asserts that his fears of retribution were based in part upon defendant Whittier's reported efforts to have him harmed by other inmates following his transfer out of the dormitory to which he had been assigned, raises genuine issues of material fact in connection with the objective test to be applied under *Hemphill,* thus precluding the entry of summary judgment.

Urging the court to disregard the strictures associated with evaluation of a summary judgment motion and to proceed to assess plaintiff's credibility, in reliance upon the Second Circuit's decision in *Jeffreys v. City of New York,* 426 F.3d 549, 555 (2d Cir.2005) (characterizing plaintiff's version of the events as so wholly credible that no reasonable jury could believe it), defendants contend that plaintiff's claimed fear of retribution does not suffice under *Hemphill* to serve as a counterweight to the availability of the IGP in New York. I recommend that the court decline defendants' invitation to assure the role of factfinder, and instead find that plaintiff's assertion that he feared reprisal is sufficient to raise a genuine issue of material fact regarding whether administrative remedies were available

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

to him.

2. *Waiver and Estoppel*

Since defendants have raised exhaustion of remedies, an affirmative defense, at the earliest available opportunity, they have not waived the defense. The circumstances now presented, however, do provide a basis upon which an estoppel could potentially be predicated.

Prison officials may be estopped from defending against an inmate civil rights action based upon the plaintiff's failure to exhaust available administrative remedies, including when "(1) an inmate was led to believe by prison officials that his alleged incident was not a 'grievance matter' and assured that his claims were otherwise investigated ... (2) an inmate makes a 'reasonable attempt' to exhaust his administrative remedies, especially where it is alleged that corrections officers failed to file the inmate's grievances or otherwise impeded or prevented his efforts, and (3) the state's time to respond to the grievance has expired." *Martinez v. Williams,* 349 F.Supp.2d 677, 683 (S.D.N.Y.2004) (citing and quoting, *inter alia, O'Connor v. Featherston,* No. 01 Civ. 3251, 2002 WL 818085, at *2-*3 (S.D.N.Y. Apr. 29, 2002)). Thus, for example, a defendant who fails to forward an inmate's complaint to a grievance officer in a timely manner may be estopped from invoking the defense. *Hemphill,* 380 F.3d at 688-89. Similarly, an estoppel may be found where a defendant's use of force or threats inhibit an inmate's ability to utilize grievance procedures. *Ziemba v. Wezner,* 366 F.3d 161, 162-64 (2d Cir.2004).

*\*10* In this instance there is a potential basis for finding an estoppel. Plaintiff's complaints against Corrections Officer Whittier were the subject of an investigation by the DOCS Inspector General, a fact of which the plaintiff was keenly aware. Plaintiff's apparent belief that this investigation obviated the need for him to file a grievance regarding the issue was in all likelihood fortified when, in response to his grievance filed at Groveland, he was advised by the IGP Supervisor at that facility that if the matter had previously been brought "to some administration's attention [,] ... it is not necessary to have this matter readdressed." *See* Complaint (Dkt. No. 2) Exh. 12. This response may well have dissuaded the plaintiff from

pursuing the matter further, including to press his otherwise untimely grievance to the CORC or to attempt to convince officials at Groveland that mitigating circumstances existed to accept his otherwise untimely grievance. *See* 7 N.Y.C.R.C. § 701.7(a)(1). Accordingly, in my view a reasonable factfinder could conclude that defendants should be estopped from asserting a defense based upon failure to exhaust.[FN11]

> [FN11.] It should be noted that fear of retribution can also provide a basis for finding that a defendant should be estopped from asserting failure to exhaust as a defense. *See Hemphill,* 380 F.3d at 688-89.

3. *Special Circumstances*

The third category of circumstances under which an inmate's failure to exhaust may be excused was addressed by the Second Circuit in *Giano v. Goord,* 380 F.3d 670 (2d Cir.2004). In *Giano,* the court rejected the concept of a categorical statement regarding the "special circumstances" exception, instead, determining that the court should "[look] at the circumstances which might understandably lead usually uncounselled prisoners to fail to grieve in the normally required way." 380 F.3d at 678.

Defendants claim that plaintiff has not shown special circumstances which might explain why his grievance was late. Plaintiff counters that he should be entitled to the benefit of this special circumstances exception for two reasons. First, Snyder again asserts that his failure to file a grievance was motivated out of fear of retribution, based upon his efforts to seek review of the matter by the Inspector General's office. Additionally, plaintiff notes that his complaint regarding Corrections Officer Whittier was the subject of at least one letter to prison officials, resulting in an investigation by the DOCS Inspector General. Such efforts can provide a basis for finding exhaustion notwithstanding the technical failure of a prisoner to avail himself or herself of the three tiered IGP set forth in the governing regulations. *See Heath,* 2002 WL 31242204, at *4-*5; *Perez,* 195 F.Supp.2d at 545-46; *see also Marvin v. Goord,* 255 F.3d 40, 43 n. 3 (2d Cir.2001) ("Resolution of the matter through informal channels satisfies the exhaustion requirement, as, under

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

the administrative scheme applicable to New York prisoners, grieving through informal channels is an available remedy."). In order to avail himself of this exception, however, plaintiff must demonstrate that his informal complaints led to a favorable resolution in communication with his charges of misconduct. *Thomas v. Cassleberry,* 315 F.Supp.2d 301, 304 (W.D.N.Y.2004) (rejecting plaintiff's argument that defendants' motion for summary judgment for failure to exhaust should be denied because although plaintiff complained to the Inspector General's Office, there were no allegations that his complaints resulted in a favorable resolution); *Grey v. Sparhawk,* No. 99 CIV. 9871, 2000 WL 815916, at *2 (S.D.N.Y. June 23, 2000) (complaint filed directly with the Inspector General found insufficient to fulfill exhaustion requirement); *cf. Giano,* 380 F.3d at 679 (finding that plaintiff's attempt to expose allegedly retaliatory behavior during a disciplinary hearing which centered upon the same retaliatory act which he complains provided a basis to find justification for plaintiff's failure to exhaust). While plaintiff is unable to make this claim, it is purely the product of the failure of prison officials to notify him of the results of the Inspector General's investigation despite his written requests for this information. I am therefore unable to state with certainty that plaintiff is not entitled to the benefit of the special circumstances exception to the PLRA's exhaustion requirement.

*11 In sum, applying the tripartite test announced in the Second Circuit's August, 2004 collection of exhaustion cases and their progeny, I find genuine issues of fact including summary judgment on the issue of plaintiff's alleged failure to exhaust available administrative remedies, and therefore recommend denial of defendants' motion to dismiss on this procedural basis.

C. *Personal Involvement*

Turning to the merits of plaintiff's claims, defendants allege that Snyder's complaint discloses potential personal involvement in the events occurring at Washington on the part of only defendants Whittier and Funnye, and that none of them are implicated in the legal mail claims stemming from plaintiff's incarceration in Groveland. This, defendants argue, provides a basis for dismissal of certain of plaintiff's claims.

Personal involvement of a defendant in alleging a constitutional deprivation is a prerequisite to an award of damages against that person under section 1983 against that person. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

1. *Events at Washington*

The only defendants alleged by the plaintiff to have had direct involvement in or knowledge of the events at Washington are two corrections officers directly implicated, defendants Whittier and Funnye, as well as the Assistant Inspector General involved in the investigation of those matters, Mark Miller. Nothing in the record now before the court suggests any actual involvement of or awareness by DOCS Commissioner Goord, Inspector General Roy, or Washington Superintendent Plescia, in any of the relevant events. Instead, plaintiff's claims against those defendants appear to be based purely upon their supervisory positions and Snyder's contention that by virtue of their roles, they must have known about the incident, or the very least should be charged with constructive knowledge of the constitutional violations alleged. These allegations are insufficient to implicate those defendants in the matters involved; it is well established that a supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor-there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501.

It is true that a supervisory official can be found liable in a civil rights setting such as that now presented in one of several ways: 1) the supervisor may have directly participated in the challenged conduct; 2) the supervisor, after learning of the violation through a report or appeal, may have failed to remedy the wrong; 3) the supervisor may have created or allowed to continue a policy or

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

custom under which unconstitutional practices occurred; 4) the supervisor may have been grossly negligent in managing the subordinates who caused the unlawful event; or 5) the supervisor may have failed to act on information indicating that unconstitutional acts were occurring. *Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986). The plaintiff, however, has failed to present any evidence which tends to establish a basis for finding liability on the part of defendants Goord, Roy, or Plescia under any of those theories. Accordingly, I recommend a finding that claims against them based upon lack of personal involvement.

*12 Plaintiff's claims against defendant Miller present a slightly different situation. Defendant Miller was charged with investigating the incident implicated in plaintiff's excessive force claims. At the time of the investigation, however, any harassment of him by Whittier had ended, and plaintiff had been transferred out of Washington. Plaintiff does not allege the existence of any lingering effects of the events at Washington, following his transfer out of that prison, which could have been prevented had defendant Miller acted to end the constitutional violations involved. Plaintiff's only quarrel with defendant Miller appears to be his failure, and the failure of his office, to notify him of the status of the investigation conducted in response to his communications inquiring in that regard. This fact alone, however, provides no basis for a finding that defendant Miller was involved in the constitutional violations alleged. *Cf. Greenwaldt v. Coughlin,* No. 93 Civ. 6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr. 19, 1995) ("It is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.") (citing *Garrido v. Coughlin,* 716 F.Supp. 98, 100 (S.D.N.Y.1989) (dismissing claim against superintendent of prison where only allegation was that he ignored inmate's request for an investigation)).

2. *Plaintiff's Legal Mail Claims*

Plaintiff's legal mail claims involve actions taken by prison officials at Groveland, including those working in the prison mail room. None of the individuals named in plaintiff's complaint, however, was employed at

Groveland, and plaintiff has identified no basis to conclude that any of them, including particularly DOCS Commissioner Goord, had any awareness of or involvement in the decision to deny legal mail status to his communications to the National Gay and Lesbian Task Force or to open his returned mail sent to that agency. Plaintiff's legal mail claim is subject to dismissal for failure to name, as a defendant, anyone proven to have been personally involved in that deprivation. *Bass,* 790 F.2d at 263.

IV. *SUMMARY AND RECOMMENDATION*

While plaintiff failed to file a grievance, and thereby avail himself of the comprehensive inmate grievance program offered to him as a New York State prisoner, to address the harassment allegedly endured at Washington at the hands of defendant Whittier and fellow inmates, in light of the existence of genuine issues of material fact I am unable to state that no reasonable factfinder could discern a proper basis exists to excuse this failure and find that plaintiff should not be barred on this procedural basis from pursuing his claims surrounding the events at Washington. I therefore recommend that defendants' motion for summary judgment dismissing plaintiff's excessive force and harassment claim on this procedural ground be denied. I do find, however, that plaintiff has failed to demonstrate the personal involvement of any of the defendants in his legal mail claim, and of defendants Goord, Roy, Plescia and Miller in connection with the claims growing out of events occurring at Washington, and therefore recommend that defendants' motion for summary judgment dismissing all claims against those defendants be granted.

*13 Based on the foregoing, it is hereby

ORDERED that the time within which defendants must answer plaintiff's complaint in this matter is hereby stayed and extended until ten days following the issuance of a decision by Senior District Judge Thomas J. McAvoy deciding the present summary judgment motion, or such other time as Judge McAvoy shall direct; and it is further

RECOMMENDED that defendants' motion for summary

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

judgment dismissing plaintiff's complaint (Dkt. No. 20) be
GRANTED, in part, and that plaintiff's legal mail claim be
DISMISSED in its entirety, and further that all remaining
claims be DISMISSED as against defendants Goord, Roy,
Plescia and Miller, but that it otherwise be DENIED, and
that the matter proceed with regard to plaintiff's
constitutional claims against defendants Whittier and
Funnye based upon events occurring at the Washington
Correctional Facility.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten
days within which to file written objections to the
foregoing report. Such objections shall be filed with the
Clerk of the Court. FAILURE TO OBJECT TO THIS
REPORT WITHIN TEN DAYS WILL PRECLUDE
APPELLATE REVIEW. 28 U.S.C. § 636(b)(1);
Fed.R.Civ.P. 6(a), 6(e), 72; Roldan v. Racette, 984 F.2d
85 (2d Cir.1993).

The clerk is directed to promptly forward copies of this
order to the parties in accordance with this court's local
rules.

N.D.N.Y.,2007.
Snyder v. Goord
Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)
(Cite as: 1998 WL 278264 (N.D.N.Y.))

**H** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Anthony ROBINSON, Plaintiff,
v.
Jane DELGADO, Hearing Officer and Lieutenant; and
Donald Selsky, Director of Inmate Special Housing
Program, Defendants.
**No. 96-CV-169 (RSP/DNH).**

May 22, 1998.

Anthony Robinson, Veterans Shelter, Brooklyn, for
Plaintiff, Pro Se.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Attorney for Defendants, Albany, Ellen Lacy
Messina, Esq., Assistant Attorney General, of Counsel.

ORDER

POOLER, D.J.

**\*1** Anthony Robinson, a former inmate incarcerated by the
New York State Department of Corrections ("DOCS"),
sued two DOCS employees, alleging that they violated his
right to due process in the course of a disciplinary
proceeding and subsequent appeal. On September 9, 1997,
defendants moved for summary judgment. Defendants
argued that plaintiff failed to demonstrate that the fifty
days of keeplock confinement that he received as a result
of the hearing deprived him of a liberty interest within the
meaning of the Due Process Clause. Plaintiff did not
oppose the summary judgment motion, and Magistrate
Judge David N. Hurd recommended that I grant it in a
report-recommendation filed April 16, 1998. Plaintiff did
not file objections.

Because plaintiff did not file objections, I "need only
satisfy [myself] that there is no clear error on the face of
the record in order to accept the recommendation."
Fed.R.Civ.P. 72(b) advisory committee's note. After
reviewing the record, I conclude that there is no clear error
on the face of the record. After being warned by
defendants' motion that he must offer proof in admissible
form that his disciplinary confinement imposed an
"atypical and significant hardship on the inmate in relation
to the ordinary incidents of prison life," Robinson failed
to offer any such proof. *Sandin v. Conner, 515 U.S. 472,
115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995).*
Consequently, he cannot maintain a due process challenge.
*Id.* Therefore, it is

ORDERED that the report-recommendation is approved;
and it is further

ORDERED that defendants' motion for summary
judgment is granted and the complaint dismissed; and it is
further

ORDERED that the Clerk of the Court serve a copy of this
order on the parties by ordinary mail.
HURD, Magistrate J.

REPORT-RECOMMENDATION

The above civil rights action has been referred to the
undersigned for Report and Recommendation by the
Honorable Rosemary S. Pooler, pursuant to the local rules
of the Northern District of New York. The plaintiff
commenced the above action pursuant to 42 U.S.C. § 1983
claiming that the defendants violated his Fifth, Eighth, and
Fourteenth Amendment rights under the United States
Constitution. The plaintiff seeks compensatory and
punitive damages.

Presently before the court is defendants' motion for
summary judgment pursuant to Fed R. Civ. P. 56.
However:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)
(Cite as: 1998 WL 278264 (N.D.N.Y.))

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P 56(e).

In addition, "[f]ailure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." L.R. 7.1(b)(3).

*2 The defendants filed their motion on September 9, 1997. The response to the motion was due on October 23, 1997. It is now five months beyond the date when the plaintiff's response was due, and he has failed to file any papers in opposition to defendants' motion.

Therefore, after careful consideration of the notice of motion, affirmation of Ellen Lacy Messina, Esq., with exhibits attached, and the memorandum of law; and there being no opposition to the motion; it is

RECOMMENDED that the motion for summary judgment be GRANTED and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(l), the parties have ten days within which to file written objections to the foregoing report. *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696(1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(l); Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of HHS,* 892 F.2d

15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Order and Report-Recommendation, by regular mail, upon the parties to this action.

N.D.N.Y.,1998.
Robinson v. Delgado
Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1997 WL 665551 (N.D.N.Y.)
(Cite as: 1997 WL 665551 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Marcus COTTO, Plaintiff,
v.
Daniel SENKOWSKI, Superintendent of Clinton
Annex; T.J. Howard, Hearing Officer; J. Maggy,
Sergeant; Byron Wind, Officer; Barry Rock, Officer;
and Philip Coombe, Jr., Acting Commissioner,
Defendants.
**No. 95-CV-1733 (RSP/DNH).**

Oct. 23, 1997.

Marcus Cotto, Plaintiff, pro se, Auburn Correctional
Facility, Auburn, New York.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Attorney for Defendants, Albany, New York,
Darren O'Connor, Esq., Asst. Attorney General, of
Counsel.

MEMORANDUM DECISION AND ORDER

POOLER, D.J.

**\*1** This matter comes to me following a
report-recommendation by Magistrate Judge David N.
Hurd, duly filed on the 29th of August, 1997. Following
ten days from the service thereof, the Clerk has sent me
the entire file, including any and all objections filed by the
parties herein.

In his *pro se* complaint, Cotto alleges that in August 1995,
he and some other inmates were attacked while
incarcerated at Clinton Correctional Facility. Compl., Dkt.
No. 1, ¶ 2. Cotto alleges that as a result of this incident he
was charged with engaging in violent conduct and conduct

which disturbed the order of the facility. *Id.* Although
Cotto was found guilty of these charges and sentenced to
a term of one year in the Special Housing Unit and loss of
six months good time, his sentence was reversed on
administrative appeal. *Id.* Cotto brought this action
pursuant to 42 U.S.C. § 1983, alleging various violations
of his rights under the Eighth and Fourteenth
Amendments. *Id.*

By motion filed March 3, 1997, defendants sought
summary judgment. Dkt. No. 17. Plaintiff filed no papers
in opposition to the motion. In his report-recommendation,
the magistrate judge recommended that I grant defendants'
motion pursuant to Local Rule 7.1(b)(3), which provides
that, absent a showing of good cause, failure to respond to
a motion shall be deemed consent to the relief requested.
Dkt. No. 19, at 2. Cotto has filed no objections to the
report-recommendation.

After careful review of all of the papers herein, including
the magistrate judge's report-recommendation, it is

ORDERED that the report-recommendation is hereby
approved, and it is further

ORDERED that defendants' motion for summary
judgement is GRANTED and the complaint against them
dismissed in its entirety, and it is further

ORDERED that the Clerk of the Clerk serve a copy of this
order on the parties by regular mail.

IT IS SO ORDERED.
DAVID N. HURD, United States Magistrate Judge.

*REPORT-RECOMMENDATION*

This matter was referred to the undersigned by the
Honorable Rosemary S. Pooler, for
Report-Recommendation pursuant to the Local Rules of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 665551 (N.D.N.Y.)
(Cite as: 1997 WL 665551 (N.D.N.Y.))

the Northern District of New York.

Plaintiff commenced the above § 1983 action making various allegations regarding violations of his civil rights under the United States Constitution. Pursuant to Fed.R.Civ.P. 56, the defendants have moved for summary judgment alleging that there is no genuine issue as to any material fact and that as a matter of law they are entitled to judgment.

The defendants have filed a motion pursuant to Fed.R.Civ.P. 56 granting summary judgment in favor of the defendants on grounds including that there is no genuine issue as to any material fact, and that the defendant is entitled to judgment as a matter of law.

It is now more than ninety days beyond the date when the response papers were due, and the plaintiff has not filed any papers in opposition to the motion. "Failure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." Rules of U.S. Dist. Ct. for Northern Dist. of N.Y., L .R. 7.1(b)(3).

*2 NOW, upon careful consideration of the notice of motion, statement pursuant to Local Rule 7.1(F), with exhibits attached, and the memorandum of law submitted in support of the defendants' motion; and there being no opposition to the motion, it is

RECOMMENDED that the motion be granted and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(I), the parties have ten days within which to file written objections to the foregoing report. *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(I); Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d

85, 89 (2d Cir.1993); *Small v. Secretary of HHS,* 892 F.2d 15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation, by regular mail, upon the parties to this action.

N.D.N.Y.,1997.
Cotto v. Senkowski
Not Reported in F.Supp., 1997 WL 665551 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

C   Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph
Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for
Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

*1 Plaintiff brings suit against defendant Syracuse
University ("University") pursuant to 20 U.S.C. § 1681 *et
seq.* ("Title IX") claiming hostile educational
environment, and retaliation for complaints of same.
Presently before the court is the University's motion for
summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are
affected by plaintiff's failure to file a Statement of Material
Facts which complies with the clear mandate of Local
Rule 7.1(a)(3) of the Northern District of New York. This
Rule requires a motion for summary judgment to contain

a Statement of Material Facts with specific citations to the
record where those facts are established. A similar
obligation is imposed upon the non-movant who

shall file a response to the [movant's] Statement of
Material Facts. The non-movant's response shall mirror the
movant's Statement of Material Facts by admitting and/or
denying each of the movant's assertions in matching
numbered paragraphs. Each denial shall set forth a specific
citation to the record where the factual issue arises.... *Any
facts set forth in the [movant's] Statement of material
Facts shall be deemed admitted unless specifically
controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an
eleven page, twenty-nine paragraph Statement of Material
Facts, replete with citations to the record in every
paragraph. Plaintiff, in opposition, filed a two page, nine
paragraph statement appended to her memorandum of law
which failed to admit or deny the specific assertions set
forth by defendant, and which failed to contain a single
citation to the record. Plaintiff has thus failed to comply
with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules
are not suggestions, but impose procedural requirements
upon parties litigating in this District." *Osier v. Broome
County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a
consequence, courts in this district have not hesitated to
enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [FN1]
by deeming the facts asserted in a movant's proper
Statement of Material Facts as admitted, when, as here, the
opposing party has failed to comply with the Rule. *See,
e.g.,* *Phipps v. New York State Dep't of Labor,* 53
F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v.
Car-Freshner Corp.,* 49 F.Supp.2d 84, 86
(N.D.N.Y.1999); *Osier,* 47 F. Supp .2d at 317; *Nicholson
v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy,
Inc. v. Stewart and Stevenson Operations, Inc.,* 1998 WL
903629, at *1 n. 1 (N.D. N.Y.1998); *Costello v.. Norton,*
1998 WL 743710, at *1 n. 2 (N.D.N.Y.1998); *Squair v.
O'Brien & Gere Engineers, Inc.,* 1998 WL 566773, at *1

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

n. 2 (N.D.N.Y.1998). As in the cases just cited, this court deems as admitted all of the facts asserted in defendant's Statement of Material Facts. The court next recites these undisputed facts.

FN1. Amended January 1, 1999.

BACKGROUND

*2 Plaintiff became a doctoral student in the University's Child and Family Studies ("CFS") department in the Spring of 1995. Successful completion of the doctoral program required a student to (1) complete 60 credit hours of course work; (2) pass written comprehensive examinations ("comp.exams") in the areas of research methods, child development, family theory and a specialty area; (3) after passing all four comp. exams, orally defend the written answers to those exams; (4) then select a dissertation topic and have the proposal for the topic approved; and (5) finally write and orally defend the dissertation. Plaintiff failed to progress beyond the first step.

Each student is assigned an advisor, though it is not uncommon for students to change advisors during the course of their studies, for a myriad of reasons. The advisor's role is to guide the student in regard to course selection and academic progress. A tenured member of the CFS department, Dr. Jaipaul Roopnarine, was assigned as plaintiff's advisor.

As a student's comp. exams near, he or she selects an examination committee, usually consisting of three faculty members, including the student's advisor. This committee writes the questions which comprise the student's comp. exams, and provides the student with guidance and assistance in preparing for the exams. Each member of the committee writes one exam; one member writes two. Two evaluators grade each exam; ordinarily the faculty member who wrote the question, and one other faculty member selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising duties, was the coordinator of exams for the entire CFS

department. In this capacity, he was generally responsible for selecting the evaluators who would grade each student's comp. exam, distributing the student's answer to the evaluators for grading, collecting the evaluations, and compiling the evaluation results.

The evaluators graded an exam in one of three ways: "pass," "marginal" or "fail." A student who received a pass from each of the two graders passed that exam. A student who received two fails from the graders failed the exam. A pass and a marginal grade allowed the student to pass. A marginal and a fail grade resulted in a failure. Two marginal evaluations may result in a committee having to decide whether the student would be given a passing grade. In cases where a student was given both a pass and a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions independently of each other, and no indication of the student's identity was provided on the answer. FN2 The coordinator, Roopnarine, had no discretion in compiling these grades-he simply applied the pass or fail formula described above in announcing whether a student passed or failed the comp. exams. Only after a student passed all four written exam questions would he or she be permitted to move to the oral defense of those answers.

FN2. Of course, as mentioned, because one of the evaluators may have written the question, and the question may have been specific to just that one student, one of the two or three evaluators may have known the student's identity regardless of the anonymity of the examination answer.

*3 Plaintiff completed her required course work and took the comp. exams in October of 1996. Plaintiff passed two of the exams, family theory and specialty, but failed two, child development and research methods. On each of the exams she failed, she had one marginal grade, and one failing grade. Roopnarine, as a member of her committee, authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization

of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators; [FN3] as mentioned, Clawson, not Roopnarine, authored the exam question.

> FN3. Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

*4 Plaintiff took the third research methods examination in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

for this task. Busby gave plaintiff a failing grade, and
began his written evaluation by stating that

[t]his is one of the most poorly organized and written
exams I have ever read. I cannot in good conscience vote
any other way than a fail. I tried to get it to a marginal but
could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto
and Busby each evaluated plaintiff's exam answer
independently, without input from either Roopnarine or
anyone else. Kawamoto and Busby did not know whose
exam they were evaluating. [FN4] Importantly, it is also
undisputed that none of the three evaluators knew of
plaintiff's claims of sexual harassment.

> FN4. Clawson knew it was plaintiff's
> examination because she was plaintiff's advisor,
> and wrote the examination question.

After receiving the one passing and two failing
evaluations, Burgess notified plaintiff in December of
1997 that she had, yet again, failed the research methods
exam, and offered her two options. Although the
University's policies permitted a student to only take a
comp. exam three times (the original exam, plus two
retakes), the CFS department would allow plaintiff to
retake the exam for a fourth time, provided that she took
a remedial research methods class to strengthen her
abilities. Alternatively, Burgess indicated that the CFS
department would be willing to recommend plaintiff for a
master's degree based on her graduate work. Plaintiff
rejected both offers.

The second time plaintiff used the term sexual harassment
in connection with Roopnarine was six months after she
was notified that she had failed for the third time, in May
of 1998. Through an attorney, she filed a sexual
harassment complaint against Roopnarine with the
University. This written complaint repeated her allegations
that Roopnarine had yelled at her, been rude to her, and
otherwise had not been responsive to her needs. She also,

for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life,
including once telling her that women are attracted to him,
and when he attends conferences, they want to have sex
with him over lunch; and

2. that Roopnarine told her that he had a dream in which
he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the
only specific information regarding sexual harassment
brought to the attention of University officials.

The University concluded that the alleged conduct, if true,
was inappropriate and unprofessional, but it did not
constitute sexual harassment. Plaintiff then brought this
suit. In her complaint, she essentially alleges two things;
first, that Roopnarine's conduct subjected her to a sexually
hostile educational environment; and second, that as a
result of complaining about Roopnarine's conduct, the
University retaliated against her by preventing her from
finishing her doctorate, mainly, by her failing her on the
third research methods exam.

*5 The University now moves for summary judgment.
Primarily, it argues that the alleged conduct, if true, was
not sufficiently severe and pervasive to state a claim.
Alternatively, it argues that it cannot be held liable for the
conduct in any event, because it had no actual knowledge
of plaintiff's alleged harassment, and was not deliberately
indifferent to same. Finally, it argues that plaintiff is
unable to establish a retaliation claim. These contentions
are addressed below.

DISCUSSION

The principles that govern summary judgment are well
established. Summary judgment is properly granted only
when "there is no genuine issue as to any material fact and
... the moving party is entitled to a judgment as a matter of
law." Fed.R.Civ.P. 56(c). When considering a motion for
summary judgment, the court must draw all factual

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

inferences and resolve all ambiguities in favor of the nonmoving party. *See* Torres v. Pisano, 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, *see* Norton v. Sam's Club, 145 F.3d 114, 117-20 (2d Cir.), *cert. denied,* 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." Danzer, 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

*I. Hostile Environment*

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action. *See* Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing Cannon v. University of Chicago, 441 U .S. 677 (1979) and Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60 (1992)).

A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[FN5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. *See Davis,* 119 S.Ct. at 1675 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986), a Title VII case). *Accord* Kracunas v. Iona College, 119 F.3d 80, 87 (2d Cir.1997); Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by Gebser, 118 S.Ct. at 1999.

> FN5. In Gebser, 118 S.Ct. at 1999, and *Davis v.* Monroe County Bd. of Educ., 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the *respondeat superior* principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. *See, e.g.,* Distasio v. Perkin Elmer Corp., 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct, and only then consider whether this conduct is actionable. *See, e.g.,* Quinn v. Green Tree Credit Corp., 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *See id.*

*6 In Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

so "severe or pervasive" as to create an " 'objectively'
hostile or abusive work environment," which the victim
also "subjectively perceive[s] ... to be abusive."
Richardson v. New York State Dep't of Corr. Servs ., 180
F.3d 426, 436 (alteration in original) (quoting Harris, 510
U.S. at 21-22). From this court's review of the record,
there is no dispute that plaintiff viewed her environment to
be hostile and abusive; hence, the question before the
court is whether the environment was "objectively"
hostile. See id. Plaintiff's allegations must be evaluated to
determine whether a reasonable person who is the target of
discrimination would find the educational environment "so
severe, pervasive, and objectively offensive, and that so
undermines and detracts from the victim['s] educational
experience, that [this person is] effectively denied equal
access to an institution's resources and opportunities."
Davis, 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or
pervasive enough to create an objectively hostile or
abusive work environment-an environment that a
reasonable person would find hostile or abusive" is
beyond the purview of the law. Harris, 510 U.S. at 21.
Thus, it is now clear that neither "the sporadic use of
abusive language, gender-related jokes, and occasional
testing," nor "intersexual flirtation," accompanied by
conduct "merely tinged with offensive connotations" will
create an actionable environment. Faragher v. City of
Boca Raton, 524 U.S. 775, 787 (1998). Moreover, a
plaintiff alleging sexual harassment must show the
hostility was based on membership in a protected class.
See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S.
75, 77 (1998). Thus, to succeed on a claim of sexual
harassment, a plaintiff "must always prove that the
conduct at issue was not merely tinged with offensive
sexual connotations, but actually constituted
discrimina[tion] ... because of ... sex." Id. at 81 (alteration
and ellipses in original).

The Supreme Court has established a non-exclusive list of
factors relevant to determining whether a given workplace
is permeated with discrimination so severe or pervasive as
to support a Title VII claim. See Harris, 510 U.S. at 23.
These include the frequency of the discriminatory conduct,
its severity, whether the conduct was physically
threatening or humiliating, whether the conduct
unreasonably interfered with plaintiff's work, and what
psychological harm, if any, resulted from the conduct. See

id.; Richardson, 180 F.3d at 437.

Although conduct can meet this standard by being either
"frequent" or "severe," Osier, 47 F.Supp.2d at 323,
"isolated remarks or occasional episodes of harassment
will not merit relief [ ]; in order to be actionable, the
incidents of harassment must occur in concert or with a
regularity that can reasonably be termed pervasive." '
Quinn, 159 F.3d at 767 (quoting Tomka v. Seiler Corp.,
66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic
events will only meet the standard if they are sufficiently
threatening or repulsive, such as a sexual assault, in that
these extreme single incidents "may alter the plaintiff's
conditions of employment without repetition." Id. Accord
Kotcher v. Rosa and Sullivan Appliance Ctr., Inc., 957
F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be
repeated and continuous; isolated acts or occasional
episodes will not merit relief.").

*7 The University quite properly argues that the conduct
plaintiff alleges is not severe and pervasive. As discussed
above, she claims that she was subjected to behavior by
Roopnarine that consisted primarily of his yelling at her,
being rude to her, and not responding to her requests as
she felt he should. This behavior is insufficient to state a
hostile environment claim, despite the fact that it may have
been unpleasant. See, e.g., Gutierrez v. Henoch, 998
F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to
job-related disagreements or personality conflicts, without
more, do not create sexual harassment liability);
Christoforou v. Ryder Truck Rental, Inc., 668 F.Supp.
294, 303 (S.D.N.Y.1987) ("there is a crucial difference
between personality conflict ... which is unpleasant but
legal ... [and sexual harassment] ... which is despicable
and illegal."). Moreover, the court notes that plaintiff has
failed to show that this alleged behavior towards her was
sexually related-an especially important failing
considering plaintiff's own testimony that Roopnarine
treated some males in much of the same manner. See, e.g.,
Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed
at him in a meeting"). As conduct that is "equally harsh"
to both sexes does not create a hostile environment,
Brennan v. Metropolitan Opera Ass'n, Inc., 192 F.3d 310,
318 (2d Cir.1999), this conduct, while demeaning and
inappropriate, is not sufficiently gender-based to support
liability. See Osier, 47 F.Supp.2d at 324.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *See id.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur much often. Thus, without more, plaintiff's claims fail as well.

**8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressured to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. *See Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us,' " are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at *5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to

which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at *6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *see supra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. *See Davis,* 119 S.Ct. at 1671; *Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation." Id.* (Emphasis supplied). *Accord Davis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

gained actual knowledge of the harassment. *See Reese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murreel v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

*9 By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7] *See Reese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

> FN6. Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

> FN7. As mentioned previously, *see supra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third

exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *See Murray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[FN8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *See Murray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v. Ohio State Univ.,* 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

> FN8. As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.[FN9]

> **FN9.** Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in [plaintiff's] case was inconsistent with these standards.").

### CONCLUSION

**\*10** For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**C**   Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Wayne HARGROVE, Plaintiff,
v.
Sheriff Edward RILEY; Nassau County Correctional
Facility, et al; Nassau County University Medical Staff
and Nassau County Correctional Facility, Defendants.
**Civil Action No. CV-04-4587 (DGT).**

Jan. 31, 2007.

Wayne Hargrove, Ossining, NY, pro se.

Alexander V. Sansone, Troy & Troy, Lake Ronkonkoma,
NY, Joseph Carney, Mineola, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, J.

*1 Inmate Wayne Hargrove ("Hargrove" or "plaintiff")
brings this *pro se* action pursuant to 42 U.S.C. § 1983
against the Nassau County Sheriff, Nassau County
Correctional Facility ("NCCF") and NCCF's medical staff,
(collectively, "defendants"), seeking damages for injuries
allegedly caused by defendants while he was incarcerated
at NCCF. Defendants now move for summary judgment
pursuant to Fed.R.Civ.P. 56 arguing, *inter alia,* that
Hargrove's claims should be dismissed because he failed
to exhaust administrative remedies, as required by the
Prison Litigation Reform Act of 1995 ("PLRA"), 42
U.S.C. § 1997e. For the following reasons, defendants'
motions for summary judgment are granted.

**Background**

On August 27, 2004,[FN1] Hargrove filed a complaint,
alleging that defendants violated his civil rights when they
forcibly administered purified protein derivative skin tests
("PPD test") to test for latent tuberculosis ("TB") in April
2002, 2003 and 2004 while he was incarcerated at NCCF.
Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A. Hargrove
named Nassau County Sheriff Edward Reilly ("Reilly"),
NCCF and Nassau County University Medical Staff[FN2] as
defendants.[FN3] On November 22, 2004, after discovery,
County Defendants and NHCC Defendants filed separate
motions for summary judgment pursuant to Fed.R.Civ.P.
56. Both defendants properly filed a Local Rule 56.1
Statement and served Hargrove a Notice to *Pro Se* Litigant
Opposing Motion for Summary Judgment, pursuant to
Local Civil Rule 56.2.

FN1. Hargrove signed the complaint August 27,
2004. The *pro se* clerk's office received and filed
the complaint on September 20, 2004. Under the
prison mail-box rule, a *pro se* prisoner's
complaint is deemed filed when it is delivered to
prison authorities. *See, e.g., Walker v.
Jastremski,* 430 F.3d 560, 562 (2d
Cir.2005)(deeming *pro* se prisoner's § 1983
action filed on date complaint was handed to
prison officials). There is no evidence in the
record as to when Hargrove handed the
complaint to prison officials. However, it is clear
the operative date is between August 27, 2004
and September 20, 2004. As discussed, *infra,*
both of these dates occur before Hargrove
properly exhausted the administrative remedies
available to him at NCCF.

FN2. The Nassau County University Medical
Staff are employed by the Nassau Health Care
Corporation ("NHCC"). Pursuant to the
Correctional Center Health Services Agreement
between the County of Nassau and NHCC, dated
September 24, 1999, NHCC provides medical
services for inmates at NCCF. County Defs.'s
Not. of Motion, Decl., at 1.

FN3. Reilly and NCCF are represented
separately from NHCC. Accordingly, when a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

distinction is necessary, Reilly and NCCF will be referred to as "County Defendants" and Nassau County University Medical Staff and NHCC will be referred to as "NHCC Defendants."

**(1)**

**Tuberculosis Testing at NCCF**

Upon entering NCCF, new prisoners must first go through medical intake. Aff. of Kim Edwards, ("Edwards Aff.") ¶ 3. This standard process usually takes seventy-two hours. Edwards Aff. ¶ 4. During medical intake, NCCF tests inmates for TB. Aff. of Getachew Feleke ("Feleke Aff.") ¶ 3. NCCF generally uses a PPD test to detect latent TB. Feleke Aff. ¶ 3. However, if an inmate has previously tested positive for TB, it is NCCF's policy to test for TB using an x-ray instead.[FN4] Feleke Aff. ¶ 3. As part of its Infectious Disease Program, NCCF re-tests inmates for TB each year, beginning after they have been housed in that facility for one year. Edwards Aff. ¶ 5.

> FN4. According to WebMD, "[a] tuberculin skin test should not be done for people who have a(1) Known TB infection [or a] (2) Positive tuberculin skin test in the past. A second test may cause a more severe reaction to the TB antigens." Jan Nissl, RN, BS, *Tuberculin Skin Tests*, W E B M D , h t t p : / / www.webmd.com/hw/lab_tests/hw203560.asp (last visited Jan. 31, 2007).

**(2)**

**Hargrove's Tuberculosis Testing at NCCF**

On March 15, 2002, Hargrove was incarcerated at NCCF. NHCC Defs.' 56.1 Statement ¶ 1. Before entering the general population, Hargrove was processed through medical intake. NHCC Defs.' 56.1 Statement ¶ 2. The NCCF Medical Intake Chart for Hargrove, dated March 15, 2002 ("3/15/02 Chart"), shows that Hargrove informed medical staff that he had previously been exposed to

tuberculosis. NHCC Defs.' Notice of Mot., Ex. C, at 1; NHCC Defs.' 56.1 Statement ¶ 2. The 3/15/02 Chart also shows that Hargrove reported testing positive to a prior PPD test and that he had been treated for TB in 2000. NHCC Defs.' Notice of Mot., Ex. C, at 1. Hargrove alleges that he was exposed to and treated for TB in 1997. Hargrove's Aff. in Opp. to Mot. for Summary Judgment, ("Aff. in Opp."), Ex. A at 1-2. Defendants contend that Hargrove was given an x-ray during the medical intake process because of his reported positive PPD test, and that the x-ray was negative, showing no active TB infection. NHCC Defs.' 56.1 Statement ¶ 2; Edwards Aff. ¶ 3. Without specifying a date, Hargrove generally states that his "request to be x-rayed was denied." Aff. in Opp. at 3.

**\*2** Pursuant to NCCF's Infectious Disease Program, after being incarcerated in NCCF for a year, Hargrove was scheduled to be re-tested for TB. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. On May 24, 2003, Hargrove was given a PPD skin test. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. This test was negative. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. According to Hargrove, he requested an x-ray instead of a PPD test because of his previous exposure to TB, but was forced to submit to the PPD test. He also alleges that defendants threatened to put him in "keep lock" or "lock up" unless he submitted to the PPD test.[FN5] Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A.

> FN5. Hargrove has made contradictory statements about being placed in "keep lock" or "lock up." It is unclear whether he is alleging that defendants threatened to place him in "lock up" unless he submitted to the PPD test or whether he was actually placed in "lock up" until such time that he agreed to submit to the PPD tests. For example, in his complaint, Hargrove states that when he "refused to submit to another [PPD] test, the Correctional Authorities were brought in and placed [him] in lock up." Complaint ¶ 4. In a hearing before Magistrate Judge Bloom on January 31, 2005, Hargrove stated that he took the PPD tests because he was told that he would be placed in "lock up" until he submitted to the test. Hr'g Tr. 6:1-18; 9:5-10:10. In Exhibit B to his complaint, Hargrove alleges both that he was given an unwarranted TB shot and that when he refused the same shot he was placed in "keep

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

lock." Complaint, Ex. B. There is no evidence in the record that Hargrove was ever segregated from the general population while housed at NCCF, outside of the seventy-two hour initial medical intake period. Aff. of Sgt. Neumann ("Neumann Aff.") at 1-2 (referring to prison records showing Hargrove's holding locations which demonstrate that he was never placed in "lock up"); NCCF 56.1 Statement ¶ E. Whether or not Hargrove was actually placed in "lock up" is not a material fact for purposes of this motion; as explained in detail, *infra,* Hargrove's failure to exhaust administrative remedies under the PLRA precludes a consideration of the merits of his Section 1983 claim.

The following year, in June of 2004, Hargrove was scheduled to be retested. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Because of the contradiction between the negative May 2003 PPD test and his reported positive history, NCCF contacted the Infectious Disease Department of the Nassau County Medical Center. Edwards Aff. ¶ 6. It was suggested that Hargrove be given a two-step PPD test, administered fifteen days apart. Feleke Aff. ¶ 4; Edwards Aff. ¶ 6. Hargrove was given these two PPD skin tests in June 2004. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Again, Hargrove alleges that these tests were administered against his will and under threat of being placed in quarantine. Complaint, Exs. A, B; Aff. in Opp., Ex. A.

On December 3, 2004, Hargrove was seen by a physician's assistant. NHCC Defs.' 56.1 Statement ¶ 6. During this meeting, Hargrove complained of a dry cough and that the site on his forearm where the June 2004 PPD tests had been administered was red and swollen. NHCC Defs.' 56.1 Statement ¶ 6; 11/28/04 Sick Call Request.

Hargrove's December 18, 2004 chart notes a positive PPD test and an order was placed in the chart that Hargrove not be submitted for future PPD tests. Edwards Aff. ¶ 7; NHCC Defs.' 56.1 Statement ¶ 8. *See also* 11/19/2004 Grievance.

Hargrove alleges that the following physical ailments were caused by the PPD tests: chronic coughing, high blood pressure, chronic back pain, lung infection, dizzy spells, blurred vision and a permanent scar on both his forearms. Complaint, Ex. C; Aff. in Opp. at 3-4.

(3)

**NCCF's Inmate Grievance Procedure**

NCCF has had an inmate grievance program ("IGP") in place since 2001. Aff. of Kenneth Williams, ("Williams Aff."), at 2. NCCF's IGP is carried out in conformance with the New York State Commission of Corrections Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"). *Id.*

The IGP is designed to resolve complaints and grievances that an inmate may have regarding the inmate's care and treatment while incarcerated at NCCF. Williams Aff. at 2. Upon entering NCCF, all inmates receive a copy of the NCCF inmate handbook, which outlines the IGP. *Id.*

**\*3** The record does not include an actual copy of NCCF's IGP, but the NCCF's IGP is detailed in the affidavit of NCCF Investigator Kenneth Williams. [FN6] The IGP encourages inmates to resolve their grievances informally with the staff member assigned to the inmate housing unit first. *Id.* If an acceptable resolution cannot be reached, inmates must then proceed through the formal three-step process set out in the IGP. *Id.* at 3.

> FN6. Hargrove does dispute any statements made by Investigator Williams regarding the inmate grievance procedure, time limits or its availability to him. Furthermore, Hargrove does not dispute that he received a handbook outlining the IGP.

The first step requires an inmate to submit his grievance form [FN7] to the Inmate Grievance Unit by placing it in a locked box located in each housing area, "within five days of the date of the act or occurrence giving rise to the grievance." [FN8] *Id.* at 2-3. NCCF indexes all grievance

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

the 11/19/2004 and 5/11/2005 Grievance Forms, none of the other documents were "received by the grievance unit, and, given the locked box system, the grievance-forms were never submitted by plaintiff/inmate." Williams Aff. at 2.

> FN10. It is NCCF's procedure to forward to the attention of the Grievance Unit all official grievance forms and complaint letters-even ones not specifically addressed to the Grievance Unit. Williams Aff. at 3.

**\*4** A visual examination of the grievance forms Hargrove submitted in support of his claims suggests forgery. Five of the nine grievance forms were requests to stop PPD testing. *See* April 19, 2002 grievance; April 28, 2002 grievance; April 20, 2003 grievance; April 28, 2003 grievance; November 19, 2004 grievance. The remaining grievance forms concerned Hargrove's requests for medical shoes. *See* March 18, 2002 grievance; July 6, 2002 grievance; February 20, 2003 grievance; May 11, 2005 grievance. Of the grievance forms complaining of unwanted PPD tests, the April 28, 2002 grievance form is a patent photocopy of the April 19, 2002 grievance form, and the April 28, 2003 grievance form is a patent photocopy copy of the April 20, 2003 grievance form, with only the handwritten dates changed. The only potentially authentic grievance forms relating to Hargrove's complaint about the PPD testing are dated April 19, 2002, April 20, 2003, and November 19, 2004. Of these grievance forms, only the November 19, 2004 has been authenticated by NCCF personnel. *See generally* Williams Aff. at 1-4.

Turning to the complaint letters addressed to Reilly, many contain notary stamps cut from the bottom of unrelated documents and photocopied onto the bottom of the complaint letters. *See* County Defs.' Mem. of Law at 18-21. C.O. Thomas McDevitt and C.O. Paul Klein, both of whom perform notary services for prisoners at NCCF, have submitted sworn affidavits, stating that they kept individual Notary Log Books covering all dates relevant to this litigation. Aff. of C.O. Klein, ("Klein Aff."), at 1; Aff. of C.O. McDevitt, ("McDevitt Aff."), at 1. McDevitt's Notary Log Book shows that he notarized only one document for Hargrove. This document, dated May 13, 2002, was a motion related to Hargrove's criminal trial.

McDevitt Aff. at 1-2. Hargrove signed the Notary Log Book acknowledging receipt of that notarized motion. McDevitt Aff. at 2. McDevitt states that he never notarized any other documents for Hargrove. McDevitt Aff. at 2. However, McDevitt's stamp and signature dated May 13, 2002 (the date of the legitimate notarization) appear on Hargrove's letter to Sheriff Reilly dated May 10, 2002. County Defs.' Not. of Motion, Ex. A.

These facts repeat themselves in regard to the documents bearing the notary stamp and signature of Klein. Klein had performed several legitimate notarizations for Hargrove in connection to Hargrove's criminal trial. Klein Aff. at 1-2. Hargrove signed Klein's Notary Log Book acknowledging receipt of those notarized documents. Klein Aff. at 2. However, Klein states that he never notarized any of Hargrove's letters addressed to Sheriff Reilly that bear Klein's stamp and signature. Klein Aff. at 2. On all of the documents that Hargrove submitted bearing Klein's stamp and signature, the dates and signatures of Klein match identically to the dates on which he had performed legitimate notarizations for Hargrove in connection with his criminal trial. Defendants argue it is clear that the documents bearing the stamps and signatures of McDevitt and Klein were not actually notarized by these notaries. County Defs.' Mem. of Law at 17-22.

**\*5** Hargrove does not deny these allegations. Instead, he resubmits the documents that McDevitt and Klein testify they did not notarize with his Affidavit in Opposition and insists that the documents "refute[ ] the assertions put forth by the defendants." Aff. in Opp. at 2.

**Discussion**

**(1)**

**Summary Judgment Standard**

A motion for summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court ruling on a summary judgment motion must construe the facts in the light most favorable

Page 6

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

to the non-moving party and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Williams v. Metropolitan Detention Center,* 418 F.Supp.2d 96, 100 (E.D.N.Y.2005).* Defendants, the moving party in this action, bear the burden of demonstrating the absence of a genuine issue of material fact. *Baisch v. Gallina,* 346 F.3d 366, 371 (2d Cir.2003).

As Hargrove is proceeding *pro se,* his complaint must be reviewed carefully and liberally, and be interpreted to "raise the strongest argument it suggests," *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001), particularly when civil rights violations are alleged, *see, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Plaintiff's complaint does not specify the legal theories upon which it relies, but, in construing his complaint to raise its strongest arguments, it will be interpreted to raise claims under 42 U.S.C. § 1983. *See, e.g., Dufort v. Burgos,* No. 04-CV-4940, 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005) (liberally construing plaintiff's complaint, which failed to specify the legal theory or theories upon which it rested, as, *inter alia,* a claim under 42 U.S.C. § 1983); *Williams,* 418 F.Supp.2d at 100 (same).

**(2)**

**Prison Litigation Reform Act**

**a. Purpose of the Prison Litigation Reform Act**

The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits." *Woodford v. Ngo,* --- U.S. ----, 126 S.Ct. 2378, 2387 (2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). It seeks to eliminate unwarranted interference with the administration of prisons by federal courts, and thus " 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Woodford,* 126 S.Ct. at 2387 (quoting *Porter,* 534 U.S. at 525). *See also Booth v. Churner,* 532 U.S. 731, 739 (2001). Formal grievance procedures allow prison officials to reconsider their policies, implement the necessary corrections and discipline prison officials who fail to follow existing policy. *See Ruggiero v. County of*

*Orange,* 467 F.3d 170, 177-78 (2d Cir.2006).

**b. The Exhaustion Requirement**

The PLRA's "invigorated" exhaustion provision, 42 U.S.C. § 1997e(a), provides the mechanism to reduce the quantity and improve the quality of prisoners' suits by requiring that prison officials have the opportunity to address prisoner complaints through internal processes before allowing a case to proceed in federal court. *Woodford,* 126 S.Ct. at 2382 (citing *Porter,* 534 U.S. at 524). Section 1997e(a) provides that:

**\*6** [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983. *Woodford,* 126 S.Ct. at 2383; *Ruggiero,* 467 F.3d at 174; *Williams,* 418 F.Supp.2d at 100-01. The exhaustion provision is applicable to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings, as long as other forms of relief are obtainable through administrative channels. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004); *see also Woodford,* 126 S.Ct. at 2382-83 ("[A] prisoner must now exhaust administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.") (citing *Booth,* 532 U.S. at 734).

In June 2006, the Supreme Court held that the PLRA requires "proper exhaustion" before a case may proceed in federal court. *Woodford,* 126 S.Ct. at 2387. "Proper exhaustion" requires a prisoner to use " 'all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2385 (emphasis in original)). Although the level of detail

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

necessary to properly exhaust a prison's grievance process will vary from system to system, *Jones v. Bock,* 127 S.Ct. 910, 2007 WL 135890, at *12 (Jan. 22, 2007), "proper exhaustion" under the PLRA " 'demands compliance with [that] agency's deadlines and other critical procedural rules.' " *Ruggiero,* 467 F.3d at 176 (quoting *Woodford,* 126 S.Ct. at 2386). Thus, the PLRA's exhaustion requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2382).


**(3)**


**Exhaustion Analysis: Hargrove did not Exhaust the Administrative Remedies Made Available by NCCF prior to Bringing Suit**


Section 1997e(a) of the PLRA applies to Hargrove's complaint; Hargrove was and continues to be confined in a correctional facility, *see Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004), and Hargrove's claim is about a "prison condition" within the meaning of the PLRA, *see Williams,* 418 F.Supp.2d at 101. *See also Sloane v. W. Mazzuca,* No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) (recognizing PLRA's application to complaint alleging retaliation by prison officials for plaintiff's refusal to consent to a PPD test). Accordingly, the merits of Hargrove's Section 1983 claims can only be addressed if it is first determined that Hargrove properly exhausted each claim under Section 1997e(a) of the PLRA before filing his complaint in federal court.

**\*7** Hargrove has submitted both forged [FN11] and authentic grievance forms in opposing defendants' motions for summary judgment. Excluding, for the moment, the forged documents, NCCF's records reflect that Hargrove did not submit his first grievance until after he filed the instant complaint. Williams Aff. at 1. Hargrove's first grievance complaining of unwanted PPD testing is dated November 19, 2004, Williams Aff. at 1, two to three months after Hargrove filed his complaint. Additionally, this first grievance, dated November 19, 2004, was submitted five months after the last PPD test was administered to him in June 2004. NHCC Defs.' 56.1 Statement ¶¶ 5,6. This five-month period far exceeds the five-day window

provided by NCCF's IGP. Since Hargrove failed to comply with the IGP's deadlines, he did not properly exhaust the available administrative remedies. *Ruggiero,* 467 F.3d at 176 (" 'untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement.' ") (quoting *Woodford,* 126 S.Ct. at 2382).

> FN11. Based on an examination of the documents themselves, as well as the uncontradicted testimony of the notaries performing services for prisoners at NCCF, *see generally* Klein Aff.; McDevitt Aff., and of the investigator in the Inmate Grievance Unit, *see generally* Williams Aff., it appears that many of the documents submitted by Hargrove are forgeries. However, in order to view the facts in the light most favorable to Hargrove, and so as to avoid making findings of fact in a summary judgment motion, for the purposes of the exhaustion analysis, all of the documents will be considered to be authentic. However, for purposes of the sanctions analysis, the documents will be explored and the consequences of Hargrove's misrepresentations will be addressed.


Furthermore, even if the falsified grievance forms Hargrove submitted in support of his claim are considered authentic, they are still untimely. The diagnostic TB tests (whether x-ray or PPD tests) were given to Hargrove on March 15, 2002, May 24, 2003 and in June of 2004, but the grievance forms Hargrove submitted complaining of unwanted PPD tests are dated April 19, 2002, April 28, 2002, April 20, 2003, April 28, 2003 and November 19, 2004. None of these grievances were filed "within five days of the of the date of the act or occurrence giving rise to the grievance." Williams Aff. at 3. There is no evidence in the record suggesting that NCCF's IGP allows for a tolling of the five-day time limit in which to file a grievance. [FN12]

> FN12. Even if the submitted grievances had been filed within the proscribed time period, they only show that Hargrove's grievances reached an Inmate Grievance Coordinator, the first formal step of NCCF's three-step administrative grievance process; Hargrove never appealed to

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

the Chief Administrative Officer. By failing to take the next available step in NCCF's IGP, Hargrove failed to satisfy the mandatory exhaustion requirement. *See, e.g., Williams,* 418 F.Supp.2d at 101, 102 (dismissing *pro se* complaint where plaintiff could only show he exhausted two of the four-step process mandated by prison's administrative process).

While the letters to Reilly and sick call requests show that Hargrove attempted to bring his complaints about the PPD testing to the attention of the prison staff, *see, e.g.,* Aff. in Opp., Exs. A-D, NCCF's IGP requires use of formal grievance forms. Thus, writing complaint letters and submitting sick call requests did not properly exhaust NCCF's available administrative remedies. *See, e .g., Hernandez v. Coffey,* No. 99-CV-11615, 2006 WL 2109465, at *4 (S.D.N.Y. July 26, 2006) (holding letters did not satisfy plaintiff's exhaustion obligation); *Williams,* 418 F.Supp.2d at 101 (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with the warden and medical staff did "not include the required steps of the PLRA's administrative remedy process," plaintiff failed to exhaust); *Mills v. Garvin,* No. 99-CV-6032, 2001 U.S. Dist. LEXIS 3333, at *8 (S.D.N.Y. Mar. 2, 2001) ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA").

As Hargrove failed to properly exhaust his administrative remedies, this action is precluded by 42 U.S.C. § 1997e(a) unless Hargrove can establish excuse for his failure to exhaust.

**(4)**

**No Grounds to Excuse Plaintiff's Failure to Exhaust**

*8 Exhaustion is an affirmative defense that defendants have the duty to raise. *Jones,* 2007 WL 135890, at * 8-11; *Sloane,* 2006 WL 3096031, at *4;; *Williams,* 418 F.Supp.2d at 101. Once argued by the defendants, a plaintiff has an opportunity to show why the exhaustion requirement should be excused or why his failure to exhaust is justified. *See Ruggiero,* 467 F.3d at 175;

*Collins v. Goord,* 438 F.Supp.2d 399, 411 (S.D.N.Y.2006) ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply.'")(internal citations omitted). Thus, before concluding that a prisoner failed to exhaust available administrative remedies as required by Section 1997e(a) of the PLRA, the following three factors must be considered: (1) whether administrative remedies were actually available to the prisoner; (2) whether defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; and (3) whether special circumstances, such as a reasonable misunderstanding of the grievance procedures, exist justifying the prisoner's failure to comply with the exhaustion requirement. *Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).

FN13. Courts in the Second Circuit have questioned what effect, if any, the Supreme Court's recent decision in *Woodford* requiring "proper exhaustion" may have on the three-step *Hemphill* inquiry. The Second Circuit has yet to address this issue. *See Ruggiero,* 467 F.3d at 175-76 (declining to "determine what effect *Woodford* has on our case law in this area ... because [plaintiff] could not have prevailed even under our pre-*Woodford* case law"). To date, district courts have acknowledged the tension, but resolved to apply *Hemphill* to exhaustion claims until instructed otherwise by the Second Circuit. *See, e.g., Larkins v. Selsky,* 04-CV-5900, 2006 WL 3548959, at *9, n. 4 (S.D.N.Y. Dec. 6, 2006) (applying the current law of the Second Circuit to exhaustion claims); *Sloane,* 2006 WL 3096031, at *5 ("Until such time as the Court of Appeals considers the impact of *Woodford,* if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this circuit to the exhaustion claims."); *Collins v. Goord,* 438 F.Supp.2d at 411 n. 13 (acknowledging that *Woodford* and *Hemphill* may be in tension, but deciding exhaustion claims under *Hemphill* inquiry); *Hernandez v. Coffey,* No.99-CV11615, 2006 WL 2109465, at *3 (S.D.N.Y. July 26, 2006) (same). Here, Hargrove does not prevail under *Hemphill;* therefore, there is no occasion to address the potential effect *Woodford* may

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

have had in his case.

**a. Whether administrative remedies were "available" to Hargrove**

The first step in the *Hemphill* inquiry requires a court to determine whether administrative remedies were available to the prisoner. *Hemphill*, 380 F.3d at 686. The test for assessing availability is an "objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Id.* at 688 (internal quotation marks omitted). In making this determination, "courts should be careful to look at the applicable set of grievance procedures." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). Exhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, *Ruggiero,* 467 F.3d at 179, or where defendants' behavior prevents plaintiff from seeking administrative remedies,[FN14] *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004).

> **FN14.** Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies "unavailable" to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.

Here, Hargrove has not claimed that NCCF's administrative grievance procedure was unavailable to him. In fact, Hargrove demonstrated his access to and knowledge of NCCF's IGP by filing proper grievances on November 19, 2004 and on May 10, 2005. Hargrove did not dispute any part of Investigator Williams's affidavit detailing the IGP and its availability to inmates since 2001. Specifically, Hargrove did not dispute, upon entering the facility, that he received a copy of the inmate handbook outlining the IGP. He has not claimed that he is unfamiliar with or unaware of NCCF's IGP. Hargrove has not alleged that prison officials failed to advance his grievances[FN15] or that they threatened him or took any other action which effectively rendered the administrative process unavailable.

**FN15.** Although not specifically alleged, interpreting the evidence to "raise the strongest argument," Hargrove may be arguing that NCCF's IGP was not available to him because the Grievance Coordinator failed to respond to his grievances. In the single grievance regarding PPD tests that defendants concede is authentic, Hargrove writes, "[n]ow for the third time your office refused to answer my grievances so please look into this matter because the T.B. shot is [sic] effecting my health." 11/19/04 Grievance. This language implies that Hargrove filed grievances in the past and received no response from the Inmate Grievance Coordinator. Furthermore, Hargrove wrote on one of the submitted copies of the November 19, 2004 grievance that "[t]his is the only accepte[sic] that Plaintiff got back from all grievances and letters that the Plaintiff sent to Sheriff Riley and his medical staffs about his staff making [sic] take T.B. test for 3 year[s]." County Defs' Not. of Motion, Ex. A, 11/19/2004 grievance.

First, it must be reiterated that filing of the initial grievances was untimely. However, even assuming *arguendo* that the original grievances had been timely filed, district courts in the Second Circuit have held that the "lack of a response from the [Inmate Grievance Review Committee] does not excuse an inmate's obligation to exhaust his remedies through available appeals." *Hernandez v. Coffey,* 2006 WL 2109465, at *3-5. *See also Hemphill,* 380 F.3d at 686 ("Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system"); *Acosta v. Corr. Officer Dawkins,* No. 04-CV-6678, 2005 WL 1668627, at *3 (S.D.N.Y. July 14, 2005) (inmate required to appeal lack of response to exhaust administrative remedies); *Mendoza v. Goord,* No. 00-CV-0146, 2002 U.S. Dist. LEXIS 22573, at *6 (S.D.N.Y. Nov. 21, 2002) ("If, as a result of a negligent error by prison officials-or even their deliberate attempt to sabotage a prisoner's grievance-the prisoner

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

[does not receive a response] on his complaint, he is not thereby forestalled from appealing"). Hargrove did not assert or offer evidence suggesting that he appealed the unresponsiveness or that those appeals were not advanced.

**\*9** Additionally, Hargrove's transfer from NCCF to Sing Sing Correctional Facility ("Sing Sing") in July 2005 did not excuse his previous failure to properly exhaust. *See, e.g., Sims v. Blot,* No. 00-CV-2524, 2003 WL 21738766, at \*4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); *Santiago v. Meinsen,* 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000) (determining that plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred). Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF. The last PPD test Hargrove complains of was given in 2004; therefore, Hargrove had until June or July of 2004 to timely file his grievance in accordance with NCCF's IGP. Hargrove was not transferred to Sing Sing until July 2005. County Defs.' Mem. of Law at 2. Thus, Hargrove's transfer cannot excuse his previous failure to properly exhaust.

**b. Estoppel**

The second step of the inquiry asks whether defendants are estopped from raising exhaustion as a defense. Specifically, "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (internal citations omitted).

Here, Hargrove has not made any statements that would permit a finding that defendants should be estopped from raising the affirmative defense of exhaustion or that defendants waived the right to raise the defense. Defendants first raised the PLRA's exhaustion requirement as an affirmative defense in their respective answers. *See* County Defs.' Am. Answer at 3; NHCC Defs.' Answer at

1. County Defendants raised it again in their motion for summary judgment. *See* County Defs.' Mem of Law at 15-23. Thus, defendants are not estopped from raising the affirmative defense now. *See, e.g., Sloane,* 2006 WL 3096031, at \*8 (exhaustion defense not waived where defendants first raised it in their motion to dismiss).

Additionally, defendants have not threatened Hargrove or engaged in other conduct preventing him from exhausting the available administrative remedies. *Cf. Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004) (holding defendants were estopped from asserting non-exhaustion because of prison officials' beatings, threats and other conduct inhibiting the inmate from filing proper grievances); *Feliciano v. Goord,* No. 97-CV-263, 1998 WL 436358, at \*2 (S.D.N.Y. July 27, 1998) (holding defendants were estopped from asserting non-exhaustion where prison officials refused to provide inmate with grievance forms, assured him that the incidents would be investigated by staff as a prerequisite to filing a grievance, and provided prisoner with no information about results of investigation). Hargrove has not argued otherwise. *See Ruggiero,* 467 F.3d at 178 (holding defendants were not estopped from asserting a failure to exhaust defense where plaintiff pointed to no affirmative act by prison officials that would have prevented him from pursing administrative remedies); *Sloane,* 2006 WL 3096031, at \*8 (finding no estoppel where plaintiff did not argue that defendants prevented him from pursuing the available administrative remedies); *Hernandez,* 2006 WL 2109465, at \*4 (finding no estoppel where plaintiff did not argue that any threats or intimidation prevented him from pursuing his appeals). Thus, for the same reasons that administrative remedies were not deemed unavailable to Hargrove, defendants are not estopped from raising a failure to exhaust defense.

**c. Special circumstances**

**\*10** Even where administrative remedies are available and the defendants are not estopped from arguing exhaustion, the court must "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " *Hemphill,* 380 F.3d at 688 (quoting *Giano,* 380 F.3d at 676). For example, plaintiff's reasonable interpretation of regulations differing from

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

prison official's interpretation has been held to constitute a "special circumstance." *Giano*, 380 F.3d at 676-77. No special circumstances have been alleged that would excuse Hargrove from availing himself of administrative remedies. *See Sloane*, 2006 WL 3096031, at *8; *Freeman v. Goord*, No. 02-CV-9033, 2004 U .S. Dist. LEXIS 23873, at * 9-10 (S.D.N.Y.2004) (granting motion to dismiss where "there is no evidence in the record ••• of any 'special circumstances' in this action.")

### (5)

### Hargrove's Failure to Exhaust, in Addition to his Fraud on the Court, Warrants Dismissal with Prejudice

Hargrove has not sufficiently rebutted the defendants' assertion of failure to exhaust, and a liberal reading of his submissions does not reveal any grounds to excuse that failure.

Because Hargrove filed a complaint in federal court before filing a grievance, permitting his unexhausted and unexcused claim to proceed would undercut one of the goals of the exhaustion doctrine by allowing NCCF to be haled into federal court without the "opportunity to correct its own mistakes with respect to the programs it administers." *Woodford*, 126 S.Ct. at 2385. *See also Ruggiero*, 467 F.3d at 178 (citing *Porter*, 534 U.S. at 525). Thus, his complaint must be dismissed.

In general, dismissal without prejudice is appropriate where plaintiff has failed to exhaust but the time permitted for pursuing administrative remedies has not expired. *Berry v. Kerik*, 366 F.3d 85, 87 (2d Cir.2004). Dismissal with prejudice is appropriate where "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust." *Berry*, 366 F.3d at 88. Here, Hargrove's administrative remedies were available to him during his entire period of confinement at NCCF. He remained incarcerated in NCCF throughout the time period in which he alleges the PPD tests were given. He could have exhausted remedies for his grievances at any time. Therefore, Hargrove had ample opportunity to

seek administrative remedies but failed to do so. Because there is no evidence in the record that administrative remedies are still available to Hargrove, as the five-day time period had run, and because Hargrove has alleged no special circumstances justifying his failure to exhaust, his complaint is accordingly dismissed with prejudice. *Berry*, 366 F.3d at 88 (upholding dismissal with prejudice where plaintiff had no justification for his failure to pursue administrative remedies while they were available.)

**\*11** Additionally, defendants' have moved for sanctions based on Hargrove's alleged submission of falsified evidence. If a party commits a fraud on the court, the court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process. *Shangold v. The Walt Disney Co.*, No. 03-CV-9522, 2006 WL 71672, at *4 (S.D.N.Y. January 12, 2006) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991)). Fraud upon the court has been defined as "fraud which seriously affects the integrity of the normal process of adjudication." *Gleason v. Jandrucko*, 860 F.2d 556, 559 (2d Cir.1988); *McMunn v. Mem'l Sloan-Kettering Cancer Center*, 191 F.Supp.2d 440, 445 (S.D.N.Y.2002). In order for a court to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering the presentation of the opposing party's claim or defense." *McMunn*, 191 F.Supp.2d at 455 (quoting *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1119 (1st Cir.1989).

After carefully reviewing the allegedly fraudulent documents, it must be concluded that Hargrove consciously falsified these documents. *See, e.g., Shangold*, 2006 WL 71672, at *1, *3 (finding clear and convincing evidence of fraud where plaintiffs fabricated a timeline and plot outlines to advance their claims); *McMunn*, 191 F.Supp.2d at 446 (finding clear and convincing evidence of fraud where plaintiff edited audio tapes and represented that they were unedited during discovery). The notaries performing services for prisoners at NCCF testify that they never notarized many of the documents supplied by Hargrove. *See* Klein Aff.; McDevitt Aff. Furthermore, a visual examination of the documents themselves makes it clear that many of the documents submitted by Hargrove are forgeries.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

In considering what sanction to impose, courts consider the following five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. *Scholastic, Inc. v. Stouffer,* 221 F.Supp.2d 425, 444 (S.D.N.Y.2002) (citing *McMunn,* 191 F.Supp.2d at 461).

Here, Hargrove's deception was not an isolated instance; he fabricated the dates on many grievance forms, in addition to improperly duplicating notary stamps on complaint letters to make them look authentic. Klein Aff. at 2; McDevitt Aff. at 2; County Defs.' 56.1 Statement ¶¶ C3, D3. He submitted these forgeries to defendants during discovery and again as exhibits to his Affidavit in Opposition to Defendant's Motion for Summary Judgment. A severe sanction is warranted as Hargrove's forgeries were intentional, he never corrected them once their authenticity was challenged and he continues to insist on their veracity. Aff. in Opp. at 1-4. Given that there is clear and convincing evidence that Hargrove has continuously and consciously perpetrated a fraud on the court through his submission of fraudulent documents and sworn affirmations of those documents' authenticity, dismissal with prejudice is especially appropriate. *See, e.g., Shangold,* 2006 WL 71672, at *5 (dismissing with prejudice where plaintiffs fabricated evidence to advance their claims); *Scholastic,* 221 F.Supp.2d at 439-444 (dismissing with prejudice where plaintiff produced seven pieces of falsified evidence); *McMunn,* 191 F.Supp.2d at 445 (dismissing with prejudice where plaintiff "lie[d] to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

**Conclusion**

**\*12** Because Hargrove did not satisfy the exhaustion requirement under the PLRA, defendants' motions for summary judgment are granted. Further, considering the fraud Hargrove perpetrated on the court, the claims are dismissed against all defendants with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED:

E.D.N.Y.,2007.
Hargrove v. Riley
Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

**C**  Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
James PETTUS, Plaintiff,
v.
Jospeh McCOY, Superintendent, Deputy Ryan,
Defendants.
**No. 9:04-CV-0471.**

Sept. 13, 2006.

James Pettus, Comstock, NY, pro se.

Charles J. Quackenbush, New York State Attorney
General, The Capitol Albany, NY, for Defendants.

***DECISION and ORDER***

THOMAS J. McAVOY, Senior District Judge.

**\*1** Plaintiff commenced the instant action asserting
various violations of his constitutional rights arising out of
his placement at the Southport Correctional Facility. In his
Complaint, Plaintiff alleges that he was improperly sent to
the Special Housing Unit ("SHU") at a maximum security
facility and that being in SHU has put his life in jeopardy.
Currently before the Court is Defendants' motion for
summary judgment pursuant to Fed.R.Civ.P. 56 seeking
dismissal of the Complaint in its entirety for failure to
exhaust administrative remedies.

**I. FACTS**[FN1]

    **FN1.** The following facts are taken from
    Defendants' statement of material facts submitted
    pursuant to N.D.N.Y.L.R. 7.1(a)(3). These facts

are deemed admitted because they are supported
by the record evidence and Plaintiff failed to
submit an opposing statement of material facts as
required by Rule 7.1(a)(3). Plaintiff was
specifically advised by Defendants of his
obligation to file an opposing statement of
material facts and to otherwise properly respond
to the motion for summary judgment.

Plaintiff is an inmate in the custody of the New York State
Department of Correctional Services. Plaintiff signed the
instant Complaint on April 7, 2004. On his Complaint
form, Plaintiff indicated that there is a grievance
procedure available to him and that he availed himself of
the grievance procedure by filing a complaint with the
IGRC [FN2] followed by an appeal to the superintendent of
the facility, and then to the Central Office Review
Committee in Albany. The Complaint indicates that
Plaintiff is "waiting for response from Albany." The
Complaint was filed on April 27, 2004.

    **FN2.** Inmate Grievance Review Committee.

On April 12, 2004, prior to the filing of the instant
Complaint, Plaintiff filed a grievance relating to the issues
presented in this case. On April 19, 2004, the IGRC
recommended that Plaintiff's grievance be denied. Plaintiff
then appealed that decision to the facility Superintendent.
In the meantime, on April 27, Plaintiff commenced the
instant litigation. On May 3, 2004, after Plaintiff filed the
Complaint in this case, the Superintendent denied
Plaintiff's grievance. On May 5, 2004, Plaintiff appealed
the decision to the Central Office Review Committee in
Albany. On June 23, 2004, the Central Office Review
Committee denied Plaintiff's appeal. Plaintiff did not file
any other grievances in connection with the matters raised
in this lawsuit.

Defendants now move to dismiss on the ground that
Plaintiff commenced the instant action before fully
exhausting his available administrative remedies.

**II. DISCUSSION**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

The sole issue presented is whether Plaintiff was required to complete the administrative process before commencing this litigation. This issue has already been addressed by the Second Circuit in *Neal v. Goord,* 267 F.3d 116 (2d Cir.2001). The issue in that case was "whether plaintiff's complaint should have been dismissed despite his having exhausted at least some claims during the pendency of his lawsuit." *Id.* at 121. The Second Circuit held that "exhausting administrative remedies after a complaint is filed will not save a case from dismissal." *Id.*

In this case, Defendants have established from a legally sufficient source that an administrative remedy is available and applicable. *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also* 7. N.Y.C.R.R. § 701.1, *et seq.* Plaintiff's Complaint concerns his placement in SHU at a maximum security facility. These are matters that fall within the grievance procedure available to NYSDOCS inmates and are required to be exhausted under the Prison Litigation Reform Act, 42 U.S.C. § 1997e. Plaintiff has failed to demonstrate any applicable exception to the exhaustion requirement. Because Plaintiff commenced the instant litigation prior to fully completing the administrative review process, the instant Complaint must be dismissed without prejudice. *Neal,* 267 F.3d 116.

## III. CONCLUSION

**\*2** For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and the Complaint is DISMISSED WITHOUT PREJUDICE. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

N.D.N.Y.,2006.
Pettus v. McCoy
Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 1392164 (S.D.N.Y.), 24 NDLR P 61
(Cite as: 2002 WL 1392164 (S.D.N.Y.))

**H**

United States District Court, S.D. New York.
Abdul SHARIFF, Mark Bartley, Jamal Stephenson,
David Gobern, Lewis Purcell, Sam Johnson, Terence
Stevens, Stephen Gowins, and Abdul Suluk, Plaintiffs,
v.
Philip COOMBE, Commissioner of New York State
Docs; Glen Goord, Acting Commissioner; Christopher
Artuz, Superintendent of Green Haven Corr. Facility;
Gail Haponic, Acting Deputy of Admin. of Green
Haven; Roger Maines, Supervisor of Green Haven; M.
Muller, Maintenance Supervisor of Green Haven,
individually and in their official capacities, and the State
of New York, Defendants.
**No. 96 Civ. 3001(BSJ).**

June 26, 2002.

*Memorandum & Order*

JONES, J.

### I. INTRODUCTION

*1 Plaintiffs, nine disabled prisoners who depend on
wheelchairs for mobility, bring this action against the State
of New York and six individuals employed by the New
York State Department of Correctional Services
("DOCS") in an administrative capacity. Those six
individuals, who are sued both in their individual and in
their official capacities, are two former DOCS
Commissioners and four administrators at Green Haven
Correctional Facility ("Green Haven"), including the
Superintendent, the former Plant Superintendent, a Deputy
Superintendent, and a Maintenance Supervisor. Plaintiffs
seek both injunctive and monetary relief for conditions
affecting disabled inmates at Green Haven. The gravamen
of the Fourth Amended Complaint [FN1] is that the
conditions at Green Haven amount to unlawful
discrimination against disabled inmates. These conditions

allegedly violate (1) Title II of the Americans with
Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.;* (2)
Title V of the Rehabilitation Act of 1973 ("Rehabilitation
Act"), 29 U.S.C. § 794 *et seq.;* (3) Section 70 of the New
York State Correction Law; and (4) the Eighth and
Fourteenth Amendments of the Constitution pursuant to 42
U.S.C. § 1983.

> FN1. Unless otherwise noted, references to the
> "Fourth Amended Complaint" refer to Plaintiffs'
> most recent Complaint, the Fourth Amended
> Complaint dated September 29, 1998.

Defendants move for summary judgment on several
grounds pursuant to Federal Rule of Civil Procedure 56.
Due to changes in the legal standards applicable to
Plaintiffs' claims and the facts relevant to the issues of
injunctive relief, exhaustion, and prior adjudication, the
court must reserve decision on some issues at this time. In
such circumstances, the court has identified issues for
additional briefing by the parties in a second round of
dispositive motions. Indeed, the complexity of those and
other issues applicable to Plaintiffs' remaining claims may
require a hearing for proper resolution. For the reasons
stated below, Defendants' Motion for Summary Judgment
is GRANTED in part and DENIED in part without
prejudice to renew.

### II. CLAIMS FOR INJUNCTIVE RELIEF

Any Plaintiff who is no longer incarcerated at Green
Haven is barred from asserting a claim for injunctive relief
regarding conditions at Green Haven. *See Prins v.
Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) ("It is settled in
this Circuit that a transfer from a prison facility moots an
action for injunctive relief against the transferring
facility.") (citing cases). Plaintiffs Bartley, Gobern,
Johnson, Purcell, Stevens, and Suluk are no longer
incarcerated at Green Haven. Therefore, the court
dismisses with prejudice all claims for injunctive relief
brought by those six Plaintiffs.

Plaintiffs are not entitled to injunctive relief for those

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 1392164 (S.D.N.Y.), 24 NDLR P 61
(Cite as: 2002 WL 1392164 (S.D.N.Y.))

claims that are now moot because they have been addressed by prison officials. *See Prins v. Coughlin, 76 F.3d 504, 506; see also Farmer v. Brennan, 511 U.S. 825, 846 (1994).* Plaintiffs' injunctive claims as to the A & B yard have been rendered moot because Defendants have "repaired and repaved" this yard. (*See, e.g.,* Pls.' Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. at 11.) Accordingly, all Plaintiffs, but particularly Plaintiffs Shariff and Stephenson, are precluded from seeking injunctive relief as to the conditions of the A & B yard that have been repaired, and the court dismisses those claims with prejudice.

**\*2** In light of the changes in both Plaintiffs' circumstances and the conditions at Green Haven that have occurred since this motion was filed, the court has been unable to address Plaintiffs' remaining claims for injunctive relief. For example, when this motion was filed, numerous repairs and renovations were scheduled for Green Haven. (*See* Turbin Aff. Ex. E.) If any such repairs were, in fact, conducted, Plaintiffs' claims for injunctive relief concerning those repairs would also be mooted. The court directs the parties to address these issues, as well as other changes in the facts of this case that may affect the viability of Plaintiff's claims for injunctive relief, in the additional briefing ordered by the court.

### III. CLAIMS FOR MONETARY RELIEF

#### A. CLAIMS UNDER 42 U.S.C. § 1983

Absent express statutory abrogation or consent by a state to suit, the Eleventh Amendment bars suits brought in federal court against a state by citizens of another state or the state's own citizens. *See Kimel v. Florida Bd. of Regents, 528 U.S. 62, 72-73 (2000); Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 54 (1996). Section 1983* does not abrogate a state's immunity, *Quern v.. Jordan, 440 U.S. 332, 343-45 (1979),* and New York has not consented to suit in federal court, *Trotman v. Palisades Interstate Park Comm'n, 557 F.2d 35, 38-40 (2d Cir.1977).* State employees sued in their official capacities are also immune from suits for monetary damages under the Eleventh Amendment in cases where the state is the real party in interest. *See Al- Jundi v. Estate of Rockefeller, 885 F.2d 1060, 1065 (2d Cir.1989).*

Moreover, "[s]tates[ ] and state officers, if sued in their official capacities for retrospective relief ... are not 'persons' subject to suit under § 1983." *K & A Radiologic Tech. Services, Inc. v. Commissioner of Dep't of Health, 189 F.3d 273, 278 (2d Cir.1999).* Therefore, the court dismisses Plaintiffs' claims for monetary relief pursuant to § 1983 against the State of New York and the other six Defendants in their official capacities.

#### B. THE ADA AND THE REHABILITATION ACT [FN2]

> **FN2.** The ADA, which was adopted in 1992 and covers individuals and entities that do not receive federal funds, is broader in scope than the Rehabilitation Act, which was adopted in 1973 and is limited to programs receiving financial assistance from the federal government. *See Kilcullen v. New York State Dep't of Labor, 205 F.3d 77, 79 n. 1 (2d Cir.2000).*

Neither Title II of the ADA nor Section 504 of the Rehabilitation Act provides for suits against state officials in their individual capacities. *Garcia v. S.U.N.Y. Health Sci. Ctr. of Brooklyn, 280 F.3d 98, 107 (2d Cir.2001)* (collecting cases). Therefore, the court dismisses with prejudice Plaintiffs' claims under the ADA and the Rehabilitation Act against the six individual Defendants in their individual capacities.

The legal standards applicable to Plaintiffs' claims under the ADA and the Rehabilitation Act against the State of New York and the other six Defendants in their official capacities have changed during the pendency of this motion. The changes in the law render much of Defendants' briefing on these claims inapplicable. The court directs the parties to brief Plaintiffs' remaining claims under the ADA and the Rehabilitation Act in light of the standards set forth in *Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn, 280 F.3d 98 (2d Cir.2001).* *See also Harris v. New York State Dep't of Health, No. 01 Civ. 3343, 2002 WL 726659, at \*27-\*31 (S.D .N.Y. Apr. 24, 2002)* (applying the standards set forth in *Garcia* ).

#### C. STATE LAW CLAIMS

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 1392164 (S.D.N.Y.), 24 NDLR P 61
(Cite as: 2002 WL 1392164 (S.D.N.Y.))

**\*3** Plaintiffs raise state law claims alleging that Defendants have failed to fulfill their duties under Section 70 of the New York State Correction Law. The court dismisses Plaintiffs' claims under Section 70 against the State of New York and the six other defendants in both their personal and their official capacities for lack of subject matter jurisdiction pursuant to New York State Correction Law Section 24 and the Eleventh Amendment. *See Baker v. Coughlin,* 77 F.3d 12, 14-15 (2d Cir.1996).

### IV. OTHER ARGUMENTS CONCERNING PLAINTIFFS' REMAINING CLAIMS

### A. EXHAUSTION OF ADMINISTRATIVE REMEDIES

In their Motion for Summary Judgment, Defendants argue that Plaintiffs' claims must be dismissed for failure to exhaust administrative remedies. Under 42 U.S.C. § 1997e(a), as amended by the Prison Litigation Reform Act of 1996 ("PLRA") on April 26, 1996, no action brought by a prisoner pertaining to prison conditions may be brought until all available administrative remedies are exhausted. *Porter v. Nussle,* 122 S.Ct. 983, 988 (2002); *see* 42 U.S.C. § 1997e(a) (Supp.2000) (as amended by PLRA § 803). While the mandatory exhaustion requirement of the PLRA does not apply retroactively, any claim filed after April 26, 1996, must be exhausted administratively before it may be raised in federal court. *See Salahuddin v. Mead,* 174 F.3d, 272, 275 (2d Cir.1999); *Blissett v. Casey,* 969 F.Supp. 118, 125 (N.D.N.Y.1997).

The court denies without prejudice to renew that portion of Defendants' motion seeking dismissal of Plaintiffs' claims for failure to exhaust administrative remedies. The court reserves final decision on the issues raised by Defendants' arguments relating to exhaustion for three reasons. First, the issue of exhaustion was briefed insufficiently by the parties to permit the court to rule. Specifically, the court requires a detailed, plaintiff-by-plaintiff analysis of the exhaustion requirements applicable to each claim and the actions taken by each Plaintiff. Second, the court recognizes that Plaintiffs may have pursued additional administrative remedies during the pendency of this motion. Third,

changes in the law since briefing was submitted on this motion have clarified the exhaustion requirements applicable to each Plaintiff's claims. Depending on the exhaustion requirements applicable to each claim and the actions taken by individual Plaintiffs to pursue administrative relief, the court may lack jurisdiction over some of Plaintiffs' remaining claims. The court notes the following as guidance for the parties in fashioning future arguments:

Plaintiff Shariff's initial *pro se* Complaint was filed on February 27, 1996; therefore, the claims he alleged therein are not subject to mandatory exhaustion. Nevertheless, the court retains discretion and may require exhaustion with respect to the pre-PLRA claims raised by Plaintiff Shariff under certain circumstances. *See* 42 U.S.C. § 1997e(a) (1994) (amended 1996). The court expressly leaves open the questions of whether the court should, in its discretion, require exhaustion as to Plaintiff Shariff's claims and whether Plaintiff Shariff did, in fact, pursue administrative remedies with respect to the claims raised in this case.[FN3]

> **FN3.** Additionally, the parties have not addressed the question of whether any claims raised by Shariff in amendments to the initial Complaint filed after April 26, 1996, should be subject to the mandatory exhaustion requirements of the PLRA. The court reserves decision as to that issue.

**\*4** The other eight Plaintiffs first included their claims as part of the multiple amended complaints filed in this case after the exhaustion provisions were amended in 1996. Thus, it seems likely to the court that those eight Plaintiffs are required to have exhausted their claims prior to filing them in federal court. *Cf. Farber v. Wards Co., Inc.,* 825 F.2d 684, 689 (2d Cir.1987) (noting that "Rule 15(c) governs the 'relation back' of amended pleadings only for the purpose of the statute of limitations"). "Rule 15(c) does not exist merely to keep the door open for any tardy plaintiff.... Rather, Rule 15(c) stands as a remedial device for adding or substituting a party who 'but for a mistake concerning the identity of the proper party' would have been named originally." *Morin v. Trupin,* 778 F.Supp. 711, 735 (S.D.N.Y.1991). Thus, the decision by the other eight Plaintiffs, who raise many claims distinct from those initially filed by Plaintiff Shariff in his *pro se* Complaint,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 1392164 (S.D.N.Y.), 24 NDLR P 61
(Cite as: 2002 WL 1392164 (S.D.N.Y.))

to file their claims as part of this case rather than filing their own lawsuits is unlikely to have obviated the PLRA's mandatory exhaustion requirement with respect to their claims. Since this issue has not been addressed in the light of current case law, the court reserves decision on this issue as well.

### B. PRIOR ADJUDICATION

When briefing was submitted on this motion, some of Plaintiffs' claims already had been adjudicated or were pending in other fora. (Defs.' Reply Mem. for Summ. J., Table C.) Defendants argue for dismissal of Plaintiffs' claims on the basis of such prior adjudication, which may preclude Plaintiffs from raising those claims in this court. *See Harris v. New York State Dep't of Health,* No. 01 Civ. 3343, 2002 WL 726659 (S.D.N.Y. Apr. 24, 2002) (discussing interaction between preclusion rules and abstention doctrines). Once again, the court has not been provided with enough detail of the claims raised by Plaintiffs in other proceedings to determine whether preclusion rules, abstention doctrines, or principles concerning double recoveries would bar any of the claims raised in the Fourth Amended Complaint, and Defendants have not addressed those topics substantively in their briefing on this motion. Thus, the court denies without prejudice to renew Defendants' motion to dismiss Plaintiffs' claims as a result of prior adjudication.

### C. PRIOR PHYSICAL INJURY REQUIREMENT

Pursuant to 42 U.S.C. § 1997e(e), "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." Claims by prisoners brought pursuant to § 1983 for emotional damages unrelated to any physical injuries are subject to dismissal. *See, e.g., Dawes v. Walker,* 239 F.3d 489, 494 (2d Cir.2001) (finding failure to make an objective showing of actual injury necessary to state an Eighth Amendment claim based on prison conditions); *Siglar v. Hightower,* 112 F.3d 191, 193-94 (5th Cir.1997) (finding bruised ear an insufficient physical injury to overcome bar of § 1997e(e)); *Zehner v. Trigg,* 952 F.Supp. 1318, 1322-23 (S.D.Ind.) (dismissing claim based on prisoners' exposure to asbestos), *aff'd* 133

F.3d 459, 461 (7th Cir.1997); *Brazeau v. Travis,* No. 96 CV 783, 1996 WL 391701, at *1 (N.D.N.Y. July 9, 1996) (holding that claim for emotional damages caused by delay in receipt of parole hearing transcript was barred by § 1997e(e)).

**\*5** The absence of a physical injury does not constitute a total bar to claims by prisoners under § 1983, since application of § 1997e(e) does not bar claims for nominal damages, punitive damages, or declaratory or injunctive relief. *Wagnoon v. Gatson,* 00 Civ. 3722 and 99 Civ. 5872, 2001 U.S. Dist. LEXIS 8417, at *12-*13 (June 25, 2001). Nevertheless, Plaintiffs' claims for compensatory damages relating to non-physical accidents, particularly those raised by Plaintiffs Gobern, Johnson, and Purcell, may not meet the physical injury requirement of the PLRA. The court expressly leaves open the question of whether any Plaintiff can meet the prior physical injury requirement, which has been inadequately briefed on a plaintiff-by-plaintiff basis. Indeed, Defendant raises this issue only briefly in the context of argument presented as to the standard applicable to claims of a deprivation of rights under the Eighth Amendment. (*See* Defs.' Mem. of Law in Supp. of Mot. for Summ. J. at 30-31.)

### V. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part without prejudice to renew. The following claims raised in the Fourth Amended Complaint are dismissed with prejudice: claims by Plaintiffs Bartley, Gobern, Johnson, Purcell, Stevens, and Suluk for injunctive relief; all claims for injunctive relief as to the conditions of the A & B yard that have been repaired; all claims against the State of New York and the other six Defendants in their official capacities for monetary relief pursuant to § 1983; all claims against the six individual Defendants in their individual capacities pursuant to the ADA and the Rehabilitation Act; and all claims against all Defendants under Section 70 of the New York State Correction Law. The remainder of Defendants' Motion for Summary Judgment is denied without prejudice to renew.

The court directs the parties to appear before the court for a conference at 3:00 p.m. on Tuesday, July 2, 2002,

Not Reported in F.Supp.2d, 2002 WL 1392164 (S.D.N.Y.), 24 NDLR P 61
(Cite as: 2002 WL 1392164 (S.D.N.Y.))

prepared to discuss Plaintiffs' remaining claims and
current conditions at Green Haven. If Defendants choose
to submit additional briefing, such briefing must be
submitted as a renewed motion for summary judgment
filed within thirty days of the date of this Memorandum
and Order.


SO ORDERED:


S.D.N.Y.,2002.
Shariff v. Coombe
Not Reported in F.Supp.2d, 2002 WL 1392164
(S.D.N.Y.), 24 NDLR P 61


END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. See Fed.R.Civ.P. 72(b), Advisory

Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER FN1

FN1. This matter was referred to the undersigned
pursuant to 28 U.S.C. § 636(b) and
N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments. FN2 In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. Id. at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. Id. at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. Id. at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. Id. at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. Id. at ¶¶ 22, 27-28.

II. Motion to Dismiss

*2 When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Staron v. McDonald's Corp., 51 F.3d 353, 355 (2d Cir.1995) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir.), cert. denied,513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

III. Discussion

A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); Rhodes v. Chapman, 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. Farmer, 511 U.S. at 837.

1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes,* 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

*3 As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare

Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,*524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

**\*4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

### B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d

Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at \*3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at \*3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

### IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

### V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1998 WL 146688 (S.D.N.Y.)
(Cite as: 1998 WL 146688 (S.D.N.Y.))

▷  Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Rufus GIBSON, Plaintiff,
v.
The City of New York; Warden Ortiz; Deputy Warden
Edwin Knight; Deputy Warden Clyton Eastmond; John
Doe Area Captains (of assigned posts at times of
violations of Block 5 South in Otis Bantum Correctional
Center CPSU); John Doe Captain (Badge # 878); and
John Doe Official, Defendants.
No. 96 CIV. 3409(DLC).

March 25, 1998.

Rufus Gibson, Pro Se, Fishkill Correctional Facility,
Beacon.

Jeffrey Friedlander, Esq., Acting Corporation Counsel for
the City of New York, New York, By Renee Nebens, Esq.,
Assistant Corporation Counsel.

OPINION AND ORDER

COTE, District J.

*1 On May 9, 1996, Rufus Gibson ("Gibson") filed this
action pursuant to Section 1983 claiming that the
defendants had violated his Fourteenth Amendment rights
while he was a pretrial detainee, by subjecting him to
unconstitutional conditions of confinement and by
depriving him of due process prior to a disciplinary
confinement.[FN1] On May 9, 1996, Chief Judge Griesa, to
whom this case was then assigned, ordered Gibson to file
an amended complaint within sixty days with more
specific information to show why he is entitled to relief.
On May 23, 1996, the plaintiff filed a slightly more
detailed complaint (the "First Amended Complaint"),
which was accepted by the Court as meeting the

requirements of the May 9, 1996 Order. On March 4,
1997, the defendants filed a motion to dismiss the First
Amended Complaint for failure to state a claim.[FN2] At a
March 7, 1997, pretrial conference held on the record, the
Court allowed the plaintiff to either oppose that motion or
further amend his complaint. On April 7, 1997, the
plaintiff filed a Second Amended Complaint which
contained more detail and which changed the named
defendants to those listed in the caption of this Opinion
and Order. The defendants now move to dismiss the
Second Amended Complaint for failure to state a claim
and the plaintiff moves for the entry of a default judgment
against defendant Robert Ortiz ("Ortiz").[FN3] For the
reasons stated below, the motion to dismiss is granted in
part and denied in part and the motion for entry of a
default judgment is denied.

FN1. Gibson has since been convicted and
transferred to the custody of the New York State
Department of Corrections.

FN2. The motion to dismiss the First Amended
Complaint was made on behalf of defendants
named in that pleading: the New York City
Department of Correction Otis Bantum
Correctional Facility, Warden Ortiz, and Deputy
Warden Edwin Knight.

FN3. The instant motion was originally made
solely on behalf of the City of New York. After
having been served with the Second Amended
Complaint in July 1997, defendants Clyton
Eastmond and Edwin Knight joined in the
motion. On September 23, 1997, the plaintiff
moved to have a default judgment entered
against Robert Ortiz, who had also been served
in July 1997, but who had not filed an answer.
On October 7, 1997, Assistant Corporation
Counsel Renee Nebens filed a declaration
seeking to have Robert Ortiz join in the instant
motion. For the reasons described elsewhere in
this Opinion, the October 7 request is granted.

Background

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 146688 (S.D.N.Y.)
(Cite as: 1998 WL 146688 (S.D.N.Y.))

The Court takes as true the facts as alleged in the Second Amended Complaint. Beginning on or about February 10, 1996, Gibson was confined in the Central Punitive Segregation Unit ("CPSU") [FN4] at Rikers Island for a period of ninety days after a disciplinary hearing.[FN5] For the first thirty days of Gibson's CPSU confinement, he was housed at the James A. Thomas Center ("JATC") even though JATC "was ordered closed due to high levels of asbestos, insect infestation and possibly lead paint" and "the general population inmates were moved to other buildings." On March 10, 1996, the CPSU was moved to the Otis Bantum Correctional Center ("OBCC"). While Gibson was housed in OBCC CPSU between March 10 and May 16, 1996, he was denied access to recreation on eight occasions (March 10, 11, and 14, April 3, 13, 20, and 22, and May 4), denied access to the law library on four occasions (March 27, 28, and 29, and April 10), denied access to a religious service on March 15, and required to choose between access to recreation and the law library on April 18 and between access to recreation and the barber shop on April 19. Gibson states that he reported each deprivation to defendants Deputy Warden Edwin Knight ("Knight") and Deputy Warden Clyton Eastmond ("Eastmond"), both of whom failed to intervene or prevent the recurrence of these deprivations. In addition, the plaintiff alleges that Ortiz was aware of the problems because Knight and Eastmond reported to him.

> FN4. The defendants explain that the CPSU is the housing area at Rikers Island where inmates who have been disciplined for rules' infractions are housed.

> FN5. The plaintiff does not say when his confinement in CPSU began or for what offense he was confined. The Court has inferred the date on which Gibson's confinement began from the other events for which the plaintiff provides dates.

*2 Gibson also states that the defendants were deliberately indifferent to his condition as an asthmatic. During a slashing incident in the law library, a John Doe Captain and a corrections officer used a chemical agent (mace) in an attempt to subdue another inmate. While Gibson was not involved in the fight, he was present in the law library at the time and the exposure to the chemical agent triggered an asthma attack. Gibson returned to his cell and used his inhaler to stop the attack. Gibson complains that he was not asked by prison officials if he wanted to see a doctor and was not taken to the prison infirmary.

Finally, Gibson claims that his due process rights were violated during the procedure which had led to his confinement in CPSU. On May 1, 1996, after an Article 78 proceeding, the infraction for which Gibson was confined in CPSU was dismissed due to "a late warden signature." Gibson, however, was not released from CPSU for another fifteen days, that is, until May 16, 1996, his regularly scheduled release date. Gibson daily asked John Doe Area Captains and Knight why he was being held beyond his confinement date. These individuals told Gibson that they had checked and had not received an order for his release.

Standard for Motion to Dismiss

A court may dismiss an action pursuant to Rule 12(b)(6), Fed.R.Civ.P., only if " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which will entitle him to relief." ' Cohen v. Koenig, 25 F.3d 1168, 1172 (2d Cir.1994) (quoting Conley v. Koenig, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In considering the motion, the court must take "as true the facts alleged in the complaint and draw[] all reasonable inferences in the plaintiff's favor." Jackson Nat. Life Ins. v. Merrill Lynch & Co. 32 F.3d 697, 699-700 (2d Cir.1994). The Court can dismiss the claim only if, assuming all facts alleged to be true, plaintiff still fails to plead the basic elements of a cause of action.

When a plaintiff is proceeding pro se, the court must liberally construe the complaint. See, e.g., Boddie v. Schneider, 105 F.3d 857, 860 (2d Cir.1997). "A complaint should not be dismissed simply because a plaintiff is unlikely to succeed on the merits." Baker v. Cuomo, 58 F.3d 814, 818 (2d Cir.1995).

Discussion

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 146688 (S.D.N.Y.)
(Cite as: 1998 WL 146688 (S.D.N.Y.))

The plaintiff's allegations form the basis for claims (1) that the defendants subjected him to conditions of confinement which violated his constitutional rights, (2) that the defendants interfered with his constitutional right for access to the courts, and (3) that the defendants violated his due process rights in connection with the procedures leading to his confinement in CPSU. The Court considers each of these claims in turn.

I. *Conditions of Confinement*

Since the plaintiff was a pretrial detainee at the time of the alleged deprivations, his claims regarding the conditions of his confinement are governed by the Due Process Clause of the Fourteenth Amendment. *See Bryant v. Maffucci,* 923 F.2d 979, 983 (2d Cir.1991) (citing *Bell v. Wolfish,* 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). Under the Due Process Clause, the state may subject a pretrial detainee to restrictions that are inherent to confinement in a detention facility so long as those conditions do not amount to punishment. *See Bell,* 441 U.S. at 536-7. "Not every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense ...." *Id.* at 537. The Supreme Court has stated that the issue is whether " 'the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose.' " *Block v. Rutherford,* 468 U.S. 576, 584, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984) (quoting *Bell,* 441 U.S. at 538).

**\*3** While the Supreme Court has not provided specific guidance for determining when a pretrial detainee's rights have been violated, it has held that a person's Due Process rights regarding the conditions of confinement under the Fourteenth Amendment are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983) (citations omitted). *See Bryant,* 923 F.2d at 983; *Hayes v. New York City Dept. of Corrections,* 91 Civ. 4333, 1995 WL 495633 at \*5 (S.D.N.Y. Aug.21, 1995). The Supreme Court has articulated a two part test for determining whether an inmate has suffered an injury of a violation of his Eighth Amendment rights. *See Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). First, there is an objective component, which,

[f]or a claim (like the one here) based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a *substantial risk of serious harm.*

*Id.* (emphasis supplied). Second, there is a subjective component requiring that the prison official have a "sufficiently culpable state of mind," to wit, be deliberately indifferent to the harmful conditions. *Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). In *Farmer,* the Court rejected an objective test for a defendant's deliberate indifference, and held instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official *knows of and disregards an excessive risk to inmate health or safety;* the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer,* 511 U.S. at 837 (emphasis supplied).

1. *Denial of Access to Recreation*

Gibson states that he was denied access to recreation on eight occasions and forced to choose between recreation and the law library or the barber shop on two other occasions. When the dates are compared, it appears that he was deprived on only one occasion of the opportunity for recreation on consecutive days-March 10 and 11.[FN6] While it is well-established that inmates have a right to exercise, *see Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir.1996), the deprivation of the opportunity to participate in recreation for eight days in a sixty day period, even when coupled with the deprivation of an opportunity to exercise on two consecutive days, is not sufficiently serious to constitute punishment under the Fourteenth Amendment. *See, e.g., Anderson v. Coughlin,* 757 F.2d 35, 36 (2d Cir.1985) (an occasional day without exercise during inclement weather is not cruel and unusual punishment); *Davidson v. Coughlin,* 968 F.Supp. 121, 129 (S.D.N.Y.1997) (collecting cases under Eighth Amendment).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 146688 (S.D.N.Y.)
(Cite as: 1998 WL 146688 (S.D.N.Y.))

FN6. Gibson does not specify which option he chose when he was forced to choose between recreation and the law library or the barber shop. If he chose to forgo recreation on both of these occasions, it is possible that there were also three consecutive days when he did not have recreation-April 18, 19 and 20. This three day deprivation, however, would have been partially the result of a choice made by the plaintiff rather than solely the result of the defendants' actions.

2. *Denial of Religious Service*

Gibson alleges that he was denied access to a religious service on one occasion. This single deprivation is insufficient to state a deprivation that amounts to punishment. *See, e.g., Giglieri v. New York City Dep't of Corrections,* 95 Civ. 6853, 1997 WL 419250 at *3 (S.D.N.Y. July 25, 1997) (duration is one factor to consider in determining whether a deprivation or condition violates a pretrial detainee's Fourteenth Amendment rights). *But see Cruz v. Jackson,* 94 Civ. 2400, 1997 WL 45348 at *7 (S.D.N.Y. Feb.5, 1997) (denial of access to religious services for fifteen day period sufficient to state a claim).

3. *Medical Claim*

**\*4** Gibson further claims that he was denied adequate medical care when a corrections officer used mace to subdue another inmate while Gibson was in the vicinity. Specifically, Gibson complains that no officer asked him if he wanted to go to the infirmary after Gibson suffered an asthma attack. Gibson's allegations fail to meet either component of the test for a violation of his constitutional rights. While asthma may in some circumstances constitute a serious condition, Gibson promptly controlled his asthma attack with his inhaler and does not state that he suffered any further harm. Moreover, since the asthma was promptly controlled, corrections officers were not deliberately indifferent to his medical needs by failing to ask him if he wanted to go to the infirmary.

4. *Conditions at JATC*

Gibson alleges that during the thirty days he was confined at JATC before the CPSU was transferred to OBCC he was exposed to asbestos, insect infestation and perhaps lead paint. Further, he alleges that the CPSU remained at JATC for thirty days after a court order had closed the facility and after general population inmates had been transferred to different facilities. Gibson's allegations are sufficient to state a claim. First, Gibson's allegations regarding the conditions at JATC, coupled with the duration of his confinement there and the alleged existence of a court order closing the facility, are sufficient to describe a substantial risk of serious harm. Second, liberally construing the complaint, Gibson implies that the defendants were deliberately indifferent to that substantial risk because it took thirty days for the defendants to move the CPSU after a court order had closed JATC and after the general population inmates had been transferred.

II. *Denial of Access to the Law Library*

The plaintiff alleges that on four occasions he was denied access to the law library and on another occasion he was forced to choose between the law library and recreation.FN7 The Court understands the plaintiff to be complaining of interference with his constitutionally protected right of access to the courts. In order to state a claim for denial of access to the courts, "a plaintiff must demonstrate that a defendant caused 'actual injury,' i.e. took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim." ' *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997) (quoting *Lewis v. Casey,* 518 U.S. 343, ----, 116 S.Ct. 2174, 2179, 2180, 135 L.Ed.2d 606 (1996)). The actual injury requirement derives from the doctrine of standing. *Id.* Here, Gibson has not alleged that he was hindered in his efforts to pursue a legal claim. Given that the plaintiff has amended his complaint twice-once after the defendants' first motion to dismiss specifically raised this issue-and that the denial of access occurred at most five times in a sixty day period, the Court finds that granting the plaintiff further leave to amend regarding this allegation would be futile.

FN7. The plaintiff does not state which option he chose on this occasion.

III. *Due Process Violation*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 146688 (S.D.N.Y.)
(Cite as: 1998 WL 146688 (S.D.N.Y.))

**\*5** Gibson claims that his due process rights were violated in two ways. First, there were procedural irregularities in the process by which he was first confined in the CPSU.[FN8] Second, he was held in the CPSU for fifteen days after his disciplinary sentence had been vacated in an Article 78 proceeding. The Second Circuit has stated that

> FN8. Gibson identifies the procedural irregularity as a "late warden signature," but indicates that he requires discovery to determine the exact irregularity which caused the disciplinary decision to be revoked through the Article 78 proceeding.

[d]etermining whether an inmate has received due process involves "a two-pronged inquiry: (1) whether the plaintiff had a protected liberty interest in not being confined ... and, if so, (2) whether the deprivation of that liberty interest occurred without due process of law." *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir.1997) (quoting *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir.1996) (ellipses in original)). To show a protected liberty interest arising from state law, an inmate must show that the restraint imposes an "atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 482, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). The relevant factors which a court must consider to determine if a hardship is "atypical and significant" include:

(1) the effect of disciplinary action on the length of prison confinement; (2) the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions; and (3) the duration of the disciplinary segregation imposed compared to discretionary confinement.

*Wright v. Coughlin*, 132 F.3d 133, 136 (2d Cir.1998). *See also Sealey*, 116 F.3d at 52; *Brooks v. Di Fasi*, 112 F.3d 46, 49 (2d Cir.1997); *Miller v. Selsky*, 111 F.3d 7, 9 (2d Cir.1997).

The Court will address the third factor-the duration of

Gibson's confinement-first. The defendants, citing *Young v. Hoffman*, 970 F.2d 1154, 1156 (2d Cir.1992), argue that Gibson's first due process claim fails since his state challenge cured any procedural defect. Thus, they argue, Gibson was improperly confined for at most fifteen days. The Second Circuit has held, however, that

[t]he rule is that once prison officials deprive an inmate of his constitutional procedural rights at a disciplinary hearing and the prisoner commences to serve a punitive sentence imposed at the conclusion of the hearing, the prison officials responsible for the due process deprivation must respond in damages, absent the successful interposition of a qualified immunity defense.

*Walker v. Bates*, 23 F.3d 652, 658-59 (2d Cir.1994).[FN9] Thus, the Court properly considers the full ninety days in determining whether Gibson was deprived of a liberty interest.

> FN9. While the Second Circuit has not discussed the issue resolved in *Walker* since the Supreme Court's decision in *Sandin,* the Circuit has been faced with fact patterns which indicate that it adheres to the analysis in *Walker. See, e.g., Wright,* 132 F.3d at 135 (plaintiff's 288 day sentence overturned by Article 78 proceeding and then followed by Section 1983 action for damages); *Brooks,* 112 F.3d at 48 (plaintiff's 180 day sentence overturned by Article 78 proceeding and then followed by Section 1983 action).

While ninety days may not always be a significant deprivation, the Court is unable to determine based on the record now presented whether the duration of Gibson's disciplinary segregation-for either the full ninety day or the shorter fifteen day period-is similar to discretionary confinement of pretrial detainees. Similarly, the Court has no basis to make a determination of whether the conditions of disciplinary confinement differ from routine prison conditions-the second factor for consideration. At present, the record is clear as to only one factor, that is, the first factor. Gibson has not claimed that his confinement in CPSU in any way altered the term of his prison confinement.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 146688 (S.D.N.Y.)
(Cite as: 1998 WL 146688 (S.D.N.Y.))

**\*6** Assuming that Gibson's confinement in the CPSU implicated a protected liberty interest, he has stated a claim for a violation of his due process rights on only one of his two theories. As articulated in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Due Process Clause requires that prisoners be provided with written notice at least 24 hours prior to the hearing of the alleged violation of the disciplinary rules, a written statement indicating what evidence the fact-finder at the hearing relied upon and the reason for the disciplinary action taken, and, if institutional safety requires the omission of certain evidence, a statement indicating the fact of such omission. *Id.* at 564-65. Gibson has not alleged that he was deprived of any of the procedures required under *Wolff* at the proceeding for which he was initially confined in the CPSU. Moreover, if the defendants had failed to follow any of these procedures, Gibson would be aware of the deficiency and would not require discovery to state a claim. Thus, Gibson has failed to state a claim on his first theory. As to Gibson's second theory-that he was confined to the CPSU for fifteen days after the Article 78 proceeding vacated his disciplinary sentence-further factual development of the factors described above is required to determine whether fifteen days of disciplinary confinement for a pretrial detainee imposes an "atypical and significant hardship."

IV. *Motion for a Default Judgment*

Default judgments are governed by Rule 55, Fed.R.Civ.P. Rule 55(a) provides for entry of a default "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules." Rule 55(a), Fed.R.Civ.P. A court "[f]or good cause shown may set aside an entry of default." Rule 55(c), Fed.R.Civ.P. Although Rule 55(c) applies on its face to setting aside defaults already entered, the same analysis should be employed in evaluating opposition to entry of a default. *See Commercial Bank of Kuwait v. Rafidain Bank,* 15 F.3d 238, 243 (2d Cir.1994). The Second Circuit has stated that

[g]ood cause depends upon such factors as the willfulness of the default, the prejudice the adversary would incur were the default set aside [or should the Court decline to

enter it], and the merits of the defense proffered.

*In re Chalasani,* 92 F.3d 1300, 1307 (2d Cir.1996). In addition, the Court must keep in mind the "oft-stated preference for resolving disputes on the merits." *Enron Oil Corp. v. Diakuhara,* 10 F.3d 90, 95 (2d Cir.1993).

Here, Gibson asks the Court to enter a default judgment against Ortiz. Gibson has not shown that the default by Ortiz was willful. Ortiz joined the other defendants in moving to dismiss the *First* Amended Complaint. Only after the plaintiff filed and served a Second Amended Complaint did Ortiz neglect initially to join the motion to dismiss the Second Amended Complaint. Additionally, Gibson has not shown that he would suffer any prejudice from the Court declining to enter the default judgment against Ortiz. Finally, Ortiz may be able to interpose a successful defense; Gibson has not alleged that Ortiz was personally involved in the claims that survive the motion to dismiss. *See Sealey,* 116 F.3d at 51.[FN10]

FN10. While the defendants included in their motion to dismiss the First Amended Complaint an argument based on the plaintiff's failure to allege personal involvement, they have not included such an argument in the instant motion.

Conclusion

**\*7** The defendants' motion to dismiss is granted on all claims, except the plaintiff's claims that he was subjected to unconstitutional conditions of confinement while housed in the JATC CPSU for thirty days and that he was held in the CPSU for fifteen days after his disciplinary sentence had been vacated in an Article 78 proceeding. The plaintiff's motion for the entry of a default judgment against defendant Ortiz is denied.

SO ORDERED:

S.D.N.Y.,1998.
Gibson v. City of New York
Not Reported in F.Supp., 1998 WL 146688 (S.D.N.Y.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 146688 (S.D.N.Y.)
(Cite as: 1998 WL 146688 (S.D.N.Y.))


END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1998 WL 148386 (S.D.N.Y.)
(Cite as: 1998 WL 148386 (S.D.N.Y.))

**C**  Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Fred MABERY; Larry Basheer Hameed, Plaintiffs,
v.
John P. KEANE; Philip B. Coombe; and Anthony J.
Annucci, individually and in their official capacity,
Defendants.
Larry Deberry, Curtis Bolden, and Nyrlson Bigord,
Plaintiffs,
v.
George E. Patacki, John P. Keane, and Anthony J.
Annucci, Defendants.
**No. 95 Civ. 1093(JFK).**

March 30, 1998.

Larry Deberry, Albion, NY, Curtis Bolden, Ossining, NY,
Nyrlson Bigord, Wilton, NY, Larry Basheer Hameed,
Syracuse, NY, Fred Maberry, Bronx, NY, for pro se
plaintiffs.

Dennis C. Vacco, Attorney General of the State of New
York, New York City, of counsel, Annemarie Prudenti, for
defendants.

**OPINION and ORDER**

KEENAN, J.

*1 Before the Court is Defendants' motion for summary
judgment, pursuant to Fed.R.Civ.P. 56(c), dismissing all
of the claims against them in these two actions. For the
reasons discussed below, the motion is granted in its
entirety.

***The Parties***

Plaintiff Fred Maberry, formerly incarcerated at Tappan
Correctional Facility ("Tappan"), was released on parole
on March 11, 1997. Tappan is a medium security facility
located in Ossining New York on the grounds of the Sing
Sing Correctional Facility ("Sing Sing"), but Tappan is
physically separate from Sing Sing. *See* Morris Aff. ¶ 4.[FN1]
Sing Sing is a maximum security facility.

> FN1. While the two facilities are separate in the
> sense that the Tappan medium security inmates
> are housed apart from the Sing Sing maximum
> security inmates and enjoy separate messhall and
> recreation areas, the two facilities share the same
> grounds as well as many services and personnel.
> Thus, Plaintiffs have named the Sing Sing
> superintendent as a Defendant in these actions
> and refer to the Tappan facility as the "Sing Sing
> Annex" in the Complaints.

Plaintiff Larry Hameed, formerly incarcerated at Tappan,
is currently incarcerated at Mid-Orange Correctional
Facility.

Plaintiff Larry Deberry, formerly incarcerated at Tappan,
is currently incarcerated at Orleans Correctional Facility.

Plaintiff Curtis Bolden [FN2] is currently incarcerated at
Tappan.

> FN2. In the caption of the case, Curtis Bolden's
> name is spelled as "Crutis Bolden."

Plaintiff Nyrlson Bigord, formerly incarcerated at Tappan,
was released on parole on July 25, 1995.

Defendant John P. Keane is the former Superintendent of
Sing Sing.

Defendant Philip B. Combe is the former Commissioner
for the New York State Department of Correctional

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 148386 (S.D.N.Y.)
(Cite as: 1998 WL 148386 (S.D.N.Y.))

Services ("DOCS").

Defendant Anthony J. Annucci is counsel for DOCS.

Defendant George Pataki [FN3] is the Governor of the State of New York.

> FN3. Governor Pataki's name is spelled incorrectly as "Patacki" in the Complaints, as well as in Defendants' papers in support of their summary judgment motion.

### Preliminary Statement

At or near the time of filing their respective Complaints, Plaintiffs were incarcerated at Tappan, which is a medium security facility located in Ossining, New York and is on the grounds of the Sing Sing maximum security facility. Since the filing of these lawsuits, all of the Plaintiffs, except Curtis Bolden, have either been transferred to another facility within DOCS or have been released on parole. Plaintiffs commenced these actions, pursuant to 42 U.S.C. § 1983, alleging that the conditions under which they were confined at Tappan violated their Eighth Amendment rights secured by the United States Constitution. Because a review of the complaints in the *Maberry* case and the *Deberry* case revealed that the claims are identical, the Court consolidated discovery in these actions. Now, in light of the fact that the two Complaints are identical, Defendants in both cases have made a single motion for summary judgment.

The Court observes, as a preliminary matter, that the papers filed by Plaintiffs in opposition to this motion fail to address any of factual assertions and legal arguments set forth in Defendants' motion for summary judgment, and Plaintiffs did not submit a Local Civil Rule 56.1 statement. [FN4] In their opposition papers, Plaintiffs also make two applications: (1) to take a deposition other than by stenographic means, and (2) for an order directing Defendants to produce certain documents. As for the first request, Plaintiffs made an identical application for permission to conduct depositions by tape recorder on August 15, 1995 and this Court granted that motion on

October 19, 1995. It is the Court's understanding that Plaintiffs have not even provided Defendants with a list of individuals that Plaintiffs seek to depose. *See* Prudenti Letter (Sept. 24, 1997). This application is denied. As for the second request, the record indicates that defense counsel responded to Plaintiffs' interrogatories and documents requests, and the Freedom of Information Law requests are not addressed to these Defendants but to the County of Westchester and the United States Department of Justice. Discovery has been closed since July 29, 1997, after this Court allowed almost two years for discovery. Plaintiffs have had ample opportunity to conduct discovery in this matter and the Court will rule on the motion papers now before the Court.

> FN4. Only Plaintiff Curtis Bolden submitted papers in response to the summary judgment motion.

### Background

*2 In this 42 U.S.C. § 1983 action, Plaintiffs allege that the conditions of confinement at Tappan violate the Eighth Amendment. Specifically, Plaintiffs assert that the housing units located in buildings # 9, # 10, and # 11 (all part of Tappan) are poorly designed, constructed of highly flammable materials and lack water sprinkler systems, thus making them firetraps. Plaintiffs further allege that the conditions of confinement are not sanitary insofar as cleaning supplies are in short supply; there is no ventilation system in the sleeping or bathroom areas, thus allowing moisture and "stink" to seep into the housing areas; the facility is only exterminated once every six to twelve months; and improper ventilation has caused Plaintiffs to breathe noxious fumes from the burning of raw sewage at the nearby Westchester County sewage plant. Lastly, Plaintiffs complain that the Tappan inmates (medium security) and Sing Sing inmates (maximum security) are permitted to freely mix without appropriate supervision, resulting in threats of violence, intimidation, and fear.

Defendants now move for summary judgment on these claims, arguing that there is no genuine issue for trial on Plaintiffs' claimed Eighth Amendment violations.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 148386 (S.D.N.Y.)
(Cite as: 1998 WL 148386 (S.D.N.Y.))

### *Discussion*

A motion for summary judgment may be granted under Fed.R.Civ.P. 56 if the entire record demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Summary judgment is proper when reasonable minds could not differ as to the import of the evidence before the court." *Cable Science Corp. v. Rochdale Village, Inc.,* 920 F.2d 147, 151 (2d Cir.1990). When viewing the evidence the Court must "assess the record in the light most favorable to the non-movant and ... draw all reasonable inferences in its favor." *Delaware & Hudson Railway Co. v. Consolidated Rail Corp.,* 902 F.2d 174, 177 (2d Cir.1990). Although the movant initially bears the burden of showing that there are no genuine issues of material fact, once such a showing is made, the party opposing a properly supported motion must "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256. A genuine issue of fact is when "a reasonable jury could return a verdict for the nonmoving party," and the substantive law at issue renders certain facts as material to the outcome of the litigation. *Id.* at 248. The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmovant must " 'come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely ... on the basis of conjecture or surmise .' " *Trans Sport, Inc. v. Starter Sportswear,* 964 F.2d 186, 188 (2d Cir.1992) (citation omitted).

### A. Claims Against Defendants in their Official Capacities

**\*3** To the extent that Plaintiffs state claims against Defendants in their official capacities, those claims must be dismissed upon the doctrine of Eleventh Amendment immunity. *See Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) ("To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.").

### B. Lack of Personal Involvement by Defendants

Defendants move for summary judgment on the ground that Plaintiffs have made no allegations nor adduced any evidence through discovery to indicate that the named Defendants had any personal involvement in the alleged constitutional violations at issue here. The Court agrees.

In order to state a claim under 42 U.S.C. § 1983, a plaintiff must allege conduct, under color of state law, that deprives him of rights secured by the Constitution or laws of the United States. *See Katz v. Klehammer,* 902 F.2d 204, 206 (2d Cir.1990). A plaintiff must establish fault and causation on the part of each defendant. Consequently, a defendant's personal involvement in the alleged constitutional violation is a prerequisite to the assessment of individual liability and imposition of damages. *See generally Monell v. New York City Dep't of Social Services,* 436 U.S. 658, 690-95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977) *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). Moreover, the doctrine of *respondeat superior* does not apply to civil rights actions and cannot be used as a substitute for a lack of personal involvement on the part of a defendant. *See Monell,* 436 U.S. at 691-95. "The fact that [an official] was in a high position of authority is an insufficient basis for the imposition of personal liability." *McKinnon,* 568 F.2d at 934; *see Gill,* 824 F.2d at 196. In *Williams v. Smith,* 781 F.2d 319 (2d Cir.1986), the Second Circuit set forth the following standards for establishing personal involvement:

A defendant may be personally involved in a constitutional deprivation within the meaning of 42 U.S.C. § 1983 in several ways. [1] The defendant may have directly participated in the infraction. [2] A supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong. [3] A supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue. [4] Lastly, a supervisory official may be personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 148386 (S.D.N.Y.)
(Cite as: 1998 WL 148386 (S.D.N.Y.))

or event.

*Id.* at 323-24.

In this case, there are no allegations of specific facts in either Complaint to indicate that Superintendent Keane, former Commissioner Coombe, DOCS counsel Annucci, or Governor Pataki directly participated in the alleged violation; failed to remedy the alleged violation after learning of it; created a custom or policy fostering the violation; or was grossly negligent in supervising subordinates. The only mention of these Defendants is in the caption of the Complaint and that is not enough to establish personal involvement for § 1983 purposes.

**C. Eighth Amendment Claims**

**\*4** Even assuming that Plaintiffs adequately alleged Defendants' personal involvement and set forth evidence with regard to Defendants' personal involvement for § 1983 liability, the Court concludes that Defendants have set forth enough evidence on this motion to establish that Plaintiffs' conditions of confinement at Tappan comport with the Eighth Amendment and that no reasonable jury could render a verdict in Plaintiffs' favor on the alleged Eighth Amendment violations.

The Eighth Amendment prohibits the infliction of "cruel and unusual punishment" on those convicted of crimes. U.S. Const. amend. VIII. A plaintiff seeking to establish that conditions of confinement inflict cruel and unusual punishment in violation of the Eighth Amendment must prove both (1) "serious deprivations of basic human needs," Anderson v. Coughlin, 757 F.2d 33, 35 (2d Cir.1985), and (2) that the defendants imposed these conditions with "deliberate indifference." Wilson v. Seiter, 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

With regard to the first prong, the Court notes initially that the Eighth Amendment "does not mandate comfortable prisons," Rhodes v. Chapman, 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), and conditions that are "restrictive and even harsh" are "part of the penalty that

criminal offenders pay for their offenses against society." *Id.,* at 347. Indeed, "nobody promised them [convicted felons] a rose garden; and I know of nothing in the Eighth Amendment which requires that they be housed in a manner most pleasing to them, or considered even by most knowledgeable penal authorities to be likely to avoid confrontations, psychological depress, and the like." Atiyeh v. Capps, 449 U.S. 1312, 1315-16, 101 S.Ct. 829, 66 L.Ed.2d 785 (1981) (Rehnquist, J., in chambers). Yet, the Eighth Amendment does prohibit conditions of confinement that result in either "unquestioned and serious deprivations of basic human needs" or "deprive inmates of the minimal civilized measure of life's necessities." Rhodes, 452 U.S. at 347. The Second Circuit has stated:

There are numerous aspects of prison confinement that have the potential for causing deleterious effects on the physical and mental well-being of prisoners. The fact of confinement itself is chief among them. The Eighth Amendment does not guarantee that all such effects will be prevented, nor even that all reasonable steps will be taken to minimize risks. By prohibiting cruel and unusual punishment, the Amendment stands as a barrier against fundamental and shocking indecency to those whom the state has chosen to confine for their crimes.

 Anderson, 757 F.2d at 36.

**1. Fire Safety Allegations**

With regard to this claim, the Court observes that it is not the province of federal courts to "become enmeshed in the minutiae of prison operations." Bell v. Wolfish, 441 U.S. 520, 562, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Rather, federal courts must enforce constitutional standards. Correctional facilities "unquestionably have a duty to provide adequate fire safety for the inmates," Miles v. Bell, 621 F.Supp. 51, 65 (D.Conn.1985), and an inquiry into the adequacy of a prison's fire safety under the Eighth Amendment must be guided by some objective indicia rather than merely the subjective views of a judge. *See* Rhodes, 452 U.S. at 346.

**\*5** Defendants have offered sufficient evidence on this motion to demonstrate that the fire safety procedures at

Not Reported in F.Supp., 1998 WL 148386 (S.D.N.Y.)
(Cite as: 1998 WL 148386 (S.D.N.Y.))

Sing Sing, which includes the Tappan buildings, *see* Gibson Aff. ¶¶ 1, 3-4; Brady Aff. ¶¶ 3, 10, are more than adequate to protect the inmates' well-being and safety, and do not run afoul of the Eighth Amendment. Sing Sing and Tappan are inspected by a Fire Safety Officer for compliance with the New York State Uniform Fire Prevention and Building Code on a yearly basis. Since 1990, Tappan has been found to be in substantial compliance with the Uniform Fire Prevention and Building Code. Where certain aspects were not in compliance, the Fire Safety Officer discussed the condition with Sing Sing executive staff and the steps necessary to achieve compliance and, upon reinspection, found Sing Sing to be in complete compliance. *See* Prudenti Aff. ¶¶ 4-6.

In the Tappan Correctional Facility, which is located on Sing Sing's grounds but is physically separate from Sing Sing, inmates live in dormitories. Tappan inmates are not housed in cells, but rather, cubicles divided by half walls used there to separate the inmates' beds. These partitions meet existing fire and building codes. *See* Morris Aff. ¶¶ 4-6; Brady Aff. ¶¶ 3, 8. Since 1995, several renovations to the physical structure have taken place at Tappan, including renovation of the cubicles and construction of firewalls. These renovations were not required to bring the facility into compliance with the Uniform Fire Prevention and Building Code, but rather to improve the existing conditions at the facility. All renovations are 95% complete. *See* Brady Aff. ¶¶ 3-9.

In the event of a fire, Sing Sing has an alarm system on all housing units by which the watch commander's office can learn of an emergency in a particular area of the facility. In addition, designated officers carry radios assigned to a particular part of the facility. On each such radio is a pin which need only be pulled to send an alarm to the watch commander's office. In addition to sending help, the watch commander can communicate with the officers via telephone or radio. All appropriate supervisory personnel including the watch commander, have Ready Emergency Data books outlining the appropriate procedures to take in the case of any type of emergency. These manuals also contain listings for the contact of any and all required emergency services. *See* Morris Aff. ¶¶ 7-11. All of the buildings in which inmates are housed have fire extinguishers that are inspected at appropriate intervals and which are readily available to extinguish any fire in

those buildings. These hundreds of extinguishers are "all purpose types" and can be used for electrical or other fires. *See* Morris Aff. ¶ 12. In addition to fire extinguishers, the three Tappan housing units all have standpipes and fire hoses for firefighting purposes. These hoses are long enough to reach any occupied area and are inspected at appropriate intervals. There are also an extensive number of fire hydrants located throughout the grounds of Sing Sing which provide more than adequate water to extinguish any fire that occurs. Also, there are a number of portable smoke ejectors which are brought to the area of any fire and which remove smoke from the area. *See* Morris Aff. ¶¶ 13-15.

**\*6** Sing Sing and Tappan have a trained and certified firefighter, Noel Morris, who has been its Fire and Safety Officer since March 1, 1994. He is on duty five days per week, eight hours per day and is available "on-call" at all other times. There is a specially trained deputy fire chief on duty in facility on all shifts when Mr. Morris is not in the facility. The Fire Safety Officer supervises a 52 man fire brigade. The fire brigade has a fully equipped, operational fire truck on the grounds. Each member of the brigade has received training and been certified by the Westchester County Fire Training Center, located at Valhalla, New York. The brigade, supervised at all times by an assistant fire chief, is available 24 hours per day, 7 days per week, and can and does respond to any fire emergency at the facility. *See* Morris Aff. ¶¶ 16-18. Further, all correction officers go through fire safety training courses during their initial training at the DOCS Training Academy and during their yearly formal in-service training. Sing Sing has also trained members of the Correction Emergency Response Team ("CERT") available on the premises at all times. CERT members are trained in such areas as emergency evacuations of housing units during hazardous conditions. Sing Sing has self-contained breathing apparatus available at every housing unit to aid in the evacuation of inmates and staff in the event of a fire. *See* Morris Aff. ¶ 19. Sing Sing has emergency first aid equipment available to medical staff and a cadre of first aid trained and certified correction officers. There is a registered nurse on duty in the Sing Sing emergency room located in the hospital building 24 hours per day, seven days per week to provide emergency medical care. *See* Morris Aff. ¶ 20.

Sing Sing has a mutual aid agreement in effect with the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 148386 (S.D.N.Y.)
(Cite as: 1998 WL 148386 (S.D.N.Y.))

Town of Ossining Fire Department located at the border of the facility. This arrangement provides fire fighters and equipment access to all of Sing Sing within minutes of the reporting of any fire emergency since the nearest Ossining fire house is only several hundred feet from Sing Sing. In addition, the Ossining Fire Department comes into the facility at least once per year for a fire drill and an inspection. *See* Morris Aff. ¶ 21.

There is a daily check of all fire extinguishers and equipment and a daily safety inspection including maintenance problems conducted on every gallery or floor in every housing unit at Sing Sing. There is a Lieutenant assigned to each housing area who is responsible for submitting a report entitled "Daily Safety Checklist." There are also weekly, monthly and yearly check and reports by various staff members including Sing Sing's executive staff. *See* Morris Aff. ¶ 22.

Sing Sing has a Fire Safety and Environmental Services Committee which meets monthly at Sing Sing and monitors the health and safety of the various components of Sing Sing, including the inmate population. This committee performs audits of the facility and acts to correct any deficiencies found. *See* Morris Aff. ¶ 23. Finally, periodic and regular monthly fire drills are conducted in each housing unit which trains all staff and inmates in the safe and expeditious evacuation procedures of those housing units. This includes live evacuation drills. *See* Morris Aff. ¶ 24.

**\*7** Defendants also point out that since 1987, Sing Sing, which includes all Tappan buildings, have met all standards and requirements of the American Correctional Association ("ACA") and received a certification of accreditation. The mandatory standards for accreditation include administrative and fiscal controls, staff training and development, physical plant, safety and emergency procedures, sanitation, food services, rules and discipline and various other operations essential to good correctional management. *See* Prudenti Aff. ¶¶ 6-7, Ex. A; Brady Aff. ¶ 10.

Accordingly, the Court concludes that Defendants' have met their burden in establishing that no genuine issue of material fact exists that Tappan's fire safety procedures

meet Eighth Amendment standards. The Court grants Defendants' motion for summary judgment on this claim.

**2. Inmate Safety Claim**

The Eighth Amendment "requires prison officials to take reasonable measures to protect inmates from violence at the hands of other inmates." *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Prison officials have a duty to duty to protect prisoners from violence at the hands of other inmates since being violently assaulted in prison is "simply not part of the penalty that criminal offenders pay for their offenses against society." *Id.* at 833-34. In order to constitute an Eighth Amendment violation, conduct that does not purport to be punishment must involve more than a lack of ordinary care for the prisoner's safety; mere negligence will not suffice. *See Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). Moreover, "not every injury suffered by one prisoner at the hands of another translates into constitutional liability for prison officials responsible for the inmates' safety." *Farmer,* 511 U.S. at 834.

In the instant matter, Plaintiffs make the conclusory assertion that the commingling of Tappan and Sing Sing inmates, coupled with the lack of supervision during this commingling, has resulted in "a great number of Tappan medium security inmates [being] attacked and badly assault robbed and extorted by maximum security inmates in the Sing Sing Maximum Facility." Compl. at 2. First, there is no proof in the record, nor any specific factual allegations, to support these contentions. Second, there is no proof in the record, nor any specific factual allegations, that Plaintiffs informed Defendants that they feared for their safety or that Defendants had knowledge of or a reason to know of these alleged threats to Plaintiffs' safety and failed to take reasonable measure to abate the risk to Plaintiffs' safety.

Moreover, Defendants submitted evidence establishing that all inmates are adequately supervised at all times at all locations of the grounds which comprise Sing Sing and Tappan. While the Tappan buildings are located on the grounds of Sing Sing and Tappan shares many services with Sing Sing, Tappan is a separate and distinct inmate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 148386 (S.D.N.Y.)
(Cite as: 1998 WL 148386 (S.D.N.Y.))

facility from Sing Sing. Only medium security inmates are housed within any one of the five Tappan buildings, and Tappan inmates have separate messhalls and recreation areas. *See* Gibson Aff. ¶ 4. While several programs and activities, including chapel services, commissary trips, and medical assistance and treatment are made available to both Sing Sing and Tappan inmates, all inmates participating in such programs or activities are closely supervised. For instance, all inmates (Sing Sing and Tappan) are escorted by a correctional officer to the commissary. Each escort officer remains in the waiting area until all inmates from his block or housing area have completed their purchases. In addition to the escort officers, an officer is stationed in the entrance to the commissary. Only twenty inmates are permitted to enter the commissary at a time. Approximately four civilian employees are employed inside the commissary and oversee the purchase of goods. Similarly, all inmates seeking to attend or participate in chapel activities must be escorted by a correctional officer. Only inmates scheduled to participate in a program or work assignment will be permitted access to the chapel area. In addition, both correctional officers and several civilian employees supervise the area. The civilian employees monitor and direct may of the programs. Inmates will be escorted back to their housing area either by a corrections officer or an inmate civilian employee. While Tappan inmates may enter the hospital facility for a scheduled appointment without an escort, maximum security inmates from Sing Sing must be escorted to and from the hospital facility by a correctional officer. In addition to the escort officers, there are correctional officers stationed on each of the four floors of the medical facility and located at the entrance to the clinics and the hospital. *See* Gibson Aff. ¶¶ 4-10.

**\*8** Defendants have met their burden of establishing that no genuine issue of material fact exists with regard to Plaintiffs' inmate safety claim, and the Court grants Defendants' motion for summary judgment on this claim.

**3. Sanitary Conditions**

While Plaintiffs conclusorily allege unconstitutional sanitary and health conditions at Tappan due to a lack of cleaning supplies, infrequent extermination of housing units (only one or two times yearly), poor ventilation in the shower and bathroom areas resulting in the seepage of

"stink" and moisture into the housing areas, and the nearby burning of the raw sewage at a Westchester County Facility that results in inmates having to breathe these fumes, the Court finds that these conclusory allegations do not state Eighth Amendment violations. Further, the Court observes that, since 1987, Tappan has received accreditation from the ACA. The mandatory standards for accreditation include examination of the physical plant, sanitation, food services, and various other operations essential to good correctional management. *See* Prudenti Aff. ¶¶ 6-7, Ex. A; Brady Aff. ¶ 10. The Court grants Defendants' motion for summary judgment on this claim.

### *Conclusion*

For the reasons discussed above, the Court grants Defendants' motion for summary judgment in both the *Maberry* and *Deberry* actions. While the Court recognizes that pro se litigants are afforded a certain amount of leeway on summary judgment motions, these Plaintiffs have simply failed to raise any genuine issue of material fact on their Eighth Amendment claims. The evidence is such that no reasonable jury could render a verdict in their favor. The Court directs that these cases be closed and removed from the Court's active docket.

**SO ORDERED.**

S.D.N.Y.,1998.
Mabery v. Keane
Not Reported in F.Supp., 1998 WL 148386 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1997 WL 419250 (S.D.N.Y.)
(Cite as: 1997 WL 419250 (S.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Terenzio GIGLIERI, Plaintiff,
v.
NEW YORK CITY DEPT. OF CORRECTIONS,
Michael JACOBSON, DEPUTY COMMISSIONER,
WARDEN MANHATTAN DETENTION CENTER,
Captain GREEN, INTAKE DEPT., CORRECTION
OFFICER JOHN DOE # 1 and CORRECTION OFFICER
JANE DOE # 1, Defendants.
**No. 95 CIV. 6853.**

July 25, 1997.

Terenzio Giglieri, New York, NY, Pro Se.

Paul A. Crotty, Corporation Counsel of the City of New
York, Marilyn Richter, New York, N.Y. 10007 For
Defendants.

OPINION AND ORDER

ROBERT P. PATTERSON, JR., District Judge.

**\*1** Defendants, New York City Department of Corrections
("DOC"), Commissioner Michael Jacobson ("Jacobson")
[FN1] and Warden Manhattan Detention Center ("MDC")
move for judgment on the pleadings pursuant to Federal
Rules of Civil Procedure ("Fed.R. Civ.P.") 12(c)
dismissing the amended complaint on the grounds that it
fails to state a claim upon which relief can be granted.[FN2]
Jacobson also moves to dismiss the amended complaint
against him on the grounds of qualified immunity.

> FN1. In the caption, Michael Jacobson's title is
> incorrectly listed as Deputy Commissioner.
> (Memorandum in Support of Defendant's Motion

for Judgment on the Pleadings, "Def. Mem." at
1.)

> FN2. Defendants Captain Green, Corrections
> Officers John Doe # 1 and Jane Doe # 2 were not
> served with the summons. (Docket Sheet at 10.)
> Accordingly, this opinion addresses only those
> defendants who were duly served.

For the following reasons, defendants' motion for
judgment on the pleadings is granted for failure to state a
claim.[FN3]

> FN3. Since the amended complaint is dismissed
> for failure to state a claim, Jacobson's claim to
> qualified immunity need not be addressed.

BACKGROUND

Plaintiff Terenzio Giglieri ("Giglieri"), filed this amended
complaint *pro se* on September 23, 1995. In his amended
complaint he asserts that he was "often" subjected to
heavy concentrations of cigarette smoke for periods of "at
least forty-five minutes" on several occasions "on 30.
March, 31. March and other dates in 1995 prior to May,
1995" while confined in cells at the intake department of
the MDC. (Am. Compl. Section IV at 3.) [FN4]

> FN4. The intake department of MDC utilizes
> holding cells to keep inmates in a secure setting
> on a temporary basis as they are returning or
> leaving the jail until they can be returned to their
> housing area. (Def. Mem. at 2.)

Plaintiff further states that he was locked in these cells
with other inmates the majority of whom "chain smoke
with a passion"; that these intake cells were crowded; and
that this affected his health by way of "extensive exposure
to heavy concentration of cigarette smoke." (Am. Compl.
Section IV at 3-4.) Plaintiff also claims that when he
complained to two corrections officers and a corrections

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 419250 (S.D.N.Y.)
(Cite as: 1997 WL 419250 (S.D.N.Y.))

captain about this problem, one told him "then you shouldn't have come to jail" and others echoed this statement. *Id.* at 4. Plaintiff also asserts that he was being detained in cells without ventilation, without windows and with solid doors having a plexi-glass front. *Id.* at 3. Plaintiff claims he tried to "suck air" through a small slit in the door but was told to "get away from there" whenever he tried sucking air through the opening. (Am. Compl. Section IV at 4.) Plaintiff states that a "hispano-American officer ... liked slamming the door shut" and that "an African-American [officer] ... totally ignored [him] and others who claimed to have Asmath." (*Id.*) Plaintiff alleges that due to these circumstances, he has "been subjected to obtaining lung cancer and amphesima." (*Id.*) Plaintiff seeks relief in the form of: (1) installation of a ventilation system; and (2) monetary compensation in the amount of $4,000,000. *Id.* at 5.

DISCUSSION

A motion for judgment on the pleadings applies the same standards applicable to a motion to dismiss under Fed.R.Civ.P. 12(b)(6), under which a court must accept the allegations in the complaint as true and draw all reasonable inferences in favor of the non-movant. *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.) *cert. denied,* 513 U.S. 816, 115 S.Ct. 73, 130 L.Ed.2d 28 (1994). If the court finds that the pleadings still fail to state a claim upon which relief can be granted, the complaint should be dismissed.

**\*2** Plaintiff argues that his right to equal protection under the Fourteenth Amendment was violated because he was exposed to second-hand tobacco smoke in a holding cell which he claims had no ventilation for several periods of time of at least forty-five minutes while he was a detainee at MDC.[FN5] Giglieri argues in his amended complaint that these circumstances violated his right to equal protection because "[f]ines are imposed [by the City of New York] on restaurants with poor or no ventilations at all," yet not on the prison facility. (Am. Compl. Section IV at 3.)

FN5. While defendants cite *Rehm v. Malcom,* 432 F.Supp. 769 (S.D.N.Y.1977), to show that MDC's ventilation has been sufficient, *Rehm* does not necessarily support the contention that

MDC's ventilation system today is sufficient since *Rehm* dates from 1977, and, in *Rehm,* the ventilation system had not yet been installed. (Def. Mem. at 2.)

The U.S. Supreme Court has held that the constitutionality of conditions in detention facilities are not determined by comparison with conditions in the outside world. "'Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'DD' *Bell v. Wolfish,* 441 U.S. 520, 545-46, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), (*quoting Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948)). There is no requirement under the Fourteenth Amendment that prison conditions be equal to conditions in the outside world, *e.g.,* restaurant conditions. Plaintiff's allegation of differential treatment on this basis does not state an equal protection claim.

Since Plaintiff is a pretrial detainee, Plaintiff may also be asserting a claim under the Due Process Clause of the Fourteenth Amendment that the detention condition at issue violated his liberty interest.[FN6] A detainee may not be punished prior to an adjudication of guilt under the Due Process Clause, so Plaintiff may assert a due process violation if his complaint demonstrates that the condition at issue constitutes cruel and unusual punishment. *Id.* at 535. Under *Bell v. Wolfish,* "'a pretrial detainee is entitled to protection from adverse treatment if he can prove punitive intent *or* that a restriction or condition [of confinement] is not reasonably related to a legitimate goal ....'" *Whisenant v. Yuam,* 739 F.2d 160, 167 (4th Cir.1984) (quoting *Bell v. Wolfish,* 441 U.S. at 539).

FN6. While Plaintiff does not articulate this claim, the complaints of *pro se* plaintiffs are to be read liberally. *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595, 30 L.Ed.2d 652 (1972).

In *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 287, 50 L.Ed.2d 251 (1976) the Supreme Court applied the "deliberate indifference" standard to cases involving prisoner challenges to conditions of confinement under the Cruel and Unusual Punishment Clause of the Eighth

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 419250 (S.D.N.Y.)
(Cite as: 1997 WL 419250 (S.D.N.Y.))

Amendment. The deliberate indifference standard has two components. The first component is an objective element which requires a finding that the deprivation is sufficiently serious. *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). The second component is a subjective element which requires a finding that the official accused of the violation acted with a sufficiently culpable state of mind. (*Id.*)

The Supreme Court held in *Bell v. Wolfish, supra,* that "if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not amount to punishment of the detainee." 441 U.S. at 538-39. Placing Plaintiff temporarily in a holding cell with other detainees for court appearance or transfers is reasonably related to a legitimate governmental objective, *e.g.,* facilitating court efficiencies or transportation of detainees.

**\*3** *Helling v. McKinney,* 509 U.S. 25, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) is the leading case on exposure to environmental tobacco smoke ("ETS") in correction facilities. In *Helling,* the prisoner was assigned to live in a cell with another prisoner who smoked five packs of cigarettes a day. *Id.* at 28. The Supreme Court held that plaintiffs claiming involuntary exposure to ETS levels that pose an unreasonable risk of future health have stated an Eighth Amendment claim upon which relief could be granted. *Id.* at 25.

Plaintiff's amended complaint, however, does not state a claim under the objective element of the deliberate indifference test, that is, Plaintiff has not alleged facts showing that the deprivation alleged is sufficiently serious to state a claim for a due process violation. In determining whether the condition or restriction is significant enough to rise to the level of a constitutional violation, the Supreme Court has considered, among other factors, the duration of the condition or restriction. *See e .g., Sandin v. Connor,* 515 U.S. 472, 115 S.Ct. 2293, 2299, 132 L.Ed.2d 418 (1995) (harsh conditions or restrictions may be constitutional violations if imposed for prolonged periods of time); *Bell v. Wolfish,* 441 U.S. 521 (holding that "double-bunking" for a maximum of 60 days did not amount to punishment and did not constitute a violation of pretrial detainees' rights). The conditions complained of by Plaintiff, forty-five minutes at a time in a smoke-filled

cell on an unspecified number of occasions for no more than a little over a month, do not constitute an extended period of time and they do not approach the level of harm in *Helling.*

Plaintiff was exposed on a temporary basis to cigarette smoke, which caused him great discomfort and apprehension, but the facts alleged are insufficient to show that the ETS levels he was exposed to on a number of occasions were so extensive as to possibly cause current or future medical problems. Thus, Plaintiff's allegations are insufficient to state a claim because of the *de minimus* nature of the alleged wrong. *Cf. Wilson v. Seiter,* 501 U.S. at 294 (Supreme Court finds prison inmate's complaints of violation of Eighth Amendment rights due to, *inter alia,* overcrowding, improper ventilation, unsanitary dining facilities and food preparation, insufficiently serious to create constitutional violations); *cf. also Whitnack v. Douglas County,* 16 F.3d 954 (8th Cir.1994) (filthy cell with excrement, vomit, etc. was deplorable but not unconstitutional because the condition only continued for 24 hours); *White v. Nix,* 7 F.3d 120, 121 (8th Cir.1991) (eleven day stay in unsanitary cell not unconstitutional because of the relative brevity of stay and availability of cleaning supplies); *Harris v. Fleming,* 839 F.2d 1232, 1235-36 (7th Cir.1988) (five day stay in filthy, roach-infested cell is not of sufficient duration for a constitutional violation).

In *Metro-North Commuter Railroad Co. v. Buckley,* --- U.S. ---- at ----, 117 S.Ct. 2113, --- L.Ed.2d ---- at ----, 1997 WL 338550 at \*1 (U.S. June 23, 1997), the Supreme Court held that a plaintiff "cannot recover emotional distress damages unless, and until, he manifests symptoms of a disease." *Buckley* requires there be a "physical impact," which involves a "threatened physical contact [with the substance that might cause a disease] that caused, or might have caused, immediate traumatic harm," arising from temporary ETS exposure. *Id.*

**\*4** Since the conditions endured by Plaintiff in this case were only temporary and *de minimus,* Plaintiff has not alleged facts sufficient to state a claim that the conditions at issue were not merely incidental to the governmental purpose of temporarily holding Plaintiff until he could be returned to his permanent housing area or that this amounts to punishment. The fact that Plaintiff may have

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 419250 (S.D.N.Y.)
(Cite as: 1997 WL 419250 (S.D.N.Y.))

stated there was deliberate indifference by the officials is
thus irrelevant.

### CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss
pursuant to Fed.R.Civ.P. 12(c) is granted. Plaintiff's
claims are dismissed and this case is closed.

IT IS SO ORDERED.

S.D.N.Y.,1997.
Giglieri v. New York City D.O.C.
Not Reported in F.Supp., 1997 WL 419250 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 2227506 (N.D.N.Y.)
(Cite as: 2007 WL 2227506 (N.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Emilio FUSCO, Petitioner,
v.
D.B. DREW, Respondent.
**Civil Action No. 9:05-cv-41 (GLS/DRH).**

July 31, 2007.

Emilio Fusco, Longmeadow, MA, pro se.

Hon. Glenn T. Suddaby, United States Attorney for the
Northern District of New York, Charles E. Roberts, Esq.,
Assistant United States Attorney, of Counsel, Syracuse,
NY, for Respondent.

***ORDER***

GARY L. SHARPE, U.S. District Judge.

**\*1** The above-captioned matter comes to this court
following a Report-Recommendation by Magistrate Judge
David E. Homer, duly filed June 27, 2007. Following ten
days from the service thereof, the Clerk has sent the file,
including any and all objections filed by the parties herein.

No objections having been filed, and the court having
reviewed the Magistrate Judge's Report-Recommendation
for clear error, it is hereby

ORDERED, that the Report-Recommendation of
Magistrate Judge David R. Homer filed June 27, 2007 is
ACCEPTED in its entirety for the reasons state therein,
and it is further

ORDERED, that the petitioner's petition for a writ of
habeas corpus (Dkt. No. 1) is DENIED, and it is further

ORDERED, that the Clerk of the Court is to enter
judgment in favor of the Respondent and close this case.

IT IS SO ORDERED

**REPORT-RECOMMENDATION and ORDER**

DAVID R. HOMER, United States Magistrate Judge.

Pro se Petitioner Emilio Fusco ("Fusco") brings this
petition for a writ of habeas corpus pursuant to 28 U.S.C.
§ 2241 alleging a violation of his due process rights under
the Fifth Amendment in regards to a disciplinary hearing
at which he was found guilty and sentenced to the loss of
good conduct credits. Pet. (Dkt. No. 1) at Ground One.[FN1]
For the reasons which follow, it is recommended that the
petition be denied.

FN1. Fusco was released from the custody of the
Federal Bureau of Prisons on May 8, 2006. *See*
Fed. Bureau of Prisons Website, < http://
www.bop.gov/iloc2/InmateFinderServlet?Tran
saction =IDSearch & needingMoreList=false &
IDType=IRN & IDNumber=02689-748> (visited
June 25, 2007). However, Petitioner fulfills the
"in custody" requirement of 28 U.S.C. § 2241
because Fusco is subject to a three-year term of
supervised release after his incarceration was
completed. *See Harvey v. City of N.Y.,* 435
F.Supp.2d 175, 178 (E.D.N.Y.2006) (citing
*Scanio v. United States,* 37 F.3d 858, 860 (2d
Cir.1994)) (supervisory release); *see also
Fleming v.. Abrams,* 522 F.Supp. 1203, 1204-05
(S.D.N.Y.1981) (same); Scannell Decl. (Dkt. No.
5) at Ex. 1a.

**I. Background**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2227506 (N.D.N.Y.)
(Cite as: 2007 WL 2227506 (N.D.N.Y.))

Fusco was convicted in the United States District Court for the District of Massachusetts of racketeering and money laundering conspiracies in violation of 18 U.S.C. §§ 1962(d) and 1956(h). Scannell Decl. (Dkt. No. 5) at Ex. 1a. On September 19, 2003, Fusco was sentenced to thirty-three months to be followed by a three-year term of supervised release. *Id.* On April 1, 2004, while housed at the Federal Correctional Institution in Fort Dix, New Jersey, Fusco was charged with minor assault on another person. *Id.* at Ex. 1b. The charge alleged that on April 1, 2004, Fusco was running across the courtyard and when the reporting officer yelled for him to stop, Fusco ran into another **inmate**, bumping the other **inmate** in the chest with his own chest. *Id.* When the officer ran toward the **inmates**, Fusco again bumped into the other **inmate** and began yelling in that **inmate's** face. *Id.* Fusco told the officer that he and the other **inmate** were friends and were just playing around. *Id.* The officer took both **inmates** to his supervisor's office. *Id.*

A copy of the charge was delivered to Fusco and a supervisory officer proceeded to conduct an investigation. *Id.* Fusco did not request any witnesses to be interviewed during the investigation. However, in his own interview, Fusco stated that he may have been yelling but did not punch anyone. *Id.* The supervisor found the charge to be valid, Fusco was placed in the special housing unit and the matter was referred to a disciplinary hearing officer ("DHO") to conduct a hearing. *Id.* On April 5, 2004, Fusco received notice of the hearing, signed a waiver of his right to have a staff representative, and acknowledged the rights afforded him at the hearing. *See id.* at Exs. 1c & 1d. Fusco also signed and wrote on a form that he waived his right to present witnesses, although he provided the names of two witnesses on that form. *Id.* at Ex. 1c.

**\*2** On April 15, 2004, a hearing was conducted.[FN2] *Id.* at Ex. 1e. Fusco denied the charge. He stated that he did not assault the other **inmate**, he was coming from the gym, he and the other **inmate** were just talking, and they never touched each other. *Id.* The DHO noted that Fusco had requested two **inmate** witnesses but that they were not called because Fusco had waived his right to call witnesses. *Id.* In addition to Fusco's testimony, the DHO considered a memorandum from Lt. Kaough, which contained an interview with the other **inmate** involved in the incident. *Id.* at Exs. 1e & 1f. The other **inmate** stated that he was near the soccer and baseball field talking to

Fusco "about which lifting weights were better[,] Italy or American." *Id.* at Ex. 1f. The **inmate** then stated that Fusco reached out to touch his face and stated that he was handsome. *Id.* The **inmate** noted that Fusco was not trying to fight or hurt him. *Id.* The DHO found that the versions of events related by Fusco, the reporting officer, and the other **inmate** were contradictory. *Id.* at Ex. 1e. The DHO further found that the statements of Fusco and the other **inmate** were not as credible as the reporting officer's statement. *Id.* Based on that evidence, the DHO found that Fusco committed the act as charged. *Id.*

FN2. A copy of the hearing transcript was not provided.

The DHO imposed sanctions of disciplinary segregation for thirty days and a recommendation of loss of good conduct credits for twenty-seven days. *Id.* In imposing sentence, the DHO noted that the assault demonstrated a disregard of the rules and impeded the staff's ability to maintain the facility in an orderly fashion. *Id.* Fusco was provided with a copy of the determination on April 23, 2004, and was notified of his right to appeal. *Id.* Fusco subsequently exhausted all administrative remedies. *Id.* at Exs. 1g, 1h, & 1i. During these appeals, Fusco alleged that there was no proof to substantiate the charge, he was denied an interpreter, and because he could not fully understand the English language, he was tricked into waiving his right to call witnesses. *Id.* This action followed.

**II. Discussion**

Fusco contends that his due process rights under the Fifth Amendment [FN3] were violated when he was not provided a staff representative or interpreter and, when he was denied the right to call two witnesses. Pet. at § D, DHO Hr'g, at ¶ 8.

FN3. Since Fusco was imprisoned in a federal institution, the Fifth and not the Fourteenth Amendment of the United State Constitution would apply to his due process claim. *See Pugliese v. Nelson,* 617 F.2d 916, 918 n. 2 (2d Cir.1980). The analysis of a due process claim

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2227506 (N.D.N.Y.)
(Cite as: 2007 WL 2227506 (N.D.N.Y.))

under the Fifth Amendment is virtually identical to that under the Fourteenth Amendment. *See Chew v. Dietrich, 143 F.3d 24, 28 n. 4 (2d Cir.1998)* (holding that the due process analysis under the two amendments is "basically the same").

The Due Process Clause of the **Fifth Amendment** states that "no person shall be ... deprived of life, liberty, or **property**, without due process of law [.]" U.S. Const. amend. V. In order to present a due process claim, a petitioner must establish that he possessed a constitutionally protected liberty **interest**. *Allocco Recycling, Ltd. v. Doherty,* 378 F.Supp.2d 348, 365 (S.D.N.Y.2005) (citing *Matthews v. Eldridge,* 424 U.S. 319, 332 (1976)); *Reno v. Flores,* 507 U.S. 292, 301-02 (1993); *DeMichele v. Greenburgh Cent. Sch. Dist. No. 7,* 167 F.3d 784 789 (2d Cir.1999)). Such a protected liberty interest exists when there is a recommendation for loss of good conduct credits. *Hinebaugh v. Wiley,* 137 F.Supp.2d 69, 76 (N.D.N.Y.2001) (citing *Wolff v. McDonnell,* 418 U.S. 539, 558 (1974)).

**\*3** The Supreme Court has held that a prison disciplinary proceeding does not constitute a "criminal prosecution, [and thus] the full panoply of rights due a defendant in such proceedings does not apply ." *Wolff,* 418 U.S. at 556. Therefore, a disciplinary hearing that results in loss of good conduct credits will satisfy due process if the following are provided to the **inmate**: 1) at least twenty-four hour advance notice of the charges; 2) a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence as long as the presentation of evidence is not unduly hazardous to institutional safety or correctional goals; 3) a fair and impartial hearing officer; and 4) a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken. *See Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citing *Wolff,* 418 U.S. at 563-67); *see also Hinebaugh v. Wiley,* 137 F.Supp.2d at 76. FN4 Furthermore, the Supreme Court has held that "requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board[.]" *Superintendent, Mass. Corr. Inst. at Walpole v. Hill,* 472 U.S. 445, 455-56 (1985); *see also Hinebaugh,* 137 F.Supp.2d at 76. The Second Circuit has interpreted "some evidence" to be some "reliable evidence." *Luna v. Pico,* 356 F.3d 481, 488 (2d Cir.2004).

FN4. The Federal Bureau of Prisons has also set forth regulations incorporating these requirements to govern procedures federal prison disciplinary proceedings. *See* 28 C.F.R. § 541.17.

Here, there is no evidence to establish that Fusco was denied any of his due process rights. Fusco was advised of his right to a staff representative and he waived this right by placing a check mark on a form stating that he declined to have a staff representative. Scannell Decl. at Exs. 1c, 1d, & 1e. There is no indication from the DHO's report that Fusco made any complaints that he was denied this right during the hearing and the first time this issue was raised was in his administrative appeals. *See id.* at Exs. 1e, 1g, 1h, & 1i. Furthermore, there is absolutely no indication that Fusco ever requested an Italian interpreter because he had difficulty speaking and understanding English. *See generally id.* at Exs. 1c, 1d, & 1e. As with the staff representative issue, no complaints or objections were lodged until the appeals process. *See id.* at Exs. 1g, 1h, & 1i.

As to the opportunity to call two **inmate** witnesses, the record demonstrates that Fusco was not denied his rights. Fusco was advised that he could call witnesses and yet chose to check the line that he did not wish to have witnesses. *Id.* Moreover, Fusco expressly wrote on the same form that he wanted to waive his right to have witnesses called and provided his signature directly after the handwritten statement. *Id.* at Ex. 1c. Apparently, no objections or complaints were registered at the hearing when the waiver of witnesses was raised. *Id.* at Ex. 1e. Notwithstanding, the DHO considered a statement made by one of the witnesses Fusco sought to call who was also the subject of the disciplinary charge. *Id.* at Exs. 1e & 1f.

**\*4** Additionally, there is reliable evidence that the incident in question occurred. The reporting officer witnessed and described the alleged event in detail. *Id.* at Ex. 1b. Furthermore, the statements made by the **inmate** involved in the incident and Fusco were contradictory in that the **inmate** stated that there was some touching whereas Fusco stated that there was none. *Id.* at Exs. 1e & 1f. This

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2227506 (N.D.N.Y.)
(Cite as: 2007 WL 2227506 (N.D.N.Y.))

contradiction on a central factual issue rendered their statements unreliable as opposed to that of the reporting officer. Thus, based on all the evidence presented, no violation of due process occurred.

Therefore, it is recommended that the Petition be denied.

### III. Conclusion

For the reasons stated herein, it is hereby

**RECOMMENDED** that the petition for a writ of habeas corpus (Dkt. No. 1) be **DENIED;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW*. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), & 6(e).

N.D.N.Y.,2007.
Fusco v. Drew
Not Reported in F.Supp.2d, 2007 WL 2227506 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 1286800 (D.Conn.)
(Cite as: 2010 WL 1286800 (D.Conn.))

Only the Westlaw citation is currently available.

United States District Court,
D. Connecticut.
Thomas MAY, Plaintiff,
v.
Miguel DeJESUS, Correctional Officer, Defendant.
**No. 3:06CV1888 (AWT).**

March 30, 2010.

Thomas J. May, Machiasport, ME, pro se.

Matthew B. Beizer, Attorney General's Office, Hartford, CT, for Defendant.

***RULING ON MOTION FOR SUMMARY JUDGEMENT***

ALVIN W. THOMPSON, District Judge.

**\*1** The plaintiff, Thomas May, who is currently incarcerated at Maine State Prison in Warren, Maine, commenced this civil rights action *pro se* and *in forma pauperis* against the defendant, Correctional Officer Miguel DeJesus. The plaintiff claims that the defendant deprived him of basic human needs in violation of the Eighth and Fourteenth Amendment, which resulted in physical injury and emotional distress. The defendant has moved for summary judgment on all claims. For the reasons set forth below, the motion for summary judgment is being granted.

**I. Facts**

In December 2004, the plaintiff underwent hemorrhoid surgery. Following the surgery, Dr. Ruiz, a prison physician, prescribed Ducosate Sodium, a laxative, to be taken by the plaintiff twice a day from December 9, 2004 until March 29, 2005.

In March 2005, the defendant was employed as a Correctional Officer at Osborn Correctional Institution ("Osborn") in Somers, Connecticut where the plaintiff, a sentenced inmate, was incarcerated. On March 14, 2005, the plaintiff was scheduled to participate in a trial in a case filed in the United States Bankruptcy Court in New Haven, Connecticut. Department of Correction officials assigned the defendant to transport the plaintiff in a prison van from Osborn to the Bankruptcy Court in New Haven, a distance of approximately 65 miles. The plaintiff had taken his prescribed laxative medication prior to the trip to New Haven. The plaintiff and the defendant were the only occupants in the prison van. The plaintiff wore handcuffs and leg shackles during the trip to and from New Haven.

The plaintiff avers that, at the beginning of the trip to New Haven, the defendant did not ask him whether he had to use the bathroom and did not instruct him to use the bathroom. The plaintiff avers that "[i]f [the defendant] had asked or instructed me, I would have told [the defendant] that I did not need to use a bathroom, because at that time I had no urge to defecate or urinate." (Thomas J. May Affidavit (Doc. No. 27 Ex. 2) ("May Aff.") ¶ 9) Approximately 45 to 60 minutes into the trip to New Haven, the plaintiff informed the defendant that he needed to defecate and asked the defendant to stop the van at the Cheshire Correctional Institution so that he could use the bathroom. The defendant did not stop the van and the plaintiff defecated in his pants. The plaintiff was forced to sit in his soiled pants for 15 to 30 minutes until the van arrived at the courthouse in New Haven.

Upon his arrival at the courthouse, Deputy United States Marshals permitted the plaintiff to throw out his soiled pants, underwear and socks, take a shower and change into a new pair of pants. The United States Marshals' Service did not provide the plaintiff with a new pair of socks. The bankruptcy proceeding lasted approximately two hours. Thereafter, the plaintiff was placed in leg shackles and handcuffs for the return trip to Osborn.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1286800 (D.Conn.)
(Cite as: 2010 WL 1286800 (D.Conn.))

The plaintiff avers that, at the beginning of the return trip to Osborn, the defendant did not ask him whether he had to use the bathroom and did not instruct him to use the bathroom. The plaintiff avers that "[i]f [the defendant] had instructed or asked me, I would have told [the defendant] that I did not need to use a bathroom, because at that time I had no urge to urinate or defecate." (May Aff.¶ 29) Approximately 60 minutes into the return trip, the plaintiff informed the defendant that he had to urinate and asked the defendant to stop the van at the Hartford Correctional Center or MacDougall-Walker Correctional Institution in Suffield so that he could use a bathroom. The defendant did not stop the van and the plaintiff urinated in his pants. The plaintiff sat in his urine-soaked pants for 15 to 30 minutes, before the van arrived at Osborn. Upon his arrival at Osborn, the plaintiff was escorted back to his cell.

**\*2** The plaintiff suffered a small abrasion, approximately 1/4 inch by 1/8 inch in size on his left ankle where the leg shackle rubbed against his skin during the return trip to Osborn. On March 24, 2005, a nurse examined the plaintiff's ankle and noted a small, well-healed scab on the front of the ankle, no sign of infection, redness or swelling and excellent range of motion. The nurse recommended follow-up as needed.

## II. Legal Standard

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c). *See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir.1994).* When ruling on a motion for summary judgment, the court may not try issues of fact, but must leave those issues to the jury. *See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir.1987).* Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined ... to issue-finding; it does not extend to issue-resolution." *Gallo, 22 F.3d at 1224.*

Summary judgment is inappropriate only if the issue to be resolved is *both* genuine and related to a material fact. Therefore, the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson, 477 U.S. at 248* (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." *Anderson, 477 U.S. at 248.* Only those facts that *must* be decided in order to resolve a claim or defense will prevent summary judgment from being granted. Immaterial or minor facts will not prevent summary judgment. *See Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir.1990).*

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and ... draw all reasonable inferences in its favor." *Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir.2000)*(quoting *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp., 902 F.2d 174, 177 (2d Cir.1990)).* However, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment. *Stern v. Trustees of Columbia University, 131 F.3d 305, 315 (2d Cir.1997)* (quoting *Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d. Cir.1990)).* Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" will be insufficient; there must be evidence on which a jury could "reasonably find" for the nonmovant. *Anderson, 477 U.S. at 252.*

**\*3** Where one party is proceeding *pro se,* the court reads the *pro se* party's papers liberally and interprets them to raise the strongest arguments suggested therein. *See Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir.1994).* Despite this liberal interpretation, however, an unsupported assertion cannot overcome a properly supported motion for summary judgment. *Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir.1991).*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1286800 (D.Conn.)
(Cite as: 2010 WL 1286800 (D.Conn.))

**III. Discussion**

The plaintiff contends that the defendant's failure to stop the van on the way to and from the courthouse to permit him to use the bathroom, which also resulted in injury from the application of leg shackles to his bare ankles, constituted a violation of his right to be free from unconstitutional conditions of confinement. The plaintiff also contends that he suffered humiliation and emotional distress as a result of the violation.[FN1]

> [FN1.] Deliberate indifference by prison officials to a prisoner's serious medical need constitutes cruel and unusual punishment in violation of the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Although the plaintiff had undergone hemorrhoid surgery and was taking medication because of the surgery, he did not include a claim of deliberate indifference to medical needs in his complaint. The court does not construe the complaint as raising such a claim because even if the plaintiff could prove his medical condition was serious, he does not contend that the defendant was aware of this medical condition or of the fact that the plaintiff was taking medication. Thus, the plaintiff could not show that the defendant was deliberately indifferent to that condition.

The defendant moves for summary judgment on the ground that the plaintiff has failed to produce evidence that could show he was subjected to unconstitutional conditions of confinement during the trip to and from the courthouse.

**A. Constitutional Violation: Conditions of Confinement**

"It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney,* 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components-one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009).

In *Gill v. Riddick,* No. Civ. 9:03-CV-1456, 2005 WL 755745 (March 31, 2005), the court stated:

> A prisoner alleging that a certain prison condition constitutes cruel and unusual punishment must prove both an objective and subjective element, specifically, the inmate must show that the deprivation at issue is objectively sufficiently serious such that the plaintiff was denied the minimal civilized measure of life's necessities, and that the defendant possessed a sufficiently culpable state of mind associated with the unnecessary and wanton infliction of pain.... The objective component of an Eighth Amendment violation must be evaluated based on the severity of the deprivation imposed.... When considering whether a particular condition is so serious as to invoke the Eighth Amendment, a court should assess the duration of the condition and the potential for serious physical harm.... To prove the second, subjective component, a prisoner must establish that the person who inflicted the unconstitutional condition was deliberately indifferent to the severe deprivation.

*Id.,* at *16(internal quotation marks and citations omitted). "Because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient" to state a claim of unconstitutional conditions of confinement. *Blyden v. Mancusi,* 186 F.3d 252, 263 (2d Cir.1999).

*4 The defendant contends that the plaintiff has not met either the objective or the subjective component of the Eighth Amendment test because, as to the objective component, he has not produced evidence that he suffered an unconstitutional deprivation during his trip to or from the courthouse in New Haven, and, as to the subjective component, he has not produced evidence that the defendant acted with the requisite state of mind. The court concludes that the plaintiff has failed to create a genuine issue of fact as to the objective component and, for that reason, the defendant is entitled to summary judgment.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1286800 (D.Conn.)
(Cite as: 2010 WL 1286800 (D.Conn.))

"To satisfy the objective component of an Eighth Amendment conditions of confinement claim, Plaintiff must show that the conditions alleged, either alone or in combination, deprive him of 'the minimal civilized measure of life's necessities,' such as adequate food, clothing, shelter, sanitation, medical care, and personal safety." *Alvarez v. County of Cumberland,* Civil No. 07-346(RBK), 2009 WL 750200, *4 (D.N.J. March 18, 2009) (citation omitted). "To the extent that certain conditions are only 'restrictive' or 'harsh,' they are merely part of the penalty that criminal offenders pay for their offenses against society." *Id.*

In addition, an important consideration in determining whether a particular condition deprived an inmate of a basic human need or life necessity is the duration of the condition. *See e.g., Smith v. Copeland,* 87 F.3d 265, 268 (8th Cir.1996) (holding that inmate's confinement in cell for four days with overflowed toilet, during which time he endured stench of his own feces and urine, did not rise to level of Eighth Amendment violation); *Davis v. Scott,* 157 F.3d 1003, 1006 (5th Cir.1998)(holding that inmate being placed in cell with blood on walls and excretion on floors for three days did not meet objective component of Eighth Amendment, especially in view of fact that cleaning supplies were made available to him); *Hutto v. Finney,* 437 U.S. 678, 687-88, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978)("A filthy overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months."); *Wright v. McMann,* 387 F.2d 519, 526 (2d Cir.1967) ( "civilized standards of humane decency ... do not permit" an inmate to be placed in a filthy, unheated strip cell and deprived of clothes and basic hygiene items such as soap and toilet paper for a substantial period of time, i.e., 33 days).

The defendant concedes that unsanitary conditions, including lack of access to toilet paper or a properly functioning toilet, may constitute a severe deprivation of a basic human need. *See e.g., LaReau v. MacDougall,* 473 F.2d 974, 978 (2d Cir.1972) (confinement for five days in strip cell with only a pit toilet and without light, a sink or other source of water violated minimum standards of human decency required by Eighth Amendment); *Wright,* 387 F.2d at 522, 526 (conditions of confinement in strip cell including denial of toilet paper for 33 days violated

Eighth Amendment). The defendant contends, however, that depriving the plaintiff of the use of a bathroom for two short periods of time did not constitute an extreme deprivation of a basic human need.

*5 Courts in this and other circuits have consistently held that an occasional or temporary deprivation of toilet use, does not constitute an extreme deprivation of a basic human need or necessity of life. *See Jones v. Marshall,* No. 08 Civ. 0562, 2010 WL 234990, at *3 (S.D.N.Y. Jan.19, 2010) (denial of right to use bathroom for 90 minutes did not "establish the existence of an objective injury for purposes of Eighth Amendment claim"); *Rogers v. Laird,* Civ. No. 9:07-CV-668 (LEK/RFT), 2008 WL 619167, at *3 (N.D.N.Y. Feb.8, 2008) (denial of use of restroom during three hour trip to and from court causing inmate to urinate on himself did not "constitute an extreme deprivation of life's necessities"); *Simpson v. Wall,* 2004 WL 720276, at *3 (W.D.Wis. Mar.29, 2004) ("Sitting in one's feces for sixty to eighty miles cannot be said to present a risk of serious harm."); *Bourdon v. Roney,* 2003 WL 21058177, at *10-11 (N.D.N.Y. Mar.6, 2003) (three hours without bathroom privileges is not deprivation of minimal necessities of life); *Whitted v. Lazerson,* No. 96 Civ. 2746(AGS), 1998 WL 259929, at * 2 (S.D.N.Y. May 21, 1998) (temporary deprivation of use of toilet for 90 minutes at most, in the absence of serious physical injury, did not constitute denial of necessities of life).

In reaching this conclusion, courts have considered whether the deprivation of toilet use resulted in unsanitary conditions that posed a significant risk to the inmate's health. *See Gill,* 2005 WL 755745, at *16 (inmate who urinated on himself as result of denial of use of bathroom during trip to prison failed to satisfy objective element of Eighth Amendment because denial was temporary-70 minutes-and he suffered no injury to his health); *Qawi v. Howard,* No. Civ. A. 98-220-GMS, 2000 WL 1010281, at *3-4 (D.Del. Jul.7, 2000) (denial of use of bathroom for six hours during which inmate forced to urinate in drinking cup and bowl and defecate into a paper bag did not constitute sufficiently serious deprivation because duration of condition was brief and inmate suffered no significant health risk); *Odom v. Keane,* No. 95 Civ. 9941, 1997 WL 576088, at *4-5 (S.D.N.Y. Sept.17, 1997) (lack of a working toilet in prison cell for approximately 10 hours, absent an allegation that the prisoner risked contamination by contact with human waste, "does not rise

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1286800 (D.Conn.)
(Cite as: 2010 WL 1286800 (D.Conn.))

to the level of cruel and unusual punishment").

Although the plaintiff was forced to sit in pants that were soiled with feces for up to 30 minutes on the way to court, he was permitted to clean himself and change his clothes when he arrived at the courthouse and before he was required to appear in court. Despite the fact that the plaintiff had to sit in urine-soaked pants for up to 30 minutes on the trip back to Osborn, there is no evidence to suggest that he was not able to wash himself and change his clothes after officers escorted him to his cell. Furthermore, other than a minor abrasion on his ankle, there is no evidence to suggest that the plaintiff suffered any contamination or risk to his health as a result of having to sit in pants soiled with feces and soaked with urine. There is no aspect of the conditions described by the plaintiff that could satisfy the objective element of the Eighth Amendment standard. The conditions were temporary and did not constitute an extreme deprivation of basic human need or the minimal civilized measure of life's necessities.

**\*6** The plaintiff fails to create a genuine issue of fact as to whether he can satisfy the objective component of the Eighth Amendment test, so it is not necessary to reach subjective component. Accordingly, the defendant's motion for summary judgment is being granted on this ground.

**B. Emotional Distress**

The plaintiff asserts that the defendant subjected him to emotional distress and humiliation because he was forced to walk into the courthouse in front of the Deputy United States Marshals in soiled pants and was escorted through a crowded prison gymnasium and housing unit on the way back to his cell at Osborn in urine-soaked pants. Having granted summary judgment on the plaintiff's sole federal claim, the court declines to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c) over the plaintiff's state law claims for negligent or intentional infliction of emotional distress. *See Valencia ex rel. Franco v. Lee,* 316 F.3d 299, 305 (2d Cir.2003)("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy,

convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims.")(quoting *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)).

**IV. Conclusion**

For the reasons set forth above, the defendants' Motion for Summary Judgment **(Doc. No. 24)** is hereby **GRANTED.** The Clerk is directed to enter judgment in favor of the defendant and close this case.

It is so ordered.

D.Conn.,2010.
May v. DeJesus
Slip Copy, 2010 WL 1286800 (D.Conn.)

END OF DOCUMENT



Not Reported in F.Supp.2d, 2006 WL 2496859 (N.D.N.Y.)
(Cite as: 2006 WL 2496859 (N.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Brett TONEY, Plaintiff,
v.
Glenn GOORD, Commissioner DOCS; William Lape,
Superintendent, Marcy Correctional Facility; Michael
McDonald, Deputy Superintendent of Programs; Ms. S.
Mulvihill, Senior Correctional Counselor of Marcy
Correctional Facility; David Moulton, Correctional
Counselor of Marcy Correctional Facility; John Nuttall,
Deputy Commissioner of Programs; Dr. Haider-Shah,
Medical Doctor of Marcy Correctional Facility; and Dr.
Thesee, Office of Mental Health, Defendants.
No. 04-CV-1174.

Aug. 28, 2006.

Brett Toney, West Islip, NY, Plaintiff, Pro Se.

Hon. Eliot Spitzer, Attorney General for the State of New
York, Charles J. Quackenbush, Esq., Assistant Attorney
General, of counsel, Albany, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior United States District
Judge.

**I. INTRODUCTION**

**\*1** This *pro se* action brought pursuant to 42 U.S.C. §
1983 was referred by this Court to the Hon. Randolph F.
Treece, United States Magistrate Judge, for a
Report-Recommendation pursuant to 28 U.S.C. § 636(b)
and Local Rule 72.4. The Report-Recommendation dated
March 22, 2006 recommended that Defendants' 12(b)(6)

motion to dismiss be granted. Rep. Rec. p. 23. Plaintiff
filed written objections to the Report-Recommendation.

**II. DISCUSSION**

When a party objects to the magistrate judge's
Report-Recommendation, the Court reviews *de novo* those
portions of the findings or recommendations to which the
objections are made. See 28 U.S.C. § 636(b)(1); *Brown v.
Artuz,* 283 F.3d 492, 497 (2d Cir.2002). After such a
review, the Court may "accept, reject, or modify, in whole
or in part, the findings or recommendations made by the
magistrate [judge]. The [Court] may also receive further
evidence or recommit the matter to the magistrate [judge]
with instructions." 28 U.S.C. § 636(b)(1).

Having reviewed the record *de novo* and considered the
issues raised in Plaintiff's objections, the Court has
determined that, with one exception, the plaintiff's
objections are merely a restatement of the case he has set
forth thus far and do not raise any new issues to be
considered by the Court. The Court has therefore decided
to accept and adopt the recommendations of Magistrate
Judge Treece for the reasons stated in the March 22, 2006
Report-Recommendation, with the addition of the
following analysis which is meant to address a claim made
by the plaintiff that was not addressed by the magistrate
judge.FN1

> FN1. The claim is arguably contained in the
> Complaint, but it was not clear on what grounds
> Plaintiff was arguing a due process violation
> until he filed his objections to the
> Report-Recommendation.

In his objections to the Report-Recommendation, the
plaintiff sets forth an argument that, under New York
Corrections Law § 136, he is constitutionally entitled
(under the Due Process Clause of the 14th Amendment) to
the educational program most likely to further his own
particular rehabilitation process. Because this assertion is
not supported by the relevant case law, the plaintiff's claim
is dismissed.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2496859 (N.D.N.Y.)
(Cite as: 2006 WL 2496859 (N.D.N.Y.))

In support of his claim, the plaintiff cites *Clarkson v. Coughlin*, 898 F.Supp. 1019, 1041 (S.D.N.Y.1995), which states that "[§ 136] confers upon New York **inmates** a protected property interest in an educational program 'which, on the basis of available data, seems most likely to further the process of socialization and rehabilitation.' Depriving an **inmate** of such a program triggers the protection of the Due Process Clause." The court in that case, however, also recognized the importance of allowing the Commissioner of Correctional Services discretion in establishing such educational programs, noting that, although some property interest is created, "only the provision of no education at all or education that was wholly unsuited to the goals of a particular **inmate's** socialization and rehabilitation trigger [14th Amendment protections]." *Id.*

The plaintiff in this case has interpreted the language from *Clarkson* as meaning essentially that each **inmate** is entitled to a particularized educational program, tailored to meet his own individual rehabilitation and socialization needs. Following from this interpretation, the plaintiff asserts that, because regular drug rehabilitation programs have failed to work for him, he is entitled to a different sort of treatment that would be more likely to succeed. Obj. p. 14 (dkt. no. 30). The plaintiff has not claimed that he was deprived of all educational opportunities. Quite to the contrary, in his complaint he lists the various drug treatment programs in which he has taken part. Compl. ¶¶ 23-29 (dkt. no. 1). The plaintiff's claim instead turns on whether § 136 creates a protected property interest in specifically-tailored educational opportunities. Because the Court finds that it does not, the plaintiff's claim with respect to Correction Law § 136 is dismissed.

**\*2** As discussed by the Second Circuit in *Handberry v. Thompson,* 2006 WL 997252, at *17 (2d Cir. April 4, 2006), many other **inmates** have previously advanced similar arguments for individualized educational programs based on § 136. These arguments have been considered and consistently rejected. *Id.* (citing *Wright v. Coughlin,* 31 F.Supp.2d 301, 311 (W.D.N.Y.1998)( "Prison officials need not provide an educational program tailored to the specific needs and circumstances of the **inmate**."); *Giano v. Cuomo,* 1998 U.S. Dist. LEXIS 17215, *10 (N.D.N.Y.1998)("Courts have consistently held that

NYCL § 136 ... does not ... provide an educational program tailored to the specific needs and circumstances of the **inmate**."); *Allah v. Coughlin,* 190 A.D.2d 233, 237 (1st Dept.1993) (holding that § 136 does not guarantee **inmates** any specific education or the right to take a high school equivalency exam free of charge); *Lane v. Reid,* 575 F.Supp. 37, 39 (S.D.N.Y.1983) (holding that § 136 does not create a property interest in full-time education and a full-time job)). Rather than choosing the interpretation of *Clarkson* favored by the plaintiff here (that each individual **inmate** is entitled to the educational program that will best meet his own personal needs for rehabilitation), courts have instead interpreted it as meaning that there will be no protected property interest in educational programs unless (1) no education is offered at all, or (2) the education that is offered is wholly unsuited to the statutory goal of rehabilitation *in general. Handberry,* 2006 WL 997252, at *17.

Because Corrections Law § 136 does not entitle **inmates** to receive individualized educational opportunities while incarcerated, and because the plaintiff has not claimed either (1) that he has been denied all educational opportunities, or (2) that the educational programs provided are in any way unsuited to the general statutory goal of rehabilitation, the plaintiff has failed to state a claim upon which relief can be granted. This case is therefore dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

### III. CONCLUSION

The Court accepts and adopts the recommendations of Magistrate Judge Treece for the reasons stated in the March 22, 2006 Report-Recommendation with the addition of the discussion above. Defendants' motion to dismiss [dkt no. 22] is therefore **GRANTED** and the case is **DISMISSED** in its entirety.

### IT IS SO ORDERED

RANDOLPH F. TREECE, United States Magistrate Judge.

### REPORT-RECOMMENDATION and ORDER

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2496859 (N.D.N.Y.)
(Cite as: 2006 WL 2496859 (N.D.N.Y.))

*Pro se* Plaintiff Brett Toney brings a civil action pursuant to 42 U.S.C. § 1983, alleging violations of the Due Process and Equal Protection Clauses under the Fourteenth Amendment, and the Eighth Amendment, and the American with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.* Dkt. No. 1, Compl. at ¶¶ 1 & 12. Defendants Glenn Goord, Commissioner of the Department of Correctional Services ("DOCS"), William Lape, Superintendent at Marcy Correctional Facility ("Marcy"), Michael McDonald, Deputy Superintendent of Programs, Ms. S. Mulvihill, Senior Correctional Counselor at Marcy, David Moulton, Correctional Counselor at Marcy, John Nuttall, Deputy Commissioner of Programs, Dr. Haider-Shah, Medical Doctor at Marcy, and Dr. Thesee, at the Office of Mental Health ("OMH"), bring this Motion to Dismiss. Dkt. No. 22. Plaintiff opposes the Motion. Dkt. No. 24. For the reasons to follow, it is recommended that the Motion to Dismiss be **granted.**

## I. FACTS

**\*3** The following facts are derived from the Complaint, which on a motion to dismiss, must be taken as true. At the age of seventeen, Plaintiff became addicted to "intravenous heroin and cocaine[.]" Compl. at ¶ 21, Ex. 2. This addiction has limited Plaintiff's life activities including impairing his inability to maintain employment, interference with his education, and neglect to his health and safety which has resulted in depression and anxiety. *Id.* at ¶ 22.

During Plaintiff's incarceration at the Mid-Orange Correctional Facility, Toney completed the Alcohol and Substance Abuse Treatment ("ASAT") program in September 2000. *Id.* at ¶ 23, Ex. 4. In December 2000, Plaintiff participated in the Comprehensive Alcohol and Substance Abuse Treatment ("CASAT") program at the Arthur Kill Facility. *Id.* at ¶ 24. Plaintiff was removed from that program in April 2001 for heroin use and was placed in a special housing unit ("SHU") for sixty days. *Id.* at ¶ 25. In February 2002, Plaintiff completed the ASAT program at the Franklin Correctional Facility. *Id.* at ¶ 26, Ex. 4. In September 2002, Plaintiff was found guilty of promoting prison contraband for possessing heroin at the Mid-State Correctional Facility and was given six months confinement in SHU. *Id.* at ¶ 27. In September

2003, Plaintiff participated in the Residential Substance Abuse Treatment ("RSAT") program at the Elmira Correctional Facility. *Id.* at ¶ 28, Exs. 4 & 5. Plaintiff was then removed from that program in January 2004 for heroin use and placed in SHU for one year. *Id.* at ¶ 29. Plaintiff appealed his one year sentence claiming the sentence was excessive; on April 9, 2004, Defendant Goord affirmed the sentence. *Id.* at ¶¶ 38 & 39.

On May 9, 2004, Plaintiff requested a suitable drug treatment program and was interviewed by Dr. Thesee of the OMH. *Id.* at ¶ 45. The request was denied. *Id.* On May 10, 2004, Plaintiff wrote to Correctional Counselor Moulton seeking suitable treatment for his drug addiction. *Id.* at ¶ 44, Ex. 1, at B-1. On May 12, 2004, Plaintiff filed a grievance for "being punished because ... of his disease." *Id.* at ¶ 47, Ex. 1, at A-1. Toney also requested sick-call services but was not treated. *Id.* at ¶ 48, Ex. 13. On May 13, 2004, Plaintiff received a response from Moulton which was "ambiguous and evasive" so Plaintiff wrote another letter to Moulton. *Id.* at ¶¶ 49 & 50, Ex. 1, at B2. That same day Plaintiff wrote to Defendant Mulvihill requesting treatment for his addiction to which he received a response on May 14, 2004. *Id.* at ¶¶ 51 & 52, Ex. 1, at B-3. Therein, Plaintiff was told to send his request to parole because DOCS does not have a residential drug treatment program for **prisoners** in S-Block. *Id.* Since Plaintiff received no response to his second letter to Moulton, he sent another letter on May 18, 2004, to which he again received no response. *Id.* at ¶ 55, Ex. 1, at B-4. On May 18, 2004, Plaintiff wrote to the senior parole officer requesting treatment for his addiction, to which he received no response. *Id.* at ¶ 57, Ex. 1, at B-5.

**\*4** On May 19, 2004, Plaintiff filed two grievances and then filed a third on May 25, 2004, alleging Moulton's "failure to function properly as a Correctional Counselor." *Id.* at ¶ 58, Exs. A-2, A-3, & A-4. The three grievances were combined and filed as MCY-11198-04. *Id.* at ¶ 58. Additionally, on May 19, 2004, Plaintiff sent a letter to Defendant McDonald requesting suitable treatment for his drug addiction. *Id.* at ¶ 59, Ex. 1, at B-6. Plaintiff received a response from McDonald on May 21, 2004, which stated in part that Plaintiff should improve his disciplinary behavior in order to be transferred to a facility where he could participate in ASAT. *Id.* at ¶ 61, Ex. 1, at B-6. On May 23, 2004, Plaintiff again requested a sick-call but was not treated. *Id.* at ¶ 64, Ex. 13. Then on May 24, 2004,

Not Reported in F.Supp.2d, 2006 WL 2496859 (N.D.N.Y.)
(Cite as: 2006 WL 2496859 (N.D.N.Y.))

Plaintiff wrote another letter to McDonald but received no response. *Id.* at ¶ 65, Ex. 1, at B-7. The same day, Plaintiff sent a letter to Superintendent Lape requesting suitable treatment. *Id.* at ¶ 66, Ex. 1, at B-8. Plaintiff received no response. *Id.*

On May 26, 2004, Moulton went to Plaintiff's cell to "advise him that the administration [did] not want any more letters about treatment[.]" *Id.* at ¶ 67. Then on May 27, 2004, Plaintiff received a response to his grievance complaint, MCY-11199-04, in which Plaintiff complained of discrimination based on his addiction. *Id.* at ¶ 69, Ex. 1, at A-1. His grievance was denied; Plaintiff appealed the **Inmate** Grievance Resolution Committee's ("IGRC") decision the same day. *Id.* at ¶ 70. On June 1, 2004, Plaintiff sent a letter to Defendant Nuttall requesting suitable treatment for his drug addiction. *Id.* at ¶ 71. Plaintiff was also seen on the same day by Dr. Haider-Shah to whom he requested treatment other than ASAT and yet was told that **inmates** in SHU could not be treated. *Id.* at ¶¶ 72 & 73.

Plaintiff filed a grievance on June 3, 2004, for denial of medical treatment. *Id.* at ¶ 74, Ex. 1, at A-5. On June 4, 2004, Plaintiff received a negative response to grievances MCY-11198-04 and MCY 11199-04 from the Superintendent and appealed both to the Central Office Review Committee ("CORC"). *Id.* at ¶¶ 75 & 76, Exs. A-1 & A-4. Plaintiff then wrote a letter to Goord on June 9, 2004, seeking suitable treatment for his drug addiction. *Id.* at ¶ 77, Ex. 1, at B-9. Plaintiff received another unfavorable IGRC decision on grievance MCY-11217-04, which he appealed to the Superintendent. *Id.* at ¶ 78, Ex. 1, at A-5. To that appeal, Plaintiff received an unfavorable response on June 15, 2004, to which Plaintiff appealed to the CORC. *Id.* at ¶ 79, Ex A-5. On June 24, 2004, Plaintiff received a letter from Nuttall denying him participation in a residential or community treatment facility because of his drug use in prison. *Id.* at ¶ 80, Ex. 1, at B-9. Plaintiff's grievances, MCY-11198-04 and MCY-11199-04, were denied by the CORC on July 7, 2004. *Id.* at ¶ 84, Ex. 1, at A-1 & A-4. Toney's other grievance, MCY-11217-04, was denied by the CORC on July 14, 2004. *Id.* at ¶ 85, Ex. 1, at A-5.

## II. DISCUSSION

### A. Motion to Dismiss Standard

**\*5** Upon a motion to dismiss pursuant to FED.R.CIV.P. 12(b)(6), a court may dismiss a complaint "only if 'it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Equal Employment Opportunity Comm'n v. Staten Island Sav. Bank,* 207 F.3d 144, 148 (2d Cir.2000) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957) & citing *Drake v. Delta Air Lines, Inc.,* 147 F.3d 169, 171 (2d Cir.1998)); *see also Green v. New York State Dep't of Corr. Serv. et al,* 2003 WL 22169779, at * 1 (N.D.N.Y. Aug. 27, 2003). Furthermore, "the court must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff." *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999); *see also Smith v. Local 819 I.B.T. Pension Plan,* 291 F.3d 236, 240 (2d Cir.2002) (citations omitted). However, the court need not credit conclusory statements unsupported by assertions of facts or legal conclusions and characterizations presented as factual allegations. *Papasan v. Allain,* 478 U.S. 265, 286 (1986). Nevertheless, "[i]n assessing the legal sufficiency of a claim [under 12(b)(6) ], the court may consider those facts alleged in the complaint, documents attached as an exhibit thereto or incorporated by reference ... and documents that are integral to plaintiff's claims, even if not explicitly incorporated by reference." *Green,* 2003 WL 22169779, at * 1 (internal quotation marks and citations omitted) (alterations in original).

Moreover, pleadings submitted by *pro se* litigants "should be 'construed liberally,' " and a complaint "should not be dismissed unless 'it is clear that the plaintiff would not be entitled to relief under any set of facts that could be proved consistent with the allegations.' " *Phillips v. Girdich,* 408 F.3d 124, 127 (2d Cir.2005) (internal citations omitted). A "dismissal on the pleadings is *never* warranted unless the plaintiff's allegations are doomed to fail under any available legal theory." *Id.* at 128.

### B. ADA Claim

Plaintiff states that the Defendants violated the ADA because they discriminated against him based on his disability and they did not accommodate him in his request

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2496859 (N.D.N.Y.)
(Cite as: 2006 WL 2496859 (N.D.N.Y.))

for suitable treatment for his drug addiction. Compl. at ¶¶ 1 & 53.

The Supreme Court has stated that Title II of the ADA applies to state prisons and **inmates**. *Pennsylvania Dep't of Corr. v. Yeskey,* 524 U.S. 206, 210-12 (1998) (cited in *Singleton v. Perilli,* 2004 WL 74238, at *4 (S.D.N.Y. Jan. 16, 2004)). Although suit may be brought against a prison, the Second Circuit has held "Title II of the ADA ... [does not] provide[ ] for individual capacity suits against state officials." *Garcia v. State Univ. of New York Health Sciences Ctr. of Brooklyn,* 280 F.3d 98, 107 (2d Cir.2001).

42 U.S.C. § 12202 states that "[a] State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in [a] Federal or State court of competent jurisdiction for a violation of this [Act]." The Supreme Court has affirmed that this statute is "an unequivocal expression of Congress's intent to abrogate state sovereign immunity." *United States v. Georgia et al.,* 546 U.S. 151, 126 S.Ct. 877, 879 (2006). Moreover, the Supreme Court has held that Title II of the ADA creates a private cause of action for damages for conduct that *actually* violates the Fourteenth Amendment as Title II validly abrogates the sovereign immunity of the states. *United States v. Georgia et al.,* 126 S.Ct. at 882; *see also Tennessee v. Lane,* 541 U.S. 509, 518, & 520 (2004) (holding that "Congress can abrogate a State's sovereign immunity when it does so pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment to enforce the substantive guarantees of that Amendment" if "congruence and proportionality [exists] between the injury to be prevented or remedied and the means adopted to that end." (citing *Fitzpatrick v. Bitzer,* 427 U.S. 445, 456 (1976) & quoting *City of Boerne v. Flores,* 521 U.S. 507, 520 (1997))).[FN1]

> FN1. In *Georgia,* the Supreme Court declined to address the question of whether Title II validly abrogates sovereign immunity for conduct that does not violate the Constitution.

**\*6** The Second Circuit has stated that "a private suit for money damages under Title II of the ADA may only be maintained against a state if the plaintiff can establish that

the Title II violation was motivated by discriminatory animus or ill will due to the disability[.]" *Garcia,* 280 F.3d at 111-12. If a plaintiff were to sue individuals in their official capacities for money damages, the Second Circuit has held that it would in fact be a suit against New York and therefore the Eleventh Amendment would shield the individuals to the same extent as it would shield New York. *Garcia,* 280 F.3d at 107 (citing *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 (1989) & *Kentucky v. Graham,* 473 U.S. 159, 165-66 (1985)). However, as the Supreme Court has abrogated sovereign immunity against the states under Title II for constitutional violations, a plaintiff may bring a lawsuit against individuals in their official capacities. In addition to a lawsuit for money damages, a plaintiff may pursue prospective injunctive relief against a person in his or her official capacity. *Ex parte Young,* 209 U.S. 123, 155-56 (1908); *Cruz v. Gomez,* 202 F.3d at 595 n. 2.

In order to state a claim under 42 U.S.C. § 12132, Title II of the ADA, **prisoners** must show:

> (1) they are "qualified individuals" with a disability; (2) that the defendants are subject to the ADA; and (3) that plaintiffs were denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiffs' disabilities.

*Henrietta D. v. Bloomberg,* 331 F.3d 261, 272 (2d Cir.2003) (citation omitted).

A disability under the ADA is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such impairment." 42 U .S.C. § 12102(2) (quoted in *Bragdon v. Abbott,* 524 U.S. 624, 630 (1998)). The consideration of subsection A requires a three step process set forth by the Supreme Court. First, it must be determined if a plaintiff's conditions constitute a physical impairment. *Bragdon,* 524 U.S. at 631. The Supreme Court, looking to the Department of Health, Education and Welfare regulations to interpret the Rehabilitation Act, defines a physical or mental impairment as:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2496859 (N.D.N.Y.)
(Cite as: 2006 WL 2496859 (N.D.N.Y.))

(A) any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following bodily systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic; skin; and endocrine; or (B) any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

45 C.F.R. § 84.3(j)(2)(I) (1997) (quoted in *Bragdon v. Abbott,* 524 U.S. at 632).

*7 Second, upon determining whether a physical or mental impairment exists, an identification must be made as to the "life activity upon which [plaintiff] relies ... and determine whether it constitutes a major life activity under the ADA." *Id.* at 631. Major life activities include "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 45 C.F.R. § 84.3(j)(2)(ii) (1997) & 28 C.F.R. § 41.31(b)(2) (1997) (quoted in *Bragdon v. Abbott,* 524 U.S. at 638-39) (noting that the list is not exhaustive and that reproduction, the claimed activity, was a major life activity). The final step is to ascertain whether "the impairment substantially limited the major life activity." *Id.* at 631. The Supreme Court has stated that "[t]o be substantially limited ..., an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long-term." *Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 198 (2002).

Pursuant to Title II, Plaintiff must allege a physical or mental impairment. The disability claimed by Plaintiff is that he is a "drug addict." Compl. at ¶ 14. The Second Circuit has held that past drug addiction will constitute an "impairment" under the definition of a disability according to the ADA. *Reg'l Econ. Cmty. Action Program v. City of Middletown,* 294 F.3d 35, 46 (2d Cir.2002) (citing *Buckley v. Consol. Edison Co.,* 155 F.3d 150, 154 (2d Cir.1998) for the proposition that a *recovering* drug addict may be considered to have a "disability" under the ADA) (emphasis added). The Second Circuit has also noted that

legislative history confirms that conclusion. *Id.* (citing H.R.Rep. No. 101-485(II), at 51 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 333, which states that "physical or mental impairment" includes "drug addiction"). In essence, while *Reg'l Econ. Cmty. Action Program v. City of Middletown* holds that a *recovering* drug addict falls within the statutory definition of a "qualified individual with a disability" under Title II, the Second Circuit in that case incorporated by reference another Second Circuit case which relies upon the statutory definition found within Title I, 42 U.S.C. § 12114, for the basis of its holding that a recovering addict would qualify under the ADA. Therefore, to qualify this notion, the term "qualified individual with a disability" will not include persons who are "currently engaging in the illegal use of drugs[.]" 42 U.S.C. § 12114(a). In order to be considered a "qualified individual with a disability," the person must have (1) "*successfully completed* a supervised drug rehabilitation program and is no longer engaging in the illegal use of drugs, or has otherwise been rehabilitated successfully and is no longer engaging in such use; (2) is participating in a supervised rehabilitation program and is no longer engaging in such use; or (3) is erroneously regarded as engaging in such use, but is not engaging in such use[.]" *Id.* at § 12114(b) (emphasis added).[FN2]

FN2. The same basic provisions of 42 U.S.C. § 12114 under Title I for illegal drug use are also found within 42 U.S.C. § 12210 under the miscellaneous provisions subchapter of the ADA. 42 U.S.C. § 12210, which discusses illegal drug use, has been briefly touched upon within the prison context. *See generally Kaufman v. Carter,* 952 F.Supp. 520, 529 (W.D.Mich.1996).

*8 Moreover, a **prisoner's** "mere status as a[ ] ... substance abuser does not necessarily imply a 'limitation' " as needed to fulfill the second part of the definition of a disability. *Reg'l Econ. Cmty. Action Program v. City of Middletown,* 294 F.3d at 47 (citation omitted). Therefore, in order "[t]o prevail, a recovering drug addict ... 'must demonstrate [not only] that he [or she] was actually addicted to drugs ... in the past, [but also] that this addiction substantially limits one or more of his [or her] major life activities.' " *Id.* (quoting *Buckley v. Consol. Edison Co.,* 127 F.3d 270, 274 (2d Cir.1997)) (alterations in original).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2496859 (N.D.N.Y.)
(Cite as: 2006 WL 2496859 (N.D.N.Y.))

In addition, under Title II, the phrase " 'qualified individual with a disability' means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, ..., meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). Under the statutory definition, a plaintiff would have to prove they are eligible for the participation in the program sought. Notably, there is no constitutional right to treatment for drug addiction nor is there a right for an **inmate** to choose a drug treatment program he or she desires. *See Smith v. Follette*, 445 F.2d 955, 961 (2d Cir.1971); *Doe v. Goord*, 2005 WL 3116413, at *16 (S.D.N.Y. Nov. 22, 2005).

> FN3. The courts have analyzed that an **inmate** does not have the right to a drug treatment program of his or her choice under the Eighth Amendment. *See Doe v. Goord*, 2005 WL 3116413, at *16 (S.D.N.Y. Nov. 22, 2005) (citing *Fiallo v. DeBatista*, 666 F.2d 729, 730-31 (1st Cir.1981) & *United States v. Billiot*, 2003 WL 22271225, at *6 (A.F.Ct.Crim.App. Sept. 26, 2003)); *see also infra* Part II.C. (discussing the Plaintiff has no liberty interest in receiving drug treatment) and Part II.E. (noting that **denial** of a suitable drug treatment **program** is not a violation of the **Eighth Amendment**).

Here, Plaintiff must state a cause of action under Title II of the ADA. First, it must be determined if Toney is a "qualified individual." Plaintiff has failed to plead that he is a qualified individual. Pursuant to 42 U.S.C. §§ 12114 and 12210, Plaintiff has not *successfully completed* a supervised drug program nor has he otherwise been successfully rehabilitated. Plaintiff's ongoing drug use further inhibits qualification under the statute. Plaintiff has, in different facilities and at differing times, participated in several drug rehabilitation programs. Compl. at ¶¶ 23, 24, 26, & 28; *see supra* Part I. However, Toney was removed from many of those programs prior to completion because of drug use and received sixty days, six months,FN4 and one year confinement respectively for the three incidents. Compl. at ¶¶ 25, 27, & 29; *see supra* Part I. Plaintiff's only claim that he is drug free is because he was placed in SHU for one year as punishment for using heroin. Plaintiff's insistence on admittance to a drug rehabilitation program belies the notion that he "has been

rehabilitated successfully, by his confinement in the SHU and is no longer engaging in the use of illegal drugs[.]" Compl. at ¶ 15. Even Plaintiff's claim that he has been "erroneously regarded as engaging in such use, but is not," must fail as he was caught and punished in three different facilities for drug use. In addition, Plaintiff has not plead that he is a *recovering* drug addict, only that he is a drug addict. *Id.* at ¶ 14. Thus, Plaintiff is not a "qualified individual with a disability" within the purviews of 42 U.S.C. §§ 12114 and 12210.

> FN4. Plaintiff's segregation in SHU for six months was for possession of heroin at the Mid-State Correctional Facility.

*9 Even if Plaintiff's drug addiction were to qualify as an "impairment" for a recovering addict, Plaintiff must fulfill the remaining requirements under the ADA. Plaintiff must still allege the major life activity upon which he relies. Toney claims his major life activities that have been affected are his inability to maintain employment, interference with his education, and neglect towards his health and safety. Compl. at ¶ 22. Neglect towards his health and safety is not a major life activity. Inability to maintain employment and interference with his education may constitute major life activities. In any event, it must be determined whether the physical impairments substantially limit the major life activity asserted. Here, it would be difficult for Plaintiff to state that his drug addiction prevents or severely restricts him from doing activities that are of central importance to most people's daily lives and that the addiction's impact is permanent or long-term; therefore Plaintiff's drug addiction may not constitute a disability.

Notwithstanding, assuming ongoing drug addiction would constitute a disability, Plaintiff has failed to state a cause of action upon which relief could be granted. Plaintiff seeks accommodation based on his disability for a suitable drug treatment program. Plaintiff has identified the numerous programs he has participated in, including ASAT, CASAT, and RSAT. *See supra* Part I. Therefore, Plaintiff was not completely deprived of participation in any program. Moreover, Plaintiff would not be a "qualified individual" pursuant to Title II, 42 U.S.C. § 12131(2), as he would not be an individual with a disability who meets the essential eligibility requirements

Not Reported in F.Supp.2d, 2006 WL 2496859 (N.D.N.Y.)
(Cite as: 2006 WL 2496859 (N.D.N.Y.))

for the receipt of services or the participation in programs or activities provided by a public entity since there is no constitutional right to drug rehabilitation. Accordingly, as Plaintiff has no constitutional right to drug rehabilitation, among other things as stated above, there has been no *actual* violation of the Fourteenth Amendment and his claim must fail. *See United States v. Georgia,* 126 S.Ct. at 882.[FN5]

> FN5. Since Plaintiff is not a "qualified individual," we need not address the very question left open in *United States v. Georgia,* that is whether sovereign immunity was validly abrogated for non-constitutional violations.

Therefore, it is recommended that the Motion to Dismiss be **granted** on the ADA claim.

### C. Due Process Claims

Plaintiff alleges Defendants Mulvihill, Moulton, McDonald, Lape, Goord, and Nuttall violated his due process rights by failing to provide him with treatment he desired for his drug addiction. Compl. at ¶¶ 54, 56, 63, 68, & 82. Plaintiff claims that he has a "protected liberty interest" in a suitable drug treatment program. *Id.* at ¶ 43. In addition, Plaintiff claims that Defendant Goord violated the Due Process Clause of the Fourteenth Amendment when he affirmed a finding of guilt, on April 9, 2004, based on Disciplinary Rule 113.24,[FN6] which Plaintiff asserts is unconstitutional. *Id.* at ¶ 38.

> FN6. This disciplinary rule is found at N.Y. COMP.CODES R. & REGS ., tit. 7, § 270.2(B)(14)(xiv).

The Due Process Clause of the Fourteenth Amendment states that no "State [shall] deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. It is well-established that a **prisoner** who has been lawfully incarcerated will only have "a narrow range of protected liberty interests." *Morris v. Dann,* 1996 WL 732559, at *3 (N.D.N.Y. Dec. 11, 1996). The Supreme Court has stated that "the

criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution." *Meachum v. Fano,* 427 U.S. 215, 224 (1976); *see also Benjamin v. Fraser,* 264 F.3d 175, 189 (2d Cir.2001). Therefore, in order to succeed on a § 1983 claim based on the Fourteenth Amendment, the **prisoner** would have to prove "a deprivation of a liberty interest protected by the Due Process Clause itself, or a violation of a state-created liberty interest." *Morris,* 1996 WL 732559, at *3.

*10 For a **prisoner** to survive a motion to dismiss on a Due Process claim, the **prisoner** must allege that: 1) "the State has granted **inmates,** by regulation or statute, a protected liberty interest with respect to the terms or conditions of confinement; and 2) the defendants' action creates an 'atypical and significant hardship' with regard to those terms or conditions of confinement." *Shariff v. Artuz,* 2000 WL 1219381, at *6 (S.D.N.Y. Aug. 28, 2000) (citing *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996) & quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)).

The Second Circuit has stated "[t]he claim to a constitutional right to treatment for narcotics addiction has no basis in either the provisions of the Constitution or the decisions of the courts." *Smith v. Follette,* 445 F.2d 955, 961 (2d Cir.1971); *Doe v. Goord,* 2005 WL 3116413, at * 16 (S.D.N.Y. Nov. 22, 2005) (citing *Smith v. Follette & Gill v. United States Parole Comm'n,* 692 F.Supp. 623, 628 (E.D.Va.1988) for the proposition that "[ i]nmates have no constitutional right to any rehabilitation treatment or programs such as the drug program sought here.")).

Here, even accepting all of Toney's factual allegations as true per the motion to dismiss standard, the Court is unable to find that he has been deprived of any constitutional right as there is no constitutional right to be treated for drug addiction. Furthermore, Plaintiff has not stated that New York has created a liberty interest in receiving a drug program of Plaintiff's choosing nor does he claim how the Defendants' actions created an atypical and significant hardship to his condition of confinement. Plaintiff cites to N.Y. CORRECT. LAW §§ 70(2)(c), 72-a(1), & 73(1); however, those statutes give the

Not Reported in F.Supp.2d, 2006 WL 2496859 (N.D.N.Y.)
(Cite as: 2006 WL 2496859 (N.D.N.Y.))

Commissioner of the Department of Correctional Services the discretion to provide an **inmate** with a transfer to a drug treatment facility. Compl. at ¶¶ 18-20. New York has not created a protected liberty interest as the programs are discretionary. In regards to Plaintiff's claim against Defendant Goord for affirming a finding of guilt on the disciplinary rule, Plaintiff has again failed to state a due process violation as he has not stated a constitutional or state-created interest to "use or be under the influence of any narcotics or controlled substances unless prescribed by a health service provider [.]" N.Y. COMP.CODES R. & REGS., tit. 7, § 270.2(B)(14)(xiv).

Therefore, it is recommended that the Motion to Dismiss be **granted** on the due process claims.

### D. Equal Protection Claims

Plaintiff alleges that his confinement in SHU is a violation of the Equal Protection Clause since the confinement was based "on a discriminatory rule, prison rule 113.24" because the rule is applied to drug addicts. Compl. at ¶ 30. As in his due process claim, Plaintiff also alleges that Defendant Goord violated the Equal Protection Clause when he affirmed a finding of guilt, on April 9, 2004, based on Disciplinary Rule 113.24. *Id.* at ¶ 38. Furthermore, Plaintiff avers that Defendants Mulvihill, McDonald, Lape, Goord, and Nuttall violated his "right to equal protection of [the] law" by discriminating against him for his "disease" by failing to allow him to attend a "suitable program." *Id.* at ¶¶ 54, 63, 68, & 82. In addition, Plaintiff purports that Dr. Haider-Shah violated the Equal Protection Clause of the Fourteenth Amendment by "failing to treat him while in the SHU." *Id.* at ¶ 73.

**\*11** The Equal Protection Clause of the Fourteenth Amendment states no "State [shall] deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. It further "directs that all persons similarly circumstanced shall be treated alike." *Plyler v. Doe,* 457 U.S. 202, 216 (1982) (citation omitted).

The Second Circuit has held that in order for a **prisoner** to state a violation of the Equal Protection Clause, the

**prisoner** "must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) (citation omitted). An Equal Protection claim may be brought "by a 'class of one' where a plaintiff alleges that [ ]he has been 'intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.' " *African Trade & Info. Ctr., Inc. v. Abromaitis,* 294 F.3d 355, 362-63 (quoting *Village of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000)). However, the plaintiff need not specifically identify "actual instances where others have been treated differently" in order for the equal protection claim to be sufficient. *DeMuria v. Hawkes,* 328 F.3d 704, 707 (2d Cir.2003).

The Second Circuit has also stated that "where the state has made a legitimate effort to allocate its resources in a reasonable manner, without any evidence of an intent to discriminate on the basis of invidious grounds, the courts will not intervene." *Smith v. Follette,* 445 F.2d at 959-60. Moreover, "[t]he Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all. (Citation omitted). It is enough that the State's action be rationally based and free from invidious discrimination." *Id.* at 960 (quoting *Dandridge v. Williams,* 397 U.S. 471, 486-87 (1970)). Thus, because the social, economic, and philosophical nature of public welfare programs are not "the business of [the Supreme Court]," neither are "determination[s] of the nature of treatment of addicted criminals." *Id.* (quoting *Dandridge v. Williams,* 397 U.S. at 487).

In addition, "incarcerated **prisoners** are protected from cruel and unusual punishment in the form of inadequate medical care by the Eighth Amendment, as applied to the state by the Fourteenth Amendment." *McKenna v. Wright,* 2002 WL 338375, at \*9 (S.D.N.Y. Mar. 4, 2002) (citing *Estelle v. Gamble,* 429 U.S. 97, 101-05 (1976)). A cause of action for deliberate indifference of medical care brought by a *pro se* **prisoner** under the Fourteenth and Eighth Amendments will only be construed as a claim pursuant to the Eighth Amendment. *McKenna v. Wright,* 2002 WL 338375, at \*9.

Here, Plaintiff has not stated a claim that his SHU

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2496859 (N.D.N.Y.)
(Cite as: 2006 WL 2496859 (N.D.N.Y.))

confinement violated the Equal Protection Clause. Plaintiff merely states that the violation occurs because it is applied to drug addicts and could be applied to non-addicts. Compl. at ¶¶ 31 & 33. He does not claim that he was treated differently than other drug addicts who were caught either in the use or possession of drugs while incarcerated and that those addicts were not placed in SHU. The same reasoning applies to Defendant Goord in affirming a finding of guilt based on the violation of the disciplinary rule as he does not state that he was treated differently than other drug addicts in the same position. In regards to his claim against Defendants Mulvihill, McDonald, Lape, Goord, and Nuttall to attend a "suitable program," Plaintiff has not stated a claim that there was invidious discrimination and the Second Circuit has held that it is not the Court's place to interfere in the determination of the nature of treatment for addicts. Additionally, once again, Plaintiff has failed to state that he was treated differently than other drug addicts seeking their own desired treatment.

**\*12** As to Plaintiff's claim against Defendant Haider-Shah for failure to treat him, claims for inadequate medical care are analyzed under the Eighth Amendment. Since Toney brings this claim under both the Fourteenth Amendment and Eighth Amendment, the Court will construe Plaintiff's claim as one pursuant to only the Eighth Amendment. *See McKenna v. Wright,* 2002 WL 338375, at \*9.

Accordingly, it is recommended that the Motion to Dismiss be **granted** on the equal protection claims.

### E. Eighth Amendment Claims

Plaintiff states that his confinement in SHU for one year violates the Eighth Amendment as the punishment was "grossly disproportionate to the offense charged." Compl. at ¶ 36. Plaintiff also claims that Defendant Goord violated the Eighth Amendment when he affirmed the disciplinary sanction which Plaintiff claims was disproportionate to the offense. *Id.* at ¶ 39. Toney further alleges that Defendant Thesee violated the Eighth Amendment by denying his request "for suitable drug treatment." *Id.* at ¶ 46. In addition, Plaintiff claims that Defendants Haider-Shah, Goord, and Nuttall delayed medical treatment and that Dr. Haider-Shah also failed to

treat him. *Id.* at ¶¶ 73 & 83.

The Eighth Amendment to the U.S. Constitution, which prohibits cruel and unusual punishment, "does not mandate comfortable prisons" and is utilized to determine whether the confinement is grossly disproportionate to the severity of crimes warranting imprisonment. *Davidson v. Conway,* 318 F.Supp.2d 60, 62 (W.D.N .Y.2004) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)) (further citation omitted); *see also Benton v. Scully,* 1990 WL 16092, at \*3 (S.D.N.Y. Feb. 13, 1990). "Restraints on an inmate do not violate the amendment unless they are 'totally without penological justification,' 'grossly disproportionate,' or 'involve the unnecessary and wanton infliction of pain.' " *Smith v. Coughlin,* 748 F.2d 783, 787 (2d Cir.1984) (quoting *Rhodes v. Chapman,* 452 U.S. at 346). In *Dixon v. Goord,* the court held that an **inmate's** punishment of ten months in SHU after being found guilty of assaulting a prison officer was "penologically justified and not grossly disproportionate [.]" 224 F.Supp.2d 739, 748 (S.D .N.Y.2002) (citing *Sostre v. McGinnis,* 442 F.2d 178, 190-94, & n. 28 for the proposition that the "length of disciplinary detention did not constitute disproportionate punishment considering the gravity of the offense" which further cited to *Knuckles v. Prasse,* 302 F.Supp. 1036 (E.D.Pa.1969), noting that 400 days in segregation was held to be constitutional)); *see also Horne v. Coughlin,* 155 F.3d 26, 31 (2d Cir.1998) (stating that the court did view a six month detention in SHU to violate the standard of gross disproportionality).

"In order to establish an Eighth Amendment claim arising out of inadequate medical care, a **prisoner** must prove deliberate indifference to [his] serious medical needs." *Smith v. Carpenter,* 316 F.3d 178, 183 (2d Cir.2003) (internal quotation marks and citations omitted) (alteration in original). This standard contains objective and subjective elements. *Id.* "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberative indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Id.* at 183-84 (citing *Chance,* 143 F.3d at 702 & *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). The subjective element "entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Hathaway v. Coughlin,* 99 F.3d at 553 (quoting *Farmer v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2496859 (N.D.N.Y.)
(Cite as: 2006 WL 2496859 (N.D.N.Y.))

*Brennan,* 511 U.S. 825, 835 (1994)).

**\*13** This deliberate indifference must be in regards to the "**prisoner's** serious illness or injury[.]" *Estelle v. Gamble,* 429 U.S. 97, 105 (1976). Additionally, " '[b]ecause society does not expect that **prisoners** will have unqualified access to health care,' a **prisoner** must first make this threshold showing of serious illness or injury in order to state an Eighth Amendment claim for denial of medical care." *Smith,* 316 F.3d at 184 (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)) (further citation omitted). Some factors that determine whether a **prisoner's** medical condition is serious include: "1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment, 2) whether the medical condition significantly affects daily activities, and 3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162-63 (2d Cir.2003) (internal quotation marks and citations omitted) (noting that an **inmate** is not required to show "that he or she experiences pain that is the limit of human ability to bear, nor [does the court] require a showing that his or her condition will degenerate into a life threatening one").

The **prisoner** has to show "more than an inadvertent failure to provide adequate medical care by prison officials to successfully establish Eighth Amendment liability." *Smith,* 316 F.3d at 184 (internal quotation marks and citation omitted). Prison officials act with deliberate indifference "when [they] 'know [ ] of and disregard[ ] an excessive risk to **inmate** health or safety; the official[s] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference.' " *Chance,* 143 F.3d at 702 (quoting *Farmer v. Brennan,* 511 U.S. at 837). The Eighth Amendment deals with "the particular risk of harm faced by a **prisoner** due to the challenged deprivation of care, rather than the severity of the **prisoner's** underlying medical condition, considered in the abstract[.]" *Smith,* 316 F.3d at 186 (citations omitted). Moreover, the "severity of the alleged denial of medical care should be analyzed with regard to all relevant facts and circumstances." *Id.* at 187 (citation omitted).

Furthermore, a delay in medical treatment does not necessarily invoke the Eighth Amendment. The "delay in treatment does not violate the constitution unless it involves an act or failure to act that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Thomas v. Nassau County Corr. Ctr.,* 288 F.Supp.2d 333, 339 (E.D.N.Y.2003) (quoting *Chance,* 143 F.3d at 703). Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, such a classification is reserved "for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a life-threatening and fast degenerating condition for three days; or delayed major surgery for over two years." *Freeman v. Stack,* 2000 WL 1459782, at *6 (S.D.N.Y. Sept. 29, 2000) (internal quotation marks omitted).

**\*14** Here, Plaintiff claims that his SHU confinement of one year was grossly disproportionate to his crime. Plaintiff merely asserts a conclusory statement unsupported by any facts and furthermore only states a legal conclusion disguising it as a factual allegation. Compl. at ¶ 36. Plaintiff makes the same general statement in regards to Defendant Goord that he affirmed the disciplinary sanction which was "grossly disproportionate." *Id.* at ¶ 39. Toney provides no facts regarding the disciplinary sanction nor any documentation from the event. In any event, courts have found similar periods of confinement not to violate the Eighth Amendment and Plaintiff had been placed in SHU for sixty days and six months respectively twice before for drug use prior to his one year confinement for the same offense. *See supra* Part I.

As to Plaintiff's claim against Dr. Thesee, Plaintiff has failed to state a claim for which relief can be granted. Plaintiff states his Eighth Amendment rights were violated when his request for "suitable treatment" was denied. Here, Toney does not allege that he was deprived of essential treatment or that Defendant Thesee was indifferent to his serious needs, but only that he has not received the type of treatment which he sees fit. Although Toney is ungratified with the drug treatment programs he has received, the Eighth Amendment does not give him the right to the drug treatment of his choice. *See Doe v. Goord,* 2005 WL 3116413, at * 16 (S.D.N.Y. Nov. 22, 2005) (citing *Fiallo v. DeBatista,* 666 F.2d 729, 730-31 (1st Cir.1981) & *United States v. Billiot,* 2003 WL 22271225 at *6 (A.F.Ct.Crim.App. Sept. 26, 2003) for the proposition that "[t]here is no constitutional right to drug

Not Reported in F.Supp.2d, 2006 WL 2496859 (N.D.N.Y.)
(Cite as: 2006 WL 2496859 (N.D.N.Y.))

rehabilitation. Drug addiction therapy can fall in the category of necessary medical treatment, but only when denial of such treatment is sufficiently harmful to satisfy the deliberate indifference standard. It is not enough that an accused merely wants a certain type of treatment). Thus, even construing Plaintiff's allegations as true, as there is no constitutional right to choose a drug treatment program, Plaintiff cannot state a claim. Furthermore, Plaintiff has failed to allege any facts that would satisfy the deliberate indifference standard as Plaintiff's statements are again general and conclusory. *See generally* Compl.

Plaintiff's allegations against Defendants Haider-Shah, Goord, and Nuttall for delay in treatment and the further claim against Dr. Haider-Shah for failure to treat him while in SHU also fails to state a claim upon which relief may be granted. As to a delay in treatment, besides having to prove a serious illness, Plaintiff must show that the Defendants acted with the culpable state of mind. Even if drug addiction was to constitute a serious illness as it could significantly affect his daily activities and he had received treatment in other substance abuse programs, Plaintiff has failed to provide any facts to show that the Defendants knew of and disregarded an excessive risk to Plaintiff's health. Plaintiff's claim for delay in treatment arises from not receiving the treatment program of his choice. *See* Compl. at ¶¶ 72, 77, & 80. Plaintiff has misinterpreted the meaning of delay in treatment within the context of the Eighth Amendment. Plaintiff has not alleged that the Defendants' act or failure to act that evinced "a conscious disregard of a substantial risk of serious harm." *Thomas v. Nassau County Corr. Ctr.,* 288 F.Supp.2d at 339. Plaintiff also has not claimed that the Defendants were delaying treatment in order to punish him nor does he claim that the Defendants are ignoring a life threatening condition. *See Freeman v. Stack,* 2000 WL 1459782, at *6. Plaintiff's claim against Dr. Haider-Shah for failure to treat must also fail as Plaintiff has failed to allege any facts of a culpable state of mind on the part of Dr. Haider-Shah. Plaintiff only purports that he was told that he could not be treated with a drug treatment program while in SHU. Compl. at ¶ 72. Besides failing to meet the second prong of the Eighth Amendment standard, Plaintiff has no constitutional right to drug rehabilitation. There is no cognizable claim for failure to provide a drug treatment program.

*15 Therefore, it is recommended that the Motion to Dismiss be **granted** as to Plaintiff's Eighth Amendment claims.

### III. CONCLUSION

For the reasons stated therein, it is hereby

**RECOMMENDED,** that the Motion to Dismiss (Dkt. No. 22) be **GRANTED;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72, 6(a), & 6(e).

N.D.N.Y.,2006.
Toney v. Goord
Not Reported in F.Supp.2d, 2006 WL 2496859 (N.D.N.Y.)

END OF DOCUMENT



Not Reported in F.Supp., 1997 WL 614285 (N.D.N.Y.)
(Cite as: 1997 WL 614285 (N.D.N.Y.))

▷  Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
DONALD L. CURTIS, Plaintiff,
v.
GEORGE PATAKI, Governor, New York State; and
Philip Coombe, Jr., Defendants.
**No. 96-CV-425 RSP-GJD.**

Oct. 1, 1997.

Donald L. Curtis, Plaintiff, Pro Se.

Dennis C. Vacco, Attorney General of the State of New York, for Defendants, Albany, New York, Deborah A. Ferro, Assistant Attorney General, of Counsel.

**ORDER**

POOLER, J.

**\*1** In a report-recommendation filed September 4, 1997, Magistrate Judge Gustave J. Di Bianco recommended that I deny plaintiff Donald L. Curtis' request for a default judgment and grant defendants' requests to vacate entry of default against them and dismiss this civil rights action. Curtis filed timely objections to each of the magistrate judge's recommendations.

**BACKGROUND**

Curtis, a New York prison inmate, is serving concurrent sentences of twelve and one-half to twenty-five years for robbery and twenty-five years to life for murder. Pl.'s Reply to Defs.' Mot. Dismiss, Dkt. No. 18 ¶ 2; Defs.' Mem. Sup. Mot. Dismiss, Dkt. No. 15, at 2. On January 12, 1996, Curtis filed a complaint pursuant to 42 U.S.C. §

1983 in the United States District Court for the Western District of New York. Curtis claimed that N.Y.Correct.L. §§ 803 and 804 and N.Y.COMP.CODES R. & REGS., tit. 7 § 260.1(c) are unconstitutional insofar as they deny inmates serving a maximum life sentence of the opportunity to earn good time credits. Curtis claims that (1) he has a liberty interest in good time credits and (2) granting inmates not serving a life sentence good time credits while denying them to inmates serving a life sentence is a denial of equal protection. Compl., Dkt. No. 1, ¶¶ 3,5,10.

By order dated February 26, 1996, Chief Judge Larimer of the Western District of New York transferred Curtis's lawsuit to this district. *See* Dkt. No. 3.

By letter dated July 3, 1996, defendant Philip Coombe, then commissioner of the New York State Department of Corrections ("DOCS"), requested an extension until August 15, 1996, to answer the complaint. Dkt. No. 9. Coombe's request was granted. *Id.*

On September 24, 1996, Curtis moved for a default judgment. Dkt. No. 11. Because Curtis had not yet obtained entry of default, the Clerk treated Curtis' request as one for entry of default and entered default on September 27, 1996. Dkt. No. 11.

By letter dated December 2, 1996, both defendants requested an extension of time to January 6, 1997, to answer or move to dismiss the complaint. Dkt. No. 12. This request was granted. *Id.* Curtis then filed a motion for a default judgment on January 17, 1997. Dkt. No. 13. On February 18, 1997, defendants cross-moved to vacate entry of default and to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). Dkt. No. 14. Curtis opposed defendants' motion to dismiss. Dkt. No. 18.

In his report-recommendation issued September 4, 1997, the magistrate judge recommended that I vacate entry of default and deny plaintiff's request for a default judgment because (1) defense counsel's default was not wilful because she had been seriously ill during some of the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 614285 (N.D.N.Y.)
(Cite as: 1997 WL 614285 (N.D.N.Y.))

period in which she delayed responding to the complaint and she had requested extensions of time, (2) defendant failed to demonstrate prejudice, and (3) defendants demonstrated meritorious defenses. The magistrate judge also recommended that I dismiss plaintiff's complaint because it fails to state a claim.

**\*2** Curtis filed his objections on September 14, 1997. Curtis made the following specific objections: (1) entry of default should not have been vacated because the Attorney General has ample resources and could have assigned another attorney to handle plaintiff's law suit during Assistant Attorney General Deborah Ferro's illness and Ms. Ferro was able to work despite her illness; (2) the Magistrate Judge erred factually by (a) stating that Curtis would receive good time against his twelve and one-half to twenty-five year sentence and (b) stating that Curtis had not requested new legislation; and (3) N.Y.Correct.L. § 803(1)(a) denies Curtis equal protection because he is similarly situated to inmates who do receive good time and the statute's distinction between inmates serving life sentences and inmates who are not serving life sentences is not rationally related to a government interest.

**DISCUSSION**

**I. Standard**

I review the report-recommendation *de novo* because both plaintiff's motion for a default judgment and defendants' motion to dismiss are dispositive motions. *See* 28 U.S.C. § 636(b)(1)(C).

**II. Default**

Plaintiff moved for a default judgment. Defendants opposed plaintiff's and moved to vacate entry of default.

A party may move pursuant to Rule 55(c) to set aside entry of default for "good cause." Whether or not to vacate entry of default is left to the sound discretion of the district court judge; however, there is a strong preference in favor of adjudicating controversies on their merits. *Enron Oil*

*Corp. v. Diakuhara,* 10 F.3d 90, 95 (2d Cir.1993). The criteria employed in determining whether good cause exists are "(1) whether the default was willful; (2) whether setting aside the default would prejudice the adversary; and (3) whether a meritorious defense is presented." *Id.* In all instances, the criteria for setting aside entry of default should be construed generously. *Id.*

The magistrate judge correctly determined that defendants' default was not willful. Although defense counsel did not meet deadlines, she did request two extensions of time and she suffered from walking pneumonia from July through September 1996. Ferro Aff'n, Dkt. No. 16, ¶¶ 4,6,7. Plaintiff did not make any specific allegations to support a finding of prejudice. Finally, for reasons I explain below, defendants' motion to dismiss for failure to state a claim is meritorious. Therefore, I will vacate entry of default and deny plaintiff's motion for a default judgment.

**III. Motion to Dismiss**

Plaintiff initially claimed that both Sections 803 and 804 of the Corrections Law were unconstitutional. However, the magistrate judge correctly found that Section 804 does not apply to plaintiff because he is not serving a definite sentence. Plaintiff does not contest this finding. Therefore, I need consider only Section 803(1)(a), which provides:

Every person confined in an institution of the department or a facility in the department of mental hygiene serving an indeterminate or determinate sentence of imprisonment, *except a person serving a sentence with a maximum term of life imprisonment,* may receive time allowance against the term or maximum term of his sentence imposed by the court. Such allowances may be granted for good behavior and efficient and willing performance of duties assigned or progress and achievement in an assigned treatment program, and may be withheld, forfeited or canceled in whole or in part for bad behavior, violation of institutional rules or failure to perform properly in the duties or program assigned.

**\*3** N.Y.Correct.L. § 803(1)(a) (McKinney Suppl.1996) (emphasis added).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 614285 (N.D.N.Y.)
(Cite as: 1997 WL 614285 (N.D.N.Y.))

The Equal Protection Clause does not forbid all classifications. *Nicholas v. Tucker,* 114 F.3d 17, 20 (2d Cir.1997). Unless Section 803(1)(a) either (1) burdens a fundamental right or (2) creates a distinction that burdens a suspect class, defendants need only demonstrate that the statutory scheme is rationally related to a legitimate government interest. *Id.* (citing *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976)). Inmates serving sentences that have a maximum term of life are not a suspect classification. *Cf. Id.* (holding that inmates are not a suspect classification). Moreover, the legislature's decision to grant certain inmates good time credits "is a matter of legislative grace" and does not create a fundamental right. *People ex rel. McNeil v. New York State Bd. of Parole,* 57 A.D.2d 876, 394 N.Y.S.2d 230, 232 (2d Dep't 1977). Therefore, the magistrate judge correctly determined that Section 803(1)(a) survives equal protection scrutiny if it is rationally related to a legitimate government interest. The magistrate judge identified two such legitimate governmental interests: denying early release to inmates who-in the view of the sentencing judge-have committed crimes deserving a life sentence and administrative convenience. Because deducting good time from a life sentence is obviously impracticable, not granting good time to inmates with maximum life sentences clearly is rationally related to administrative convenience. Moreover, the legislature was entitled to assume that judges would give maximum life sentences to those felons that the judges believed had committed the most heinous crimes and were least deserving of early release. Therefore, denying good time to inmates with life sentences is rationally related to ensuring that inmates convicted of the most serious crimes are not released early.

Plaintiff argues that the magistrate judge erred by finding that (1) plaintiff would receive good time against his shorter sentence and (2) he had not asked for new legislation. Even if plaintiff is correct on these points, the asserted factual errors do not affect the equal protection analysis set forth above.

Plaintiff also argues that he has a liberty interest in good time. However, the very statute that arguably creates a right to good time for certain inmates specifically excludes inmates who, like plaintiff, are serving sentences that have

a maximum term of life. Therefore, the statute does not give Curtis a liberty interest in good time. Curtis' claim that it is unfair to subject him to a loss of good time through due process hearings while not allowing him good time is nonsensical. Curtis will incur no actual loss of good time unless his maximum life sentence is vacated and he is awarded good time against his lesser sentence.

## CONCLUSION

Therefore, the report-recommendation is approved; plaintiff's request for a default judgment is denied; entry of default is vacated; and the complaint is dismissed in its entirety.

**\*4** IT IS SO ORDERED.
GUSTAVE J. DI BIANCO, Magistrate J.

## REPORT-RECOMMENDATION

This matter was referred to the undersigned for report and recommendation by the Honorable Rosemary S. Pooler, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rules N.D.N.Y. 72.3(c).

In the instant civil rights complaint, plaintiff alleges that New York Corrections Law sections 803 and 804 violate equal protection because they deny inmates with life sentences the right to receive good time credits.

Plaintiff requests that the court abolish the existing good time credit laws, rules, regulations, policy and practices. Plaintiff requests that the laws be restructured to include plaintiff, who is serving a life sentence.

Presently before the court are two motions. The plaintiff has moved for a default judgment pursuant to FED.R.CIV.P. 55 (Docket # 13), and the defendants have cross-moved to vacate the entry of default and to dismiss the complaint for failure to state a claim pursuant to FED.R.CIV.P. 12(b)(6) (Docket # 14). For the following reasons, the undersigned agrees with defendants and will

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 614285 (N.D.N.Y.)
(Cite as: 1997 WL 614285 (N.D.N.Y.))

recommend that the entry of default be vacated and the
complaint be dismissed.

DISCUSSION

**1. *Default Judgment:***

The plaintiff moves for a default judgment, based upon the
entry of default dated September 27, 1996.[FN1] At that time,
defendants had not responded to the complaint.
Defendants now request that the entry of default be
vacated and that they be allowed to cross-move for
dismissal of the complaint.

> FN1. The plaintiff filed a document labeled
> motion for default judgment". (Docket # 11).
> However, the Clerk interpreted this document as
> a request for entry of default pursuant to
> FED.R.CIV.P . 55(a).

The court notes that under FED.R.CIV.P. 55(a), the Clerk
of the Court may enter default against a party when the
Clerk learns through affidavit or otherwise, that the party
against whom a judgment for affirmative relief has been
sought has failed to plead or otherwise defend as required
by the rules. *Dow Chemical Pacific, Ltd. v. Rascator
Maritime S.A., Intra-Span, Inc.,* 782 F.2d 329, 335 (2d
Cir.1986). Entry of default is not a default judgment,
which requires a hearing and final judgment pursuant to
FED.R.CIV.P. 55(b). *Id.*

In the instant case, plaintiff initially submitted a motion for
a default judgment, however, such a motion is improper
until the Clerk enters default against a party. Thus,
plaintiff's "motion" (Docket # 11) was considered by the
Clerk as merely a request for entry of default. The Clerk
made a written notation on the document submitted by the
plaintiff that default was "noted and entered" on
September 27, 1996. (Docket # 11). This notation is
signed by Patricia L. McGuire, Deputy Clerk. Thus, entry
of default was made on September 27, 1996.

In December of 1996, defendants requested and were

granted an extension of time within which to move to
answer or dismiss the complaint. (Docket # 12). This
request was granted by the Pro Se Staff Attorney at my
direction. The extension to serve the motion was granted
until January 6, 1997. However, on January 17, 1997, the
plaintiff moved for a default judgment. (Docket # 13). No
motion had yet been filed or served by the defendants. On
February 18, 1997, the defendants filed their cross-motion
with the court.

**\*5** In defendants' memorandum of law in support of
vacating the entry of default, defense counsel states
various extenuating circumstances which caused the delay
in this case and which caused the defendants' failure to
timely file either their answer or their motion to vacate
default and to dismiss the complaint.

The court may vacate an entry of default for good cause.
FED.R.CIV.P. 55(C). There are strong policies in favor of
resolving issues on their merits. *In re Martin Trigona,* 763
F.2d 503, 505 (2d Cir.1985). A finding of good cause is
based on whether the default was willful, whether there
will be prejudice to the other party if the court sets aside
the default, and whether a meritorious defense is
presented. *Id.* (citations omitted).

In the instant case, it is clear that the default was not
willful, and that defense counsel was attempting to comply
with deadlines for filing her motion. Additionally, a
review of the documents shows that a meritorious defense
is submitted, and there will be no prejudice to the plaintiff
to allow the case to go forward and be decided on its
merits. Thus, the court recommends vacating the entry of
default and will continue to consider defendants' motion to
dismiss.

**2. *Motion to Dismiss:***

A court may not dismiss an action pursuant to Rule
12(b)(6) unless "it appears beyond doubt that the plaintiff
can prove no set of facts in support of his claim which
would entitle him to relief." *Cohen v. Koenig,* 25 F.3d
1168, 1172 (2d Cir.1994) (citing *inter alia Conley v.
Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80
(1957)). The court must accept the material facts alleged

Not Reported in F.Supp., 1997 WL 614285 (N.D.N.Y.)
(Cite as: 1997 WL 614285 (N.D.N.Y.))

in the complaint as true. *Id.* (citing *Cooper v. Pate,* 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964)(per curiam)). In determining whether a complaint states a cause of action, great liberality is afforded to pro se litigants. *Platsky v. Central Intelligence Agency,* 953 F.2d 26, 28 (2d Cir.1991) (citation omitted).

**3. *Facts and Contentions:***

Plaintiff is an inmate serving two concurrent sentences of confinement. He is serving a 25 year to life sentence for Murder, Second Degree, and a concurrent sentence of 12 1/2 to 25 years for Robbery, First Degree. Plaintiff alleges that New York Corrections Law sections 803 and 804 are unconstitutional because they specifically except inmates who are serving life sentences from accumulating statutory good time to reduce their sentences. Plaintiff claims that he "loses" good time credits after disciplinary hearings, so he should be entitled to accumulate them. Plaintiff alleges that defendants are violating his right to equal protection of the law.

**4. *Proper Defendants:***

Defendants first allege that neither of them has the power or authority to comply with the mandatory injunctive relief sought by the plaintiff.

When a plaintiff seeks a declaration that a particular statute is unconstitutional, the proper defendants are the government officials charged with the administration and enforcement of the statute. *New Hampshire Right to Life Committee v. Gardner,* 99 F.3d 8, 13 (1st Cir.1996) (citations omitted). In the instant case, it is true that the Governor appears to have no responsibility for administering or enforcing the statute that affords inmates of correctional institutions good time. Thus, he is not an appropriate defendant in the instant case.

**\*6** However, New York Corrections Law section 803(3) specifically provides that the Commissioner of Correctional Services shall promulgate rules and regulations for the administration of the time allowances authorized by the statute. N.Y.Correct.Law. § 803(3). It is

the ultimate responsibility of the Commissioner of Correctional Services to administer and enforce the statute. Thus, defendant Coombe is a proper defendant for prospective injunctive relief in this case. Although it is true that neither of the defendants is authorized to enact legislation, the plaintiff seeks a declaration that a statute is unconstitutional. If the statute is found unconstitutional to the extent that inmates serving a life sentence could not be excepted from the provisions of the statute, it does not appear that the plaintiff is requesting that new legislation be enacted, he is requesting that he simply be allowed to participate in the existing legislation. Thus, plaintiff is not requesting new legislation. It must be remembered that plaintiff is *pro se* and may not be aware how to request appropriate relief.

In any event, regardless of whether defendant Coombe is a proper defendant, plaintiff's claim has no ultimate merit as discussed in the sections below.

**5. *Equal Protection:***

Before the court considers the substance of plaintiff's equal protection claim, the court notes that although plaintiff challenges sections 803 and 804 of the New York Corrections Law, section 804 has no application to plaintiff's case since it is a good time statute for inmates with **definite** sentences. An inmate who is serving a sentence with a minimum and a maximum term is serving an **indeterminate,** not a definite sentence. *See* N.Y.Penal Law § 70.00. Section 804, thus, does not apply to plaintiff, and he cannot challenge the application of that section. Section 803 is the appropriate section for plaintiff to challenge.

Section 803 of the New York Corrections Law provides that:

1. (a) Every person confined in an institution of the department ... serving an indeterminate or determinate sentence of imprisonment, *except a person serving a sentence with a maximum term of life imprisonment,* may receive time allowance against the term or *maximum* term imposed by the court.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 614285 (N.D.N.Y.)
(Cite as: 1997 WL 614285 (N.D.N.Y.))

N.Y.Corr.Law § 803(1)(a)(emphasis added). On its face, the law is quite clear that it does not apply to inmates whose maximum term of imprisonment is life. Without any complicated analysis, it is logical that since good time is deducted from the maximum term of an inmate's sentence, it would be impossible to calculate good time for an individual with a maximum of life term. Thus, aside from the legislature's desire to clearly exclude inmates with life sentences, perhaps because a sentence of life is usually reserved for those who commit the most serious of crimes, good time is impossible to calculate on such a term. There would be no starting number from which to subtract accumulated good time.

*7 The Equal Protection Clause insures that governmental decision makers do not treat people differently who are alike in all relevant respects. *Nicholas v. Tucker,* 114 F.3d 17, 210 (2d Cir.1997) (citing *inter alia Nordlinger v. Hahn,* 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992)). The Equal Protection Clause does not forbid all classifications, and unless the classification burdens a fundamental right or draws distinctions based on suspect classifications, the statute will be upheld if it is rationally related to a legitimate governmental interest. *Id.*

Inmates are not a suspect class such that a more exacting scrutiny is required. *Id.* Additionally, even assuming that the good time statute creates a right to obtain a reduction of one's sentence, this right would not be "fundamental" such that strict scrutiny would be required for the statute's classification to survive an equal protection challenge. *See Washington v. Glucksberg,* 521 U.S. 702, ----, 117 S.Ct. 2258, 2271, 138 L.Ed.2d 772 (1997) (discussing fundamental rights protected by the Fourteenth Amendment). *See also People ex rel. McNeil v. New York State Board of Parole,* 57 A.D.2d 876, 877, 394 N.Y.S.2d 230, 232 (2d Dep't 1977) (no fundamental right to good time). Since this statute affects neither a suspect class nor a fundamental right, its differing treatment of those who are serving life sentences needs only to be rationally related to a legitimate governmental interest to survive an equal protection challenge. Aside from the obvious problem in calculating good time for an individual with a life sentence, it is certainly rational to deny a privilege to those who have committed more serious crimes and thus, excepting individuals with life sentences from the good time statute is certainly related to this interest.[FN2]

FN2. It is also arguable that an inmate serving a life sentence is not even similarly situated to one who is not serving a life sentence. If so, there would be no need to justify the differing treatment.

Plaintiff points out that he loses good time when he is found guilty of a disciplinary violation. However, the court points out, as stated by defendants, that plaintiff has two sentences, one of which has a maximum of twenty-five years. The plaintiff can accumulate and lose good time on this less-than-life sentence in case the life sentence is somehow vacated or changed in any way. The fact that plaintiff can accumulate good time on his sentence for robbery does not mean he can accumulate good time on his life sentence. Thus, plaintiff's equal protection challenge must fail.

WHEREFORE, based on the above, it is hereby

RECOMMENDED, that plaintiff's motion for default judgment pursuant to FED.R.CIV.P. 55 (Docket # 13) be **DENIED,** and it is further

RECOMMENDED, that the defendants' motion to vacate the entry of default and to dismiss the complaint (Docket # 14) be **GRANTED,** the default be vacated, and the complaint be dismissed.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R .Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1997.
Curtis v. Pataki
Not Reported in F.Supp., 1997 WL 614285 (N.D.N.Y.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 614285 (N.D.N.Y.)
(Cite as: 1997 WL 614285 (N.D.N.Y.))

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2009 WL 632890 (N.D.N.Y.)
(Cite as: 2009 WL 632890 (N.D.N.Y.))

Ⓗ Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Victor SMITH, Plaintiff,
v.
Brian FISCHER, NYS Docs Commissioner et al.,
Defendants.
No. 9:07-CV-1264.

Feb. 2, 2009.

Victor Smith, Sodus, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Shoshanah V. Bewlay, Esq., Ass't Attorney
General, of Counsel, Albany, NY, for Defendants.

*REPORT-RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This *pro se* **prisoner** civil rights action, commenced
pursuant to 42 U.S.C. § 1983, has been referred to me for
Report and Recommendation by the Honorable David N.
Hurd, United States District Judge, pursuant to 28 U.S.C.
§ 636(b) and Local Rule 72.3(c). Plaintiff Victor D. Smith
alleges that seven employees [FN1] of the New York State
Department of Correctional Services ("DOCS")
wrongfully confined him to the Special Housing Unit
("SHU") and prevented him from attending his mother's
wake. Currently pending before the Court is Defendants'
motion to dismiss the amended complaint (Dkt. No. 15)
for failure to state a claim upon which relief may be
granted pursuant to Federal Rule of Civil Procedure
12(b)(6). (Dkt. No. 28.) For the reasons that follow, I
recommend that Defendants' motion be granted.

FN1. Brian Fischer (Commissioner of DOCS),
Susan Connell (Superintendent of Oneida
Correctional Facility), John Badger, Karl
Adamik, Ivy Lombardo (Acting Superintendent
of Orleans Correctional Facility), Anothony
Labriola, and Peter Naughton.

**I. BACKGROUND**

**A. Summary of Plaintiff's Complaint**

The amended complaint (Dkt. No. 15) ("the complaint")
is the operative pleading in this case. It alleges that:

1. On August 13, 2007, Defendant Adamik issued a
misbehavior report charging Plaintiff with various
offenses. (Dkt. No. 15 at ¶ 6(1).)

2. Defendants held Plaintiff in the SHU at Oneida
Correctional Facility pending completion of a Tier III
hearing. (Dkt. No. 15 at ¶ 6(1).)

3. The Tier III hearing was convened on August 17, 2007.
Defendant Badger was the hearing officer. He adjourned
the hearing until August 28, 2007. (Dkt. No. 15 at ¶ 6(2).)

4. Plaintiff's Tier III Hearing was reconvened on August
28, 2007. Defendant Badger found Plaintiff guilty of all
charges. He sentenced Plaintiff to 90 days of S-Block
confinement at Orleans Correctional Facility, with no
credit for the time Plaintiff served in the SHU pending
completion of his hearing. (Dkt. No. 15 at ¶ 6(2).) Plaintiff
also lost recreation, packages, commissary, and phone
privileges and three days of good time credits. (Dkt. No.
15, Ex. A.)

5. Thereafter, while Plaintiff was being held in the
S-Block, Defendants Connell, Labriola, Lombardo, and
Naughton denied Plaintiff's requests for discretionary
review. (Dkt. No. 15 at ¶ 6(3).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 632890 (N.D.N.Y.)
(Cite as: 2009 WL 632890 (N.D.N.Y.))

**\*2** 6. On October 25, 2007, Plaintiff filed a claim with the New York State Court of Claims, claiming that DOCS officials had wrongfully denied him permission to attend his mother's wake. (Dkt. No. 15 at ¶ 5(b).)

7. On October 26, 2007, Albert Prack, acting on behalf of Defendant Brian Fischer, reversed the disciplinary charges against Plaintiff. He concluded that Defendant Adamik's misbehavior report did not provide enough information to support the charges. (Dkt. No. 15 at ¶ 6(3) and Ex. B.)

8. Despite the reversal of the charges on October 26, 2007, Defendants Labriola and Lombardo denied Plaintiff's request to be released back into the general population and continued to hold him in the S-block under a "retention admission" status. (Dkt. No. 15 at ¶ 6(4).)

9. Plaintiff was released to the general prison population on November 21, 2007. (Dkt. No. 15 at ¶ 6(4).)

Plaintiff complains that Defendants' actions resulted in him being "falsely confined/imprisoned under sanctions for 98 days," including "14 days [FN2] prior to completion of a sup't (sic) hearing and 24 days following the reversal of the charges." (Dkt. No. 15 at ¶ 7.) Plaintiff also complains that he was "purposely denied an approved wake visit." (Dkt. No. 15 at ¶ 7.) Defendants' actions, Plaintiff asserts, amounted to "neglect, unfair treatment and reprisal-based conduct" that "served to create mental anxiety, irritability, paranoia and sleep deprivation at a critically sensitive juncture." (Dkt. No. 15 at ¶ 7.)

> FN2. Elsewhere in the complaint, Plaintiff alleges that he was "held in the ... SHU pending completion of a Tier III Sup't Hearing *beyond* the 14 day time requirement to complete said hearing." (Dkt. No. 15 at ¶ 6 (1), emphasis added.) According to the timeline presented in the complaint, fifteen days passed between the time Defendant Adamik issued the misbehavior report on August 13 and the completion of the disciplinary hearing on August 28. For the purposes of this decision, I have assumed that

Plaintiff was confined for 15 days pending completion of the hearing.

Plaintiff's legal arguments, liberally construed, appear to assert four causes of action: (1) a procedural due process claim under the Fourteenth Amendment; (2) a substantive due process claim under the Fourteenth Amendment; (3) an inadequate-prison-condition claim under the Eighth Amendment; and (4) an equal protection claim under the Fourteenth Amendment.

In his prayer for relief, Plaintiff requests $15,000 in compensatory damages "for mental and emotional injury" plus $10,000 in punitive damages. (Dkt. No. 15 at ¶ 9.)

**B. Summary of Grounds in Support of Defendants' Motion**

Defendants argue that (1) the complaint fails to allege facts plausibly suggesting a violation of the Fourteenth Amendment because Plaintiff has not alleged any "atypical and significant hardship"; (2) the complaint fails to allege facts plausibly suggesting a violation of the Eighth Amendment because (a) Plaintiff's **confinement** in the **SHU** does not constitute cruel and unusual punishment as a matter of law; and (b) **prisoners** have no liberty interest in funeral visits; (3) the complaint fails to state a claim under the **Equal Protection** Clause because Plaintiff does not allege that he was treated any differently than any other similarly situated person; (4) the complaint fails to allege facts plausibly suggesting that Defendants Connell, Fischer, Labriola, Lombardo, and Naughton were personally involved in any of the constitutional violations alleged; (5) Plaintiff's claim for compensatory damages is barred by 42 U.S.C. § 1997e(e) because he has not alleged any facts plausibly suggesting that he suffered a physical injury; and (6) Defendants are protected by the doctrine of qualified immunity. (Dkt. No. 28-2.) I will address only Defendants' first, second and third arguments, as they are dispositive.

**C. Summary of Plaintiff's Response to Defendants' Arguments**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 632890 (N.D.N.Y.)
(Cite as: 2009 WL 632890 (N.D.N.Y.))

**\*3** In response to Defendants' motion to dismiss, Plaintiff argues that:

1. There can be no governmental immunity extended to Defendants because they negligently performed their ministerial duties;

2. Defendants breached administrative procedures and protocols by mishandling his Tier III hearing, denying his request to attend his mother's wake, and confining him to excessive detention in the SHU after the charges against him were reversed; and

3. As a result of not attending his mother's wake, Plaintiff now suffers from mental anxiety, irritability, paranoia, and sleep deprivation. (Dkt. No. 29.)

## II. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Federal Rule of Civil Procedure 8(a)(2);[FN3] or (2) a challenge to the legal cognizability of the claim.[FN4]

FN3. *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

FN4. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ( "There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8 [a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ("Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5, 2004 WL 2613993 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7, 2002 WL 313156 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b][6] motion-one aimed at the sufficiency of the pleadings under Rule 8[a], and the other aimed at the legal sufficiency of the claims).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 632890 (N.D.N.Y.)
(Cite as: 2009 WL 632890 (N.D.N.Y.))

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. By requiring this "showing," Rule 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [FN5] The main purpose of this rule is to "facilitate a proper decision on the merits." [FN6] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN7]

> FN5. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) [citation omitted; emphasis added]; *see also Swierkiewicz*, 534 U.S. at 512 [citation omitted]; *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) [citation omitted].

> FN6. *Swierkiewicz*, 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

> FN7. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion); *accord, Hudson v. Artuz,* 95-CV-4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov.30, 1998), *Flores v. Bessereau,* 98-CV-0293, 1998 WL 315087, at

*1 (N.D.N.Y. June 8, 1998) (Pooler, J.). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

The Supreme Court has long characterized this pleading requirement under Rule 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement. [FN8] However, it is well established that even this liberal notice pleading standard "has its limits." [FN9] As a result, several Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet this liberal notice pleading standard. [FN10]

> FN8. *See, e.g., Swierkiewicz,* 534 U.S. at 513-514 (noting that Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

> FN9. 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003).

> FN10. *See, e.g., Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964-1974, 167 L.Ed.2d 929 (2007) (pleading did not meet Rule 8[a][2]'s liberal requirement); *accord, Dura Pharm.,* 125 S.Ct. at 1634-1635, *Christopher v. Harbury,* 536 U.S. 403, 416-422, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234-235 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-209 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01-7539,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 632890 (N.D.N.Y.)
(Cite as: 2009 WL 632890 (N.D.N.Y.))

2002 WL 741835, at *5 (2d Cir. Apr.26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

Most notably, in the recent decision of *Bell Atlantic Corporation v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 550 U.S. 544, 127 S.Ct. 1955, 1968-69, 167 L.Ed.2d 929 (2007).[FN11] Rather than turning on the *conceivability* of an actionable claim, the Court clarified, the Rule 8 "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965-74.

FN11. The Court in *Bell Atlantic* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... *Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Bell Atlantic,* 127 S.Ct. at 1969.

*4 More specifically, the Court reasoned that, by requiring that a pleading "show[ ] that the pleader is entitled to relief," Rule 8(a)(2) requires that the pleading give the defendant "fair notice" of (1) the nature of the claim and (2) the "grounds" on which the claim rests. *Id.* at 1965, n. 3 [citation omitted]. While this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id.* [citations omitted]. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id.*

As have other Circuits, the Second Circuit has repeatedly recognized that the clarified plausibility standard that was articulated by the Supreme Court in *Bell Atlantic* governs *all* claims, not merely antitrust claims brought under 15 U.S.C. § 1 (as were the claims in *Bell Atlantic* ).[FN12] The Second Circuit has also recognized that this *plausibility* standard governs claims brought even by *pro se* litigants (although the plausibility of those claims is be assessed generously, in light of the special solicitude normally afforded *pro se* litigants).[FN13]

FN12. *See, e.g., Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (in civil rights action, stating that "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim for relief that is plausible on its face.' ") [citation omitted]; *Goldstein v. Pataki,* 07-CV-2537, 2008 U.S.App. LEXIS 2241, at *14, 2008 WL 269100 (2d Cir. Feb. 1, 2008) (in civil rights action, stating that *"Bell Atlantic* requires ... that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level ....' ") [internal citation omitted]; *ATSI Comm'cns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98, n. 2 (2d Cir.2007) ("We have declined to read Bell Atlantic's flexible 'plausibility standard' as relating only to antitrust cases.") [citation omitted]; *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 632890 (N.D.N.Y.)
(Cite as: 2009 WL 632890 (N.D.N.Y.))

**prisoner** civil rights action, stating, "[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Bell Atlantic* ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible."* ) [emphasis in original].

FN13. *See, e.g.,* Jacobs v. Mostow, 281 F. App'x 85, 87 (2d Cir. March 27, 2008) (in pro se action, stating, "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim for relief that is plausible on its face.' ") [citation omitted] (summary order, cited in accordance with Local Rule 32.1[c][1] ); Boykin v. KeyCorp., 521 F.3d 202, 215-16 (2d Cir.2008) (finding that borrower's *pro se* complaint sufficiently presented a *"plausible* claim of disparate treatment," under Fair Housing Act, to give lenders fair notice of her discrimination claim based on lenders' denial of her home equity loan application) [emphasis added].

It should be emphasized that Rule 8's plausibly standard, explained in *Bell Atlantic,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which the Court stated, "Specific facts are not necessary" to successfully state a claim under Rule 8(a) (2). *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) [citation omitted]. That statement was merely an abbreviation of the often-repeated point of law-first offered in *Conley* and repeated in *Bell Atlantic*-that a pleading need not "set out in detail the facts upon which [the claim is based]" in order to successfully state a claim. *Bell Atlantic,* 127 S.Ct. 1965, n. 3 (citing Conley v. Gibson, 355 U.S. 41, 47 [1957] ). That statement in no way meant that all pleadings may achieve the requirement of giving a defendant "fair notice" of the nature of the claim and the "grounds" on which the claim rests without ever having to allege any facts whatsoever.[FN14] There must still be enough facts alleged to raise a right to relief above the speculative level to a plausible level, so that the defendant may know what the claims are and the grounds on which they rest (in order to shape a defense).

FN14. For example, in *Erickson,* a district court had dismissed a *pro se* **prisoner's** civil rights complaint because, although the complaint was otherwise factually specific as to how the **prisoner's** hepatis C medication had been wrongfully terminated by prison officials for a period of approximately 18 months, the complaint (according to the district court) failed to allege facts plausibly suggesting that the termination caused the **prisoner** "substantial harm." 127 S.Ct. at 2199. The Supreme Court vacated and remanded the case because (1) under Fed.R.Civ.P. 8 and *Bell Atlantic,* all that is required is "a short and plain statement of the claim" sufficient to "give the defendant fair notice" of the claim and "the grounds upon which it rests," and (2) the plaintiff had alleged that the termination of his hepatitis C medication for 18 months was "endangering [his] life" and that he was "still in need of treatment for [the] disease." *Id.* at 2200. While *Erickson* does not elaborate much further on its rationale, a careful reading of the decision (and the dissent by Justice Thomas) reveals a point that is perhaps so obvious that it did not need mentioning in the short decision: a claim of deliberate indifference to a serious medical need under the Eighth Amendment involves two elements, i.e., the existence of a sufficiently serious medical need possessed by the plaintiff, and the existence of a deliberately indifferent mental state possessed by prison officials with regard to that sufficiently serious medical need. The *Erickson* decision had to do with only the first element, not the second element. *Id.* at 2199-2200. In particular, the decision was merely recognizing that an allegation by a plaintiff that, during the relevant time period, he suffered from hepatis C is, in and of itself, a factual allegation plausibly suggesting that he possessed a sufficiently serious medical need; the plaintiff need not *also* allege that he suffered an independent and "substantial injury" as a result of the termination of his hepatis C medication. *Id.* This point of law is hardly a novel one. For example, numerous decisions, from district courts within the Second Circuit alone, have found that suffering from hepatitis C constitutes having a serious medical need for purposes of the Eighth Amendment. *See, e.g.,* Rose v. Alvees, 01-CV-0648, 2004 WL 2026481,

Not Reported in F.Supp.2d, 2009 WL 632890 (N.D.N.Y.)
(Cite as: 2009 WL 632890 (N.D.N.Y.))

at *6 (W.D.N.Y. Sept. 9, 2004); *Verley v. Goord,* 02-CV-1182, 2004 WL 526740, at *10 n. 11 (S.D.N.Y. Jan. 23, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01-CV-6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99-CV-3208, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000).

Having said all of that, it should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [FN15] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*" [FN16] In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.

FN15. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

FN16. *Hernandez,* 18 F.3d at 136 [citation omitted]; *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

**\*5** For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. [FN17] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [FN18] Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [FN19] Of course, an opportunity to amend is not required where the

plaintiff has already amended his complaint. [FN20] In addition, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [FN21]

FN17. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96-CV-7544, 1997 WL 714878, at *1, n. 2 (S.D.N.Y. Nov.17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) [citations omitted], *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) [citations omitted].

FN18. *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) [internal quotation and citation omitted].

FN19. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) [internal quotation and citation omitted]; *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so

Not Reported in F.Supp.2d, 2009 WL 632890 (N.D.N.Y.)
(Cite as: 2009 WL 632890 (N.D.N.Y.))

F.3d 402 (2d Cir.1995).

FN24. *See* McNeil v. U.S., 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by **prisoners** who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); Faretta v. California, 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf.* Phillips v. Girdich, 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

FN25. Stinson v. Sheriff's Dep't of Sullivan Cty., 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980); *accord,* Standley v. Dennison, 05-CV-1033, 2007 WL 2406909, at *6, n. 27 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); Muniz v. Goord, 04-CV-0479, 2007 WL 2027912, at *2 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); DiProjetto v. Morris Protective Serv., 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); Cosby v. City of White Plains, 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb.9, 2007); Lopez v. Wright, 05-CV-1568, 2007 WL 388919, at *3, n. 11 (N.D.N.Y. Jan.31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); Richards v. Goord, 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan.23, 2007) (Kahn,

J., adopting report-recommendation of Lowe, M.J.); Ariola v. Onondaga County Sheriff's Dept., 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); Collins v. Fed. Bur. of Prisons, 05-CV-0904, 2007 WL 37404, at *4 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

**III. ANALYSIS**

**A. Plaintiff Has Not Stated a Procedural Due Process Claim**

The complaint alleges that Defendants violated Plaintiff's due process rights under the Fourteenth Amendment. (Dkt. No. 15 at ¶ 7.) The undersigned has construed the complaint as asserting both a procedural due process claim and a substantive due process claim [FN26]. Construed liberally, the complaint asserts that Plaintiff's procedural due process rights were violated by (1) the length of his detention in the SHU; (2) the fact that the disciplinary charges were based on a false report; (3) the fact that he was held for 15 days in the SHU prior to the completion of his disciplinary hearing; and (4) the denial of the wake visit.

FN26. Defendants construed the complaint as asserting only a procedural due process claim. (Dkt. No. 28-2 at 10-11.)

*1. The length of Plaintiff's detention in the SHU*

Regarding the length of his detention, Plaintiff asserts that his due process rights were violated because he was "falsely confined/imprisoned under sanctions for 98 days." (Dkt. No. 15 at ¶ 7.) Defendants argue that the complaint fails to state such a claim because Plaintiff has failed to allege any "atypical and significant hardship." (Dkt. No. 28-2 at 3-5.) Defendants are correct.

In order to state a claim for violation of his procedural due process rights, Plaintiff must allege facts plausibly

Not Reported in F.Supp.2d, 2009 WL 632890 (N.D.N.Y.)
(Cite as: 2009 WL 632890 (N.D.N.Y.))

suggesting that (1) he was deprived of a liberty interest; (2) without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000).

**\*6** An **inmate** has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its **inmates,** by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes "an atypical and significant hardship on the **inmate** in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). Regarding the first prong of this test, "[i]t is undisputed ... that New York state law creates a liberty interest in not being confined to the SHU." *Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004). The issue, then, is whether Plaintiff's confinement in the SHU imposed "an atypical and significant hardship on [him] in relation to the ordinary incidents of prison life."

In the Second Circuit, determining whether a disciplinary confinement in the SHU constituted an "atypical and significant hardship" requires examining "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation compared to discretionary confinement." *Palmer,* 364 F.3d at 64. Where a **prisoner** has served less than 101 days in disciplinary segregation, the confinement constitutes an "atypical and significant hardship" only if "the conditions were more severe than the normal SHU conditions [FN27]." *Palmer,* 364 F.3d at 65. For confinements of an "intermediate duration-between 101 and 305 days-development of a detailed record of the conditions of the confinement relative to ordinary prison conditions is required." *Palmer,* 364 F.3d at 64-65. Disciplinary segregation lasting more than 305 days implicates a protected liberty interest even if served under "normal" SHU conditions because a term of that length is a "sufficient departure from the ordinary incidents of prison life." *Palmer,* 364 F.3d at 65 (quoting *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000)).

FN27. "Normal" SHU conditions include being kept in solitary confinement for 23 hours per day, provided one hour of exercise in the prison yard

per day, and permitted two showers per week. *Ortiz v. McBride,* 380 F.3d 649, 655 (2d Cir.2004).

Here, Plaintiff alleges that he served 98 days in the SHU. Accordingly, a protected liberty interest is implicated only if Plaintiff was confined under conditions "more severe" than "normal" SHU conditions. Plaintiff alleged no such conditions. Compare *Welch v. Bartlett,* 196 F.3d 389 (2d Cir.1999) (plaintiff alleged that while in the SHU he received "inadequate amounts of toilet paper, soap and cleaning materials, a filthy mattress, and infrequent changes of clothes); *Palmer,* 364 F.3d at 66 (plaintiff alleged that he suffered unusual SHU conditions such as being deprived of his property, being mechanically restrained whenever he was escorted from his cell, and being out of communication with his family); *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004) (plaintiff alleged that he was confined to his cell for 24 hours a day, not permitted to shower for weeks at a time, denied hygiene products, and denied utensils); *Wheeler v. Butler,* 209 F.App'x 14 (2d Cir.2006) (plaintiff alleged that he was denied the use of his hearing aids during his SHU confinement). Therefore, Plaintiff has not sufficiently alleged that his confinement in the SHU deprived him of a protected liberty interest.

**\*7** District courts in the Second Circuit are split on whether a **prisoner** can state a procedural due process cause of action when he alleges that he served less than 101 days in the SHU but does not allege conditions more severe than normal SHU conditions. Compare *Gonzalez-Cifuentes v. Torres,* No. 9:04-cv-1470 GLS/DRH, 2007 WL 499620, at \* 3 (N.D.N.Y. Feb.13, 2007) ("The Second Circuit has held that at least where the period of confinement exceeded thirty days, refined fact-finding is required to resolve defendants' claims under *Sandin.* No such fact-finding can occur ... on a motion to dismiss") and *Smart v. Goord,* 441 F.Supp.2d 631, 641 (S.D.N.Y.2006) ("Smart has not alleged that the conditions of her confinement were more severe than normal SHU conditions ... However, such detailed factual allegations are not necessary to withstand a motion to dismiss ... Since Smart has alleged that she was confined for seventy days, she has met her burden in alleging the deprivation of a protected liberty interest") with *Alvarado v. Kerrigan,* 152 F.Supp.2d 350 (S.D.N.Y.2001) (granting motion for judgment on the pleadings where **prisoner's**

Not Reported in F.Supp.2d, 2009 WL 632890 (N.D.N.Y.)
(Cite as: 2009 WL 632890 (N.D.N.Y.))

allegations about the conditions of his 93-day SHU confinement failed to "elevate his confinement to the level of deprivation required under *Sandin*); *Sales v. Barizone,* No. 03 Civ. 6691RJH, 2004 WL 2781752, at *7 (S.D.N.Y. Dec.2, 2004) (granting motion to dismiss with leave to amend because plaintiff's "due process claim arising out of two months' confinement in the SHU ... cannot survive the *Sandin* test absent further allegations") *Tookes v. Artuz,* No. 00 Civ. 4969 RCC HBP, 2002 WL 1484391, at * 3 (S.D.N.Y. July 11, 2002) ("No such additional egregious circumstances are pled here. Indeed, the complaint is devoid of any allegations regarding the circumstances of plaintiff's confinement. Nor has [plaintiff] responded to the defendants' motion in order to provide further detail. Therefore, dismissal of plaintiff's due process claims is appropriate"); and *Prince v. Edwards,* No. 99 Civ. 8650, 2000 WL 633382, at *5 (S.D.N.Y. May 17, 2000) (dismissing case with prejudice where the complaint contained "no allegations whatever regarding the conditions of [ **prisoner's** 66-day] confinement."). The Second Circuit has never addressed this issue directly [FN28]

FN28. While the Second Circuit has stated that "development of a detailed record will assist appellate review" of SHU cases and that "development of a detailed record of the conditions of the confinement relative to ordinary conditions is required," it has done so only in cases involving "intermediate" SHU confinements of 101 to 305 days. *Colon,* 215 F.3d at 232; *Palmer,* 364 F.3d at 64-65. Even in this "intermediate" context, where a detailed record is "required," the Second Circuit has not remanded a case for further development of the record absent an allegation of severe SHU conditions. For example, in *Iqbal v. Hasty,* 490 F.3d 143 (2d Cir.2007), the plaintiff was confined to a super-restrictive housing unit for six months. He sued, arguing in part that his procedural due process rights were violated. The defendants moved to dismiss. The district court denied the motion, finding that the plaintiff had alleged the deprivation of a liberty interest. The defendants brought an interlocutory appeal. The Second Circuit affirmed, finding that "the Plaintiff's confinement of more than six months fell in the intermediate range, thereby requiring inquiry into the conditions of his confinement,

which he *sufficiently alleges* to have been severe." *Iqbal,* 490 F.3d at 163 (emphasis added).

The undersigned agrees with the *Alvarado, Sales, Tookes,* and *Prince* courts that a motion to dismiss can be granted where a **prisoner** who served less than 101 days in the SHU alleges that his procedural due process rights were violated but does not allege conditions more severe than normal SHU conditions. The undersigned adopts this view for two reasons. First, as discussed at length above, Rule 8 requires that a complaint include factual allegations that raise a right to relief above the speculative level to the plausible level. Where a **prisoner** contends merely that his SHU confinement lasted for a period of something less than 101 days, without alleging that he served that SHU term under conditions more severe than normal SHU conditions, his right to relief under a procedural due process theory is purely speculative. Second, the Second Circuit's manner of reviewing motions to dismiss in SHU confinement cases suggests that dismissal is the better course. In its cases, the Second Circuit has focused on the *content* of the **prisoner's** allegations regarding SHU conditions rather than establishing a bright-line rule that a determination of whether conditions were "atypical and significant" cannot be resolved on a Rule 12(b)(6) motion. For example, in *Ortiz,* the district court granted the defendants' motion to dismiss a case in which a **prisoner** complained of a 90-day SHU confinement. The Second Circuit reversed, not because the *Sandin* issue can never be decided at the motion to dismiss stage, but because *the prisoner had alleged the existence of "conditions in SHU far inferior to those prevailing in the prison in general."* *Ortiz,* 380 F.3d at 655 (emphasis added).

**\*8** Plaintiff's bare allegation that his procedural due process rights were violated by his 98-day confinement in the SHU is insufficient to state a claim. Therefore, I recommend that this claim be dismissed with leave to amend.

2. *False accusation*

To the extent that Plaintiff claims that his SHU confinement violated his due process rights because it stemmed from a false accusation, I note that "a prison

の、

Not Reported in F.Supp.2d, 2009 WL 632890 (N.D.N.Y.)
(Cite as: 2009 WL 632890 (N.D.N.Y.))

**inmate** has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)); *accord, Pittman v. Forte,* 01-CV-0100, 2002 WL 31309183, *5 (N.D.N.Y. July 11, 2002)* (Sharpe, M.J.). The only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is where the false accusation is based on something such as "retaliation against the **prisoner** for exercising a constitutional right." *Boddie,* 105 F.3d at 862; *accord, Murray v. Pataki,* 03-CV-1263, 2007 WL 965345, at *8 (N.D.N.Y. March 5, 2007)* (Treece, M.J.) [citations omitted]. Here, Plaintiff does not claim that the misbehavior report was issued in retaliation for Plaintiff's exercise of a constitutional right. Read broadly, the complaint alleges that Defendants took some actions in retaliation for Plaintiff's filing of a complaint with the Court of Claims regarding the denial of the wake visit. However, Defendant Adamik issued the misbehavior report several months *before* Plaintiff filed his complaint with the Court of Claims. Therefore, Defendant Adamik could not possibly have been retaliating for Plaintiff's exercise of his constitutional right of access to the courts when he issued the misbehavior report. Accordingly, the complaint does not state a claim for a procedural due process violation based on the filing of an allegedly false misbehavior report and I recommend that the claim be dismissed with leave to amend.

3. *SHU confinement pending completion of disciplinary hearing*

Plaintiff alleges that he was "held in the ... SHU pending completion of a Tier III Sup't Hearing beyond the 14 day time requirement to complete said hearing." (Dkt. No. 15 at ¶ 6(1).) DOCS regulations provide that:

> The disciplinary hearing or superintendent's hearing must be completed within 14 days following the writing of the misbehavior report unless otherwise authorized by the commissioner or his designee. Where a delay is authorized, the record of the hearing should reflect the reasons for any delay or adjournment, and an **inmate** should ordinarily be made aware of these reasons unless to do so would jeopardize institutional safety or correctional goals.

N.Y. Comp.Codes R. & Regs. ("N.Y.C.R.R.") tit. 7, § 251-5.1(b). Pursuant to this regulation, New York has granted **inmates** an interest in remaining free from restraints of more than 14 days pending a disciplinary hearing unless the commissioner or his designee authorizes a delay. Here, the complaint alleges that Defendant Badger authorized a delay. (Dkt. No. 16 at ¶ 6(2).) The complaint does not state whether or not the record of the hearing reflected the reasons for the delay. However, that fact is immaterial because the regulation does not require that the record reflect the reason: it merely states that the record "should" reflect the reason. See *Dallio v. Spitzer,* 343 F.3d 553, 562 (2d Cir.2003) (" 'Shall' is universally understood to indicate an imperative or mandate, whereas 'should,' to the extent it implies any duty or obligation, generally references one originating in propriety or expediency"). Accordingly, Plaintiff did not have a state-created liberty interest in remaining free from the confinement or restraint of being held in the SHU for 15 days pending completion of his disciplinary hearing. Even if he had such an interest, Plaintiff has not pleaded that a one-day delay imposed an "atypical and significant" hardship on him. Indeed, such delays are reasonably routine. See e.g. *Tookes v. Artuz,* No. 00 CIV 4969 RCC HBP, 2002 WL 1484391 (S.D.N.Y. July 11, 2002) (17-day delay between issuance of misbehavior report and conclusion of disciplinary hearing did not implicate procedural due process). Therefore, Plaintiff has not alleged facts plausibly suggesting that his procedural due process rights were violated by the one-day delay in completing his disciplinary hearing.

4. *Wake visit*

**\*9** Plaintiff's allegations regarding the denial of his wake visit do not state a claim for violation of his procedural due process rights. **Prisoners** do not have a constitutionally protected interest in attending the funeral of a relative. *Jackson v. Portuondo,* No. 9:01-CV-0379 (GLS/DEP), 2007 WL 607342, at *12 (N.D.N.Y. Feb.20, 2007); Verrone v. Jacobson,* No. 95 CIV. 10495(LAP), 1999 WL 163197, at *5 (S.D.N.Y. Mar.23, 1999); *Green v. Coughlin,* No. 94 Civ. 3356(JFK), 1995 WL 498808, at *1 (S.D.N.Y. Aug.22, 1995); Colon v. Sullivan,* 681 F.Supp. 222, 223 (S.D.N.Y.1988). Nor has such a right been created in New York by statute or regulation. The

Not Reported in F.Supp.2d, 2009 WL 632890 (N.D.N.Y.)
(Cite as: 2009 WL 632890 (N.D.N.Y.))

relevant New York statute states:

> [T]he commissioner of correctional services *may* permit any **inmate** confined by the department except one awaiting the sentence of death to attend the funeral of his or her father, mother, guardian or former guardian, child, brother, sister, husband, wife, grandparent, grandchild, ancestral uncle or ancestral aunt within the state, or to visit such individual during his or her illness if death be imminent ... but the exercise of such power shall be subject to such rules and regulations as the commissioner of correctional services shall prescribe, respecting the granting of such permission, duration of absence from the institution, custody, transportation and care of the **inmate**, and guarding against escape.

N.Y. Correct. Law § 113 (McKinney 2003) (emphasis added). The use of the word "may" indicates that the granting of wake visits is entirely discretionary. See *Jackson,* 2007 WL 607342, at *11. Therefore, Plaintiff has not alleged facts plausibly suggesting that the denial of the wake visit violated his procedural due process rights.

Because Plaintiff has not alleged any facts plausibly suggesting that he was deprived of a liberty interest, the complaint fails to state claim for a violation of Plaintiff's procedural due process rights. I therefore recommend that this cause of action be dismissed with leave to amend.

**B. Plaintiff Has Not Stated a Substantive Due Process Claim**

Although Plaintiff alleges that Defendants violated his right to due process, he has not specifically invoked substantive due process. However, given the special solicitude due to *pro se* civil rights plaintiffs, I have deemed the complaint to include a substantive due process claim and will address it *sua sponte* under 28 U.S.C. § 1915(e)(2). As mentioned above, Defendants have not addressed any possible substantive due process claim.

"Substantive due process protects individuals against government action that is arbitrary, ... conscience-shocking, ... or oppressive in a constitutional

sense, ... but not against constitutional action that is incorrect or ill-advised." *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) (internal quotation marks and citations omitted). Very few conditions of prison life are "shocking" enough to violate a **prisoner's** right to substantive due process. In *Sandin,* the Supreme Court provided only two examples: the transfer to a mental hospital and the involuntary administration of psychotropic drugs. *Sandin,* 515 U.S. at 479 n. 4, 484. Courts have also noted that a prison official's refusal to obey a state court order to release a **prisoner** from disciplinary confinement may violate the **prisoner's** right to substantive due process. *Johnson v. Coughlin,* No. 90 Civ. 1731, 1997 WL 431065, at *6 (S.D.N.Y. July 30, 1997); *Arce v. Miles,* No. 85 Civ. 5810, 1991 WL 123952, at *9 (S.D.N.Y. June 28, 1991).

**\*10** Plaintiff's complaint does not allege facts plausibly suggesting that Defendants' actions were arbitrary, conscience-shocking or oppressive in the constitutional sense. As discussed above, the complaint does not indicate that Plaintiff was held in unusual SHU conditions. Moreover, Plaintiff does not allege that Defendants refused to obey a state court order to release him from disciplinary confinement. Rather, he alleges that Defendants failed to immediately release him after DOCS itself administratively reversed his disciplinary conviction. (Dkt. No. 15 at ¶¶ 6(3), 7.) Therefore, the complaint fails to state a claim for violation of Plaintiff's right to substantive due process and I recommend that the claim be dismissed with leave to amend.

**C. Plaintiff Has Not Stated an Equal Protection Claim**

Plaintiff alleges that Defendants denied him equal protection by confining him to the SHU. (Dkt. No. 15 at ¶ 7.) The Equal Protection Clause requires the government to treat all similarly situated people alike. *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1989). To state a claim for a violation of the Equal Protection Clause, Plaintiff must allege facts plausibly suggesting that he was intentionally treated differently from others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class. *Travis v. N.Y. State Div. of Parole,* 96-CV-0759, 1998 WL 34002605, at *4 (N.D.N.Y. Aug.26, 1998) (Sharpe, M.J.), *adopted,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 632890 (N.D.N.Y.)
(Cite as: 2009 WL 632890 (N.D.N.Y.))

96-CV-0759, Decision and Order (N.D.N.Y. filed Nov. 2,
1998) (McAvoy, C.J.).

**Prisoners** do not comprise a suspect or quasi-suspect
class for Equal Protection purposes. *See Hampton v.
Hobbs,* 106 F.3d 1281, 1286 (6th Cir.1997) ("[N]either
**prisoners** nor indigents are [members of a] suspect class
....") [citations omitted]; *Holley v. Carey,* 04-CV-2708,
2007 WL 2533926, at *7 (E.D.Cal. Aug.31, 2007)
("[N]either **prisoners** nor persons with mental handicaps
are a suspect class entitled to heightened scrutiny.")
(citations omitted) *rejected on other grounds* 2008 WL
2853924; *Coleman v. Martin,* 363 F.Supp.2d 894, 902
(E.D.Mich.2005) ("**Prisoners** are not members of a
protected class ....") (citation omitted).[FN29]

> [FN29.] I note that, in addition, sex offenders, the
> mentally ill, the mentally handicapped, and the
> indigent do not comprise a suspect class for
> Equal Protection purposes. *See Travis v. N.Y.
> State Div. of Parole,* 96-CV-0759, 1998 U.S.
> Dist. LEXIS 23417, at *12-13, 1998 WL
> 34002605 (N.D.N.Y. Aug. 26, 1998) (Sharpe,
> M.J.) ("Sex offenders do not comprise a suspect
> or quasi-suspect class for Equal Protection
> purposes.") [citations omitted], *adopted,*
> 96-CV-0759, Decision and Order (N.D.N.Y.
> filed Nov. 2, 1998) (McAvoy, C.J.); *Selah v.
> Goord,* 04-CV-3273, 2006 U.S. Dist. LEXIS
> 51051, at *21 (S.D.N.Y. July 24, 2006)
> ("Neither sex offenders nor the mentally ill are a
> suspect class warranting heightened [or strict]
> equal protection scrutiny.") [citations omitted];
> *Holley v. Carey,* 04-CV-2708, 2007 U.S. Dist.
> LEXIS 64699, *23, 2007 WL 2533926 (E.D.Cal.
> Aug. 31, 2007) ("[N]either **prisoners** nor
> persons with mental handicaps are a suspect class
> entitled to heightened scrutiny.") [citations
> omitted]; *Hampton v. Hobbs,* 106 F.3d 1281,
> 1286 (6th Cir.1997) ("[N]either **prisoners** nor
> indigents are [members of a] suspect class ....")
> [citations omitted].

In the alternative to alleging membership in a suspect
class, a plaintiff may state a claim for an equal protection
violation under a "class of one" theory. *Assoko v. City of
New York,* 539 F.Supp.2d 728 (S.D.N.Y.2008). In order

to state such a claim, a plaintiff must allege (1) that he was
intentionally treated differently from other similarly
situated individuals; and (2) that the disparate treatment
was either (a) "irrational and wholly arbitrary" or (b)
motivated by animus.[FN30] *Id.* Plaintiff has not alleged that
he was treated differently from other similarly situated
individuals. Therefore, Plaintiff has not stated a cause of
action for violation of his rights under the Equal
Protection Clause and I recommend that the claim be
dismissed with leave to amend.

> FN30. The standard for proving a "class of one"
> case becomes much more stringent after a case
> proceeds beyond the pleading stage. After the
> pleading stage, a plaintiff must show that "no
> rational person could regard the circumstances of
> the plaintiff to differ from those of a comparator
> to a degree that would justify the differential
> treatment on the basis of a legitimate government
> policy; and (that) the similarity in circumstances
> and difference in treatment are sufficient to
> exclude the possibility that the defendant acted
> on the basis of a mistake." *Nielson v. D'Angelis,*
> 409 F.3d 100, 105 (2d Cir.2005) *overruled to
> extent that it allows a class of one claim by a
> public employee Appel v. Spiridon,* 531 F.3d 138
> (2d Cir.2008). *See, e.g., Cohn v. New Paltz
> Central School District,* 171 F. App'x 877 (2d
> Cir.2006).

**D. Plaintiff Has Not Stated an Eighth Amendment
Claim**

**\*11** Plaintiff claims that his SHU confinement and the
denial of the wake visit violated his Eighth Amendment
rights. (Dkt. No. 15 at ¶ 7.)

In order for Plaintiff to state a claim under the Eighth
Amendment, he must show: (1) that the conditions of his
confinement resulted in deprivation that was *sufficiently
serious;* and (2) that the defendants acted with *deliberate
indifference* to his health or safety. *Farmer v. Brennan,*
511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811
(1994); *Davidson v. Murray,* 371 F.Supp.2d 361, 370
(W.D.N.Y.2005). Deliberate indifference exists if an
official "knows of and disregards an excessive risk to

Not Reported in F.Supp.2d, 2009 WL 632890 (N.D.N.Y.)
(Cite as: 2009 WL 632890 (N.D.N.Y.))

**inmate** health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer, 511 U.S. at 837.* In considering the types of conditions that constitute a substantial risk of harm, the court considers not only the seriousness of the potential harm and the likelihood that the harm will actually occur, but also any indications that unwilling exposure to that risk violates contemporary standards of decency, in that society does not choose to tolerate this risk in its prisons. *Helling v. McKinney,* 509 U.S. 25, 36, 113 S.Ct. 2475, 2482, 125 L.Ed.2d 22 (1993).

Not every governmental action related to the interest and well-being of a prison **inmate**, however, demands Eighth Amendment scrutiny. *Sanders v. Coughlin,* No. 87 Civ. 4535, 1987 WL 26872, at *2 (S.D.N.Y. Nov 23, 1987) (citing, *inter alia, Whitley,* 475 U.S. at 319). "After incarceration, only the unnecessary and wanton infliction of pain ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Id.* (quoting, *inter alia, Whitley;* internal quotes omitted). Conduct not intended to be punishment must consist of "more than ordinary lack of due care for the **prisoner's** interests or safety" to be considered cruel and unusual punishment. *Id.* Mere negligence in the treatment of a **prisoner**, without more, is not actionable under the Eighth Amendment. See *Farmer, 511 U.S. at 837-38.*

The complaint's allegations regarding Plaintiff's SHU confinement do not state an Eighth Amendment claim. Although the service of a disciplinary sentence under ordinary conditions prevailing in the SHU "may implicate other constitutional rights, [it] does not rise to a level of constitutional significance under the Eighth Amendment and ... fails to support a claim of cruel and unusual punishment under that provision." *Monroe v. Janes,* No. 9:06-CV-0859 FJS/DEP, 2008 WL 508905 at *7 (N.D.N.Y. Feb.21, 2008) (dismissing Eighth Amendment claim where **prisoner** alleged merely that he had served 76 days in the SHU) (*citing Warren v. Irvin,* 985 F.Supp. 350, 357 (W.D.N.Y.1997)). Here, Plaintiff does not allege that his confinement in the SHU was served in anything other than ordinary conditions. Thus, he has not alleged any cruel and unusual punishment that would provide the foundation for an Eighth Amendment claim.

**\*12** The complaint's allegations regarding the denial of the wake visit fail to state an Eighth Amendment claim. Although Plaintiff cursorily states that the denial was "unfair" and "reprisal-based," he states no facts supporting those allegations. The Court of Claims opinion attached to the complaint refers to the denial as a "ministerial error." (Dkt. No. 15, Ex. D.) A "ministerial error" is not sufficiently cruel and unusual to be actionable under the Eighth Amendment. Therefore, the complaint does not allege facts plausibly suggesting that Defendants violated Plaintiff's Eighth Amendment rights and I recommend that the cause of action be dismissed with leave to amend.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 28) be **GRANTED** with leave to amend.

**ANY OBJECTIONS to this Report-Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report-Recommendation (unless the third calendar day is a legal holiday, in which case add a fourth calendar day).** See 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance.** [FN31]

> FN31. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 632890 (N.D.N.Y.)
(Cite as: 2009 WL 632890 (N.D.N.Y.))

additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at *18 n. 8 (S.D.N.Y. Sept.30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; *see also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection [ ].") [citations omitted]; *Greenhow v. Sec'y of Health & Human Servs.,* 863 F.2d 633, 638-39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

**BE ALSO ADVISED that the failure to file timely objections to this Report-Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

N.D.N.Y.,2009.
Smith v. Fischer
Not Reported in F.Supp.2d, 2009 WL 632890 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.